DAIRYLAND GREYHOUND PARK, INC.,
Plaintiff-Appellant,

v.

James E. DOYLE, in his official capacity as
Governor of the State of Wisconsin, and Stephen
E. Bablitch, in his official capacity as Secretary
of the Wisconsin Department of Administration,
Defendants-Respondents.

Supreme Court

*No. 2003AP421. Oral argument September 7, 2005.
—Decided July 14, 2006.*

2006 WI 107

(Also reported in 719 N.W.2d 408.)

9

11

14

For the plaintiff-appellant there were briefs by *Stephen L. Morgan* and *Murphy Desmond, S.C.,* Madison, and oral argument by *Stephen L. Morgan.*

For the defendants-respondents the cause was argued by *Thomas C. Bellavia, Maura FJ Whelan, John S. Greene, Charles D. Hoornstra,* assistant attorneys general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

An amicus curiae brief was filed by *Douglas B.L. Endreson, William R. Perry* and *Sonosky, Chambers, Sachse, Endreson & Perry, LLP,* Washington, D.C., and *Howard Bichler* and *St. Croix Law Office,* Webster, on behalf of St. Croix Chippewa Indians of Wisconsin; *Kevin L. Osterbauer* and *Legal Department-Chief Blackbird Center,* Odanah, on behalf of Bad River Band of the Lake Superior Tribe of Chippewa Indians; *Kris M. Goodwill* and *Lac Courte Oreilles Legal Department,* Hayward, on behalf of Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin; *Jeffrey A.*

*Crawford,* Milwaukee, and *Eric N. Dahlstrom* and *Roth-stein, Donatelli, Hughes, Dahlstrom, Schoenburg & Frye, LLP,* Tempe, AZ, on behalf of Forest County Potawatomi Community; *Andrew S. Caulum* and *Caulum Law Office, S.C.,* Madison, on behalf of Sokaogon Chippewa Community (Mole Lake Band of the Lake Superior Chippewa Indians), and there was oral argument by *Douglas B.L. Endreson.*

An amicus curiae brief was filed by *Tori L. Kluess, Jodi L. Arndt,* and *Liebmann, Conway, Olejniczak & Jerry, S.C.,* Green Bay, on behalf of the Green Bay Area Chamber of Commerce.

An amicus curiae brief was filed by *Michael Murphy* and *Ho-Chunk Nation Department of Justice,* Black River Falls, and *Lester J. Marston* and *Rapport and Marston,* Ukiah, CA, on behalf of the Ho-Chunk Nation.

An amicus curiae brief was filed by *Grant Langley, Patrick McDonnell,* and *William J. Domina,* Milwaukee, on behalf of the City of Milwaukee and the County of Milwaukee.

An amicus curiae brief was filed by *Raymond P. Taffora, Roisin H. Bell,* and *Michael Best & Friedrich LLP,* Madison, on behalf of the Metropolitan Milwaukee Association of Commerce and Associated General Contractors-Greater Milwaukee.

An amicus curiae brief was filed by *E. Michael McCann,* District Attorney, Milwaukee.

¶ 1. LOUIS B. BUTLER, JR., J. Dairyland Greyhound Park, Inc. ("Dairyland") appeals from a decision by the Honorable Richard J. Callaway, Dane County Circuit Court, granting summary judgment in favor of the defendants, Governor James E. Doyle and then-Secretary of Administration Marc J. Marotta, both in

their official capacities[1] (collectively referred to as "the Governor"), concluding that the 1993 amendment to Article IV, Section 24 of the Wisconsin Constitution ("1993 Amendment") did not affect the 1991–92 Tribal gaming compacts ("Original Compacts") or any extensions to the Original Compacts. The court of appeals certified the appeal to this court to determine the Governor's authority to extend the 11 Original Compacts.[2]

¶ 2. We conclude that the 1993 Amendment to Article IV, Section 24 of the Wisconsin Constitution does not invalidate the Original Compacts.[3] Because the Original Compacts contemplated extending the Compacts and amending the scope of Indian gaming within the Compacts, we further conclude that the parties' right of renewal is constitutionally protected by the Contract Clauses of the Wisconsin and United States Constitutions, and that amendments to the Original Compacts that expand the scope of gaming are likewise constitutionally protected by the Contract Clauses of the Wisconsin and United States Constitutions. We withdraw any language to the contrary in *Panzer v. Doyle,*

---

[1] Marc J. Marotta was the Secretary of the Department of Administration at the time this action was filed. Subsequently, Stephen E. Bablitch was appointed as the Secretary of DOA in September 2005 and the caption of this case has been amended to reflect the change.

[2] *Dairyland Greyhound Park, Inc. v. Doyle,* certification by Wisconsin Court of Appeals (June 2, 2003).

[3] Justice Prosser, in his concurrence/dissent, asserts that we conclude that the 1993 Amendment "had no impact on Indian gaming." Justice Prosser's concurrence/dissent, ¶ 277. This is a misstatement of the holding of this case. We conclude that the 1993 Amendment did not invalidate the Original Compacts. Whether the 1993 Amendment has any impact on Indian gaming outside the Original Compacts, is not before this court.

2004 WI 52, 271 N.W.2d 295, 680 N.W.2d 666, that would limit the State's ability to negotiate for Class III games under the Original Compacts.[4] Accordingly, gaming can be expanded to the extent that the State and Tribes negotiate for additional Class III games.

¶ 3. The essence of what is at issue here is whether Wisconsin should break treaties with Tribes by walking away from its contractual obligations.[5] Rules of contract interpretation and the Contract Clauses of the United States and Wisconsin Constitutions compel us to conclude that the State must honor its contractual obligations in their entirety. We therefore affirm the order of the circuit court.

¶ 4. This case stems from allegations by Dairyland that the 1993 Amendment deprives the Governor of the authority to permit Wisconsin Tribes to continue conducting casino-type gaming in Wisconsin. Dairyland asserts that Article IV, Section 24 of the Wisconsin Constitution renders all types of Class III gaming illegal, except for certain games that are specifically exempted under the Wisconsin Constitution.[6] Therefore, according to Dairyland, Class III games that are not specifically

---

[4] *See, e.g., Panzer v. Doyle,* 2004 WI 52, ¶¶ 93, 96, 271 Wis. 2d 295, 680 N.W.2d 666. We do not address the *Panzer* court's decision regarding the duration provisions. *Id.,* ¶¶ 78–82.

[5] *Oliphant v. Schlie,* 544 F.2d 1007, 1013 (9th Cir. 1976) (reversed on other grounds by *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191 (1978) (superseded by 25 USC § 1301 (1979).)) ("Reluctance on the part of the States to accord to the Indians rights guaranteed to them by treaties still exists.") (citing *United States v. Washington,* 520 F.2d 676 (9th Cir., 1975)). *See also, Harrison v. Boyd Mississippi, Inc.,* 700 So.2d 247, 253 (Miss. 1997); *Dille v. Council of Energy Resource Tribes,* 610 F. Supp. 157, 159 (D.C. Colo. 1985).

[6] Under the Wisconsin Constitution: "Except as provided in this section the legislature may not authorize gambling in any

18

exempted under the constitution are not lawful subjects of the State-Tribal Compacts. Dairyland asks this court to reverse the circuit court's decision, to enjoin the Governor from renewing the Original Compacts, and to instruct the Governor to exercise the State's right of nonrenewal according to the terms of the Original Compacts.[7]

¶ 5. The Governor asserts that the 1993 Amendment was not intended to impact the Original Compacts. Relying on the Contract Clauses of the Wisconsin[8] and United States Constitutions,[9] and federal

form." Wis. Cons. art. IV, § 24, cl. 1. Various subsections of Article IV allow the legislature to authorize specific gambling activities. *Id.,* cl. 3 (2003–04) (authorizing "bingo games operated by religious, charitable, service, fraternal or veterans' organizations or those to which contributions are deductible for federal or state income tax purposes"); *id.,* cl. 4 (authorizing "raffle games operated by local religious, charitable, service, fraternal or veterans' organizations or those to which contributions are deductible for federal or state income tax purposes"); *id.,* cl. 5 (authorizing pari-mutuel on-track betting); *id.,* cl. 6 (authorizing the state-operated lottery).

All references to the Wisconsin Constitution and Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[7] Justice Roggensack asserts that the only issue before this court is the effect of the 1993 Amendment as it relates to the games that were included in the Original Compacts and the 1998–99 extensions. Justice Roggensack's concurrence/dissent, ¶ 285. This is an inaccurate statement of the case. This court has been asked to review the impact of the 1993 Amendment on all extensions of and amendments to the Original Compacts.

[8] "No bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed . . . ." Wis. Const. art. I, § 12.

[9] "No state shall enter into any treaty, alliance, or confederation; . . . pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts . . . ." U.S. Const. art. I, § 10.

19

preemption under the Supremacy Clause of the United States Constitution,[10] the Governor asserts that the 1993 Amendment does not diminish the State's authority to renew its gaming Compacts with the Tribes.[11]

¶ 6. In *Panzer,* 271 Wis. 2d 295, ¶ 102, this court concluded that the Original Compacts were lawfully entered into and that the question of the Compacts' durability after the 1993 Amendment was a question that may require an analysis under the impairment of Contract Clauses under the United States and Wisconsin Constitutions, as well as under the Indian Gaming Regulatory Act ("IGRA"). The *Panzer* majority, however, declined to resolve these questions. *Id.,* ¶ 102. We now address the impairment of contracts issues raised by the Original Compacts and the 1993 change to the Wisconsin Constitution.[12]

---

[10] The Supremacy Clause of the United States Constitution states, in relevant part,

> This constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding.

U.S. Const. art. VI.

[11] The Governor asserts that the State has contractual rights and obligations under the Original Compacts. We do not construe the Governor, as Justice Roggensack asserts, to be arguing on behalf of the Tribal Nations against the Wisconsin Constitution. *See* Justice Roggensack's concurrence/dissent, ¶ 287.

[12] Because our decision resolves the dispute between the parties, we do not reach the issues presented regarding the

I

¶ 7. The facts are undisputed for purposes of this appeal. Following the 1991 decision in *Lac du Flambeau Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 770 F. Supp. 480 (W.D. Wis. 1991), *appeal dismissed*, 957 F.2d 515 (7th Cir. 1992),[13] and pursuant to the Indian Gaming Regulatory Act, 25 USC § 2710(d)(3)(c) (1988),[14] and Wis. Stat.

Indian Gaming Regulatory Act, 25 USC § 2710(d)(3)(c) (1988), ("IGRA") or any federal preemption issues the 1993 Amendment may raise under the Supremacy Clause of the United States Constitution.

[13] In 1991, United States District Court Judge Barbara Crabb concluded that "the state is required to negotiate with plaintiffs over the inclusion in a tribal-state compact of any activity that includes the elements of prize, chance and consideration and that is not prohibited expressly by the Wisconsin Constitution or state law." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 770 F. Supp. 480, 488 (W.D. Wis. 1991), *appeal dismissed*, 957 F.2d 515 (7th Cir. 1992).

[14] In 1988, Congress passed IGRA. IGRA divided gaming into three classes: Class I was left unregulated; the National Indian Gaming Commission (NIGC) was established to regulate Class II gaming, and Indian Tribes and states were authorized to compact for the regulation of Class III gaming. 25 USC § 2710. Class III gaming is defined as all forms of gaming that are not Class I or Class II gaming, which include lotteries, pari-mutuel on-track betting, and casino-type games. § 2703(8) (2001). Class I gaming includes games of "minimal value" as well as traditional forms of Indian gaming, § 2703(6), while Class II gaming includes bingo and certain state-authorized or unregulated card games. § 2703(7).

In enacting IGRA, Congress offered states a limited role in regulating casino-style gaming. Congress passed IGRA following the United States Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), where the

21

§ 14.035,[15] Wisconsin's then-Governor Tommy Thompson negotiated gaming compacts with the 11 Tribes located in the State. *Panzer*, 271 Wis. 2d 295, ¶ 25. By June 1992, the State had entered into compacts with each of the 11 Tribes. *Id.* The Original Compacts initially lasted for seven-year terms, with automatic extensions for five-year terms, subject to the right of either party to issue a notice of nonrenewal prior to the expiration of the term.[16] *Id., ¶¶ 25–26, 32.* These Original Compacts

United States Supreme Court adopted the prohibitory/regulatory distinction for gaming regulations on Tribal lands:

> [I]f the intent of a state law is generally to prohibit certain conduct, it falls within Pub.L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation.

*Id.* at 209; *Panzer*, 271 Wis. 2d 295, ¶ 15, ("IGRA follows the spirit of *Cabazon* by making the permissibility of Class III games a function of state law.").

Congress passed IGRA in an effort to encourage the formation of state and Tribal gaming compacts. IGRA's purpose is to serve the Tribal interest "of promoting tribal economic development, self-sufficiency, and strong tribal governments" and the states' interests in regulating gaming within their borders. 25 USC § 2702(1).

[15] Wisconsin Stat. § 14.035 states: "The governor may, on behalf of this state, enter into any compact that has been negotiated under 25 USC 2710(d) [IGRA]." This court has subsequently ruled that this legislation is not unconstitutional beyond a reasonable doubt. *Panzer*, 271 Wis. 2d 295, ¶ 72.

[16] The State entered into compacts with the following 11 Indian tribes: Bad River Band of Lake Superior Chippewa; Forest County Potawatomi Community of Wisconsin; Ho-Chunk Nation (previously the Wisconsin Winnebago Tribe); Lac Courte Oreilles Band of Lake Superior Chippewa; Lac du Flambeau Band of Lake Superior Chippewa; Menominee Tribe

permitted the Tribes to engage in certain Class III[17] casino gaming on Tribal land, including blackjack tables, electronic gaming machines, and pull-tab machines.

¶ 8. In April 1993, Wisconsin voters ratified an amendment to the Wisconsin Constitution to limit gaming in Wisconsin. *Id.,* ¶ 28. The 1993 Amendment changed Article IV, Section 24 to (1) prohibit the legislature from authorizing gambling in any form except for specific games provided for in the amendment;[18] and (2) narrowly define the nature of the state-operated lottery. 1991 EJR 27. *See also Panzer,* 271 Wis. 2d 295, ¶¶ 29–31.

¶ 9. The initial 1991–92 compacts were subsequently renewed in 1998 and 1999, each for a term of five years. *Id.,* ¶ 32. The compacts were again renewed in 2003. *Id.,* ¶ 33. Since 1992, Class III gaming has continued to be conducted on Tribal land.

¶ 10. Dairyland alleges that it began to lose revenue due to the Class III games allowed on Tribal land. Dairyland first filed this action against then-Governor

of Indians of Wisconsin; Oneida Tribe of Indians of Wisconsin; Red Cliff Band of Lake Superior Chippewa; Sokaogon Chippewa Community (Mole Lake Chippewas); St. Croix Chippewa Indians of Wisconsin; Stockbridge-Munsee Band - Mohican Nation. Copies of the Original Compacts are available at http://www.doa. state.wi.us/pagesubtext_detail.asp?linksubcatid=922&linkcatid= 81&linkid=.

[17] *Supra,* note 14 for a discussion regarding Class III gaming under IGRA.

[18] Clauses 3 through 6 list exceptions to the broad prohibition, including: 1) bingo games operated by charitable and religious organizations; 2) raffle games operated by charitable and religious organizations; 3) pari-mutuel on-track betting; and 4) the state-operated lottery. Wis. Const. art. IV, § 24.

Scott McCallum on October 23, 2001, claiming that the Governor was not authorized to extend the gaming compacts with the Tribes in light of the 1993 Amendment. Dairyland sought an injunction preventing the Governor from entering into any future compacts and directing the Governor to serve a timely notice of nonrenewal to the Tribes for the existing compacts.

¶ 11. The Dane County Circuit Court, Honorable John C. Albert, originally granted the Governor's motion to dismiss, ruling that the Tribes were indispensable parties and had not been included in the litigation. *Dairyland Greyhound Park, Inc. v. McCallum,* 2002 WI App 259, ¶ 1, 258 Wis. 2d 210, 655 N.W.2d 474. The court of appeals concluded that the circuit court erred in finding the Tribes to be indispensable parties in whose absence the action should not proceed. *Id.* The court of appeals reversed the order dismissing the action and remanded the case to the circuit court for further proceedings on Dairyland's complaint. *Id.*

¶ 12. On remand, both Dairyland and the Governor moved for summary judgment. The circuit court granted the Governor's motion for summary judgment, relying heavily upon the civil-regulatory and criminal-prohibitory distinction from *Lac du Flambeau Band,* 770 F. Supp. at 487–88, and determined that because Section 24 does not prohibit Class III Indian gaming, the compacts are lawful. *Dairyland Greyhound Park, Inc. v. Doyle,* No. 2001CV2906, Order at 12 (Dane Co. Cir. Ct. Feb. 11, 2003).

¶ 13. Dairyland appealed, and the court of appeals asked this court to accept certification on June 2, 2003. On September 12, 2003, this court accepted certification.

¶ 14. On March 30, 2004, this court remanded the case to the court of appeals because the court was

equally divided on whether to affirm the judgment of the circuit court. *Dairyland Greyhound Park, Inc. v. Doyle,* 2004 WI 34, ¶¶ 2–4, 270 Wis. 2d 267, 677 N.W.2d 275. On November 4, 2004, in light of this court's decision in *Panzer,* the court of appeals again certified the appeal to this court, and on January 11, 2005, we again accepted certification. We now affirm.

## II

¶ 15. This court reviews a grant of summary judgment de novo, benefiting from the circuit court's decision, but applying the same methodology as the circuit court. *Linden v. Cascade Stone Co., Inc.,* 2005 WI 113, ¶ 5, 283 Wis. 2d 606, 699 N.W.2d 189.

¶ 16. The interpretation of a constitutional provision, the interpretation of a contract, and whether a contract has been impaired are questions of law that we also review de novo. *Wagner v. Milwaukee County Election Comm'n,* 2003 WI 103, ¶ 18, 263 Wis. 2d 709, 666 N.W.2d 816 (constitutional interpretation); *Dieter v. Chrysler Corp.,* 2000 WI 45, ¶ 15, 234 Wis. 2d 670, 610 N.W.2d 832 ("We review the interpretation of a warranty or *any other contract* de novo.") (emphasis added); *Everson v. Lorenz,* 2005 WI 51, ¶ 10, 280 Wis. 2d 1, 695 N.W.2d 298 (contract interpretation); *Pfister v. Milwaukee Economic Develop. Corp.,* 216 Wis. 2d 243, 261, 576 N.W.2d 554 (1998) (contract impairment).

## III

¶ 17. In 1989, the Wisconsin Legislature granted the Governor the authority to enter into compacts with

the Tribes located in Wisconsin, pursuant to IGRA.[19] By 1992, Wisconsin's Governor entered into the Original Compacts on behalf of the State,[20] thereby creating a contractual relationship between the State and all 11 federally-recognized Tribes and bands located within the State borders. *Panzer,* 271 Wis. 2d 295, ¶ 25. These compacts were validly executed prior to the change in Wisconsin law under the 1993 Amendment. The parties do not dispute that the Original Compacts were valid when they were entered into in 1991 and 1992. The parties dispute, however, whether the 1993 Amendment changes the terms agreed to in the Original Compacts. The Governor contends that the 1993 Amendment does not impact the terms of the Original Compacts. In contrast, Dairyland asserts that the 1993 Amendment precludes the State from renewing or amending the compacts.

¶ 18. Whether the 1993 Amendment retrospectively invalidates the Original Compacts or any provisions contained therein, raises questions of constitutional interpretation and contract impairment. We therefore begin with an analysis of the 1993 Amendment. We then evaluate whether the 1993 Amendment affects the renewal provision.[21] Finally, we evaluate

---

[19] 1989 Wis. Act 196 (creating Wis. Stat. § 14.035); *Panzer,* 271 Wis. 2d 295, ¶ 60.

[20] The Wisconsin Governor completed the compact negotiations pursuant to the decision in *Lac du Flambeau,* 770 F. Supp. at 488. *See supra,* note 13.

[21] Ten of the Original Compacts state, in relevant part:

> The duration of this Compact shall thereafter be *automatically extended* for terms of five years, unless either party serves written notice of nonrenewal on the other party not less than one hundred eighty days prior to the expiration of the original term of this Compact or any extension thereof.

whether the 1993 Amendment impacts the contractual provisions that address the scope of gaming allowed on Tribal land.[22]

Bad River Band of Lake Superior Tribe of Chippewa Indians & State of Wisconsin Gaming Compact of 1991 § XXV(B); Forest County Potawatomi Community of Wisconsin & State of Wisconsin Gaming Compact of 1992 § XXV(B); Wisconsin Winnebago Tribe [Ho-Chunk Nation] & State of Wisconsin Compact of 1992 § XXVI(B); Lac Courte Oreilles Band of Lake Superior Chippewa Indians & State of Wisconsin Gaming Compact of 1991 § XXV(B); Lac du Flambeau Band of Lake Superior Chippewa Indians & State of Wisconsin Gaming· Compact of 1991 § XXV(B); Oneida Tribe of Indians of Wisconsin & State of Wisconsin Gaming Compact of 1991 § XXV(B); Red Cliff Bank of Lake Superior Chippewas & State of Wisconsin Gaming Compact of 1991 § XXV(B); Sokaogon Chippewa Community & State of Wisconsin Gaming Compact of 1991 § XXV(B); St. Croix Chippewa Indians of Wisconsin & State of Wisconsin Gaming Compact of 1991 § XXV(B); Strockbridge-Munsee Community & State of Wisconsin Gaming Compact of 1991 § XXV(B) (emphasis added). *See also* Menominee Indian Tribe of Wisconsin & State of Wisconsin Gaming Compact of 1992 § XXVI(1)(B) ("The duration of this Compact with respect to on-reservation gaming shall thereafter be *automatically extended* for terms of five years, unless either party serves written notice of non-renewal on the other party not less than one hundred eighty days prior to the expiration of the term specified in subsec. A. or any extension thereof.") (emphasis added).

[22] Each of the 11 Original Compacts also states, in relevant part, "The Tribe may not operate any Class III gaming not expressly enumerated in this section of this Compact *unless this Compact is amended*[.]" Bad River Compact § IV(B); Forest County Potawatomi Community of Wisconsin Compact § IV(B); Winnebago [Ho-Chunk] Compact § IV(C); Lac Courte Oreilles Compact § IV(B); Lac du Flambeau Compact § IV(B); Menominee Compact § IV(B); Oneida Compact § IV(B); Red Cliff Compact § IV(B); Sokaogon Chippewa Compact § IV(B); St. Croix Chippewa Compact § IV(B); Stockbridge-Munsee Compact § IV(B) (emphasis added).

27

A

¶ 19. The purpose of construing a constitutional amendment is to give effect to the intent of the framers and of the people who adopted it. *State v. Cole,* 2003 WI 112, ¶ 10, 264 Wis. 2d 520, 665 N.W.2d 328 (citations omitted). Constitutions should be construed so as to promote the objects for which they were framed and adopted. *Id.* "The constitution means what its framers and the people approving of it have intended it to mean, and that intent is to be determined in the light of the circumstances in which they were placed at the time[.]" *State ex rel. Bare v. Schinz,* 194 Wis. 397, 404, 216 N.W. 509 (1927) (citation omitted). We therefore examine three primary sources in determining the meaning of a constitutional provision: the plain meaning, the constitutional debates and practices of the time, and the earliest interpretations of the provision by the legislature, as manifested through the first legislative action following adoption. *Schilling v. Wisconsin Crime Victims Rights Bd.,* 2005 WI 17, ¶ 16, 278 Wis. 2d 216, 692 N.W.2d 623 (citing *Wisconsin Citizens Concerned for Cranes & Doves v. DNR,* 2004 WI 40, ¶ 44, 270 Wis. 2d 318, 677 N.W.2d 612; *Cole,* 264 Wis. 2d 520, ¶ 10). *See also Thompson v. Craney,* 199 Wis. 2d 674, 680, 546 N.W.2d 123 (1996) (citations omitted).

1

¶ 20. The 1993 Amendment reads, in relevant part, "Except as provided in this section, the legislature may not authorize gambling in any form." Wis. Const. art. IV, § 24(1). Clauses 3 through 6 list four exceptions to the broad prohibition: 1) bingo games operated by charitable and religious organizations; 2) raffle games

operated by charitable and religious organizations; 3) pari-mutuel on-track betting; and 4) the state-operated lottery. *Id.* Furthermore, as amended, Clause 6 specifically defines the state-operated lottery to exclude casino-style games, explicitly prohibiting blackjack, poker, roulette, craps, keno, slot machines, and video gaming.[23]

¶ 21. The Amendment clearly states: "the legislature may not authorize gambling in *any* form." Wis. Const. art IV, § 24(1) (emphasis added). These words can be construed to mean, simply, that *all* Class III games in Wisconsin, excluding the specific games enumerated in the Amendment, were made unconstitutional by the 1993 Amendment. Because the Amendment did not explicitly exclude Tribal gaming, the Class III games on Tribal land are, arguably, unconstitutional.

---

[23] The *Panzer* court recognized that "[t]he Tribe's existing games such as slot machines and blackjack must be sustained on the basis of the validity of the original compacts. . . ." *Panzer,* 271 Wis. 2d 295, ¶ 93. The *Panzer* court noted that the Original Compacts were negotiated pursuant to the federal district court's order in *Lac du Flambeau,* and that "[a]ny attempt at this point to impair these compacts would create serious constitutional questions." *Id.,* ¶ 99. Neither of the concurring/dissenting opinions in this case discusses the constitutional prohibition with respect to blackjack, slot machines or video gaming, and how they survive the 1993 Amendment. *See* Justice Prosser's concurrence/dissent, ¶¶ 223, 239, 240–45; Justice Roggensack's concurrence/dissent, ¶ 288. If their premise was indeed correct ("the district court was incorrect in almost every respect"), the logical extension of the concurring/dissenting opinions is that blackjack, slot machines and video gaming, in addition to other forms of Class III gaming, would not survive the 1993 Amendment. *Compare* Justice Prosser's concurrence/dissent, ¶ 205.

¶ 22. On the other hand, constitutional amendments that deal with the substantive law of the State are presumed to be prospective in effect unless there is an express indication to the contrary. *Kayden Industries, Inc. v. Murphy,* 34 Wis. 2d 718, 731, 150 N.W.2d 447 (1967). Because the 1993 Amendment is silent with regard to the issue of the pre-existing Tribal gaming compacts, the Amendment is not retrospective in operation.

¶ 23. We conclude that the 1993 Amendment's failure to explicitly address the Original Compacts creates an ambiguity as to whether the compacts fall within the Amendment's reach.[24]

2

¶ 24. As the purpose of construction of an amendment is to give effect to the intent of the framers and the people who adopted it, a paramount rule of constitutional construction is that the intent of the provision "is to be ascertained, not alone by considering the words of any part of the instrument, but by ascertaining the general purpose of the whole[.]" *Id.* at 730. "[W]hen the intent of the whole is ascertained, no part is to be construed so that the general purpose [is] thwarted, but the whole is to be made to conform to reason and good discretion." *Id.* (citation omitted). We therefore next examine the history surrounding the passage of the 1993

---

[24] We therefore disagree with the *Panzer* holding that "[t]he text of the constitution[al amendment] is absolutely clear." *Panzer,* 271 Wis. 2d 295, ¶ 86. Any language in *Panzer* to the contrary is hereby withdrawn.

30

Amendment. In our historical analysis of the 1993 Amendment, we examine the legislative debates and the ratification campaign. *See Schilling,* 278 Wis. 2d 216, ¶ 16.

a

¶ 25. In order to amend the Wisconsin Constitution, two successive legislatures must pass a proposed constitutional amendment before putting the measure to the voters for ratification. Wis. Const. art. XII, § 1.

¶ 26. Prior to the legislature's first consideration of the 1993 Amendment, the Governor convened a special session of the legislature. During this special session, the legislature created Wis. Stat. § 565.01(6m). 1991 Wis. Act 321. Like the 1993 Amendment, § 565.01(6m)[25] defines the "state

---

[25] Wisconsin Stat. § 565.01(6m) reads:

"The state lottery" means an enterprise, including a multijurisdictional lottery in which the state participates, in which the player, by purchasing a ticket, is entitled to participate in a game of chance in which any of the following applies:

1. The winning tickets are randomly predetermined and the player reveals preprinted numbers or symbols from which it can be immediately determined whether the ticket is a winning ticket entitling the player to win a prize as prescribed in the features and procedures for the game, including an opportunity to win a prize in a secondary or subsequent chance drawing or game.

2. The ticket is evidence of the numbers or symbols selected by the player or, at the player's option, randomly selected by a computer, and the player becomes entitled to a prize as prescribed in the features and procedures for the game, including an opportunity to win a prize in a secondary or subsequent chance drawing or game, if some or all of the player's symbols or numbers are selected in a chance drawing or game, if the player's ticket is randomly selected by the computer at the time of purchase or if the ticket is selected in a chance drawing.

(b) "The state lottery" does not include any of the following games or games simulating any of the following games: 1. Any game in which winners are selected based on the results of a race or

31

lottery."[26] Nevertheless, § 565.01 explicitly preserved the Original Compacts. Under the statute, the Tribal gaming compacts entered into prior to January 1, 1993, are not governed by the remaining portions of the statute: "(c) This subsection shall not affect the provisions of any Indian gaming compact entered into before January 1, 1993, under s. 14.035." Wis. Stat. § 565.01(6m)(c).

> sporting event. 2. Any banking card game, including blackjack, baccarat or chemin de fer. 3. Poker. 4. Roulette. 5. Craps or any other game that involves utilizing dice. 6. Keno. 7. Bingo 21, bingo jack, bingolet or bingo craps. 8. Any game of chance that is played on a slot machine or any mechanical, electromechanical or electronic device that is generally available to be played at a gambling casino. 9. Any game or device that is commonly known as a video game of chance or a video gaming machine or that is commonly known as or considered to be a video gambling machine, except a video device authorized by the department to permit the sale of tickets by retailers in a game authorized under par. (a) if all of the following apply:
>
> > a. The device does not determine whether the player has won a prize.
> >
> > b. The device does not indicate whether the player has won a prize other than by verifying that the player's ticket or some or all of the player's symbols or numbers on the player's ticket have been selected in a chance drawing, or by verifying that the player's ticket has been randomly selected by a central system computer at the time of purchase.
>
> 10. Any game that is similar to a game listed in this paragraph. 11. Any other game that is commonly considered to be a form of gambling and is not, or is not substantially similar to, a game that the department has the authority to conduct under this chapter.
>
> > (c) This subsection shall not affect the provisions of any Indian gaming compact entered into before January 1, 1993, under s. 14.035.

Wis. Stat. § 565.01(6m).

[26] As noted previously, both Wis. Stat. § 565.01 and Senator Adelman's original draft of 1991 SJR 93, the precursor for the 1993 Amendment, were drafted in 1992.

¶ 27. In contrast to the statute, the 1993 Amendment defined "state lottery" without any explicit statement regarding the amendment's impact, or lack thereof, on the pre-existing Tribal gaming compacts. Upon review of the record, we found no notations explaining why any reference to the Tribal gaming compacts was excluded from the 1993 Amendment proposals.

¶ 28. However, the constitutional amendment did not need to contain a similar provision in order to accomplish the same result as Wis. Stat. § 565.01(6m)(c). This subsection of the statute was intended to exempt the Original Compacts. *Panzer*, 271 Wis. 2d 295, ¶ 86 n.34 (citing Letter from James E. Doyle, Attorney General, to Walter Kunicki, Speaker of the Wisconsin Assembly, and John Medinger, Chairperson of the Assembly Committee on State Affairs (April 29, 1992) (on file with the Wisconsin Historical Society Archives, John D. Medinger Papers, Box 6, Folder 1)). Because constitutional amendments are presumed to be prospective, *Kayden,* 34 Wis. 2d at 732, it would have been superfluous for the legislature to exempt the Original Compacts in order for the 1993 Amendment to achieve the same goal.[27]

---

[27] We recognize that the legislature rejected an amendment to the *ballot question* that would have explicitly exempted the Original Compacts. This could be interpreted to mean that the legislature intended to invalidate the Original Compacts. However, the rejection of this amendment is only one act by the legislature, and does not outweigh the vast majority of other legislative records and news reports, discussed in ¶¶ 25–44 of this opinion, that clearly indicate that the 1993 Amendment would not affect the Original Compacts. *See* Justice Prosser's concurrence/dissent, ¶ 219.

¶ 29. Because the 1993 Amendment and Wis. Stat. § 565.01 were passed contemporaneously, we must not interpret the two enactments "to indicate a contradictory legislative intent." *See State ex rel. Teunas v. County of Kenosha,* 142 Wis. 2d 498, 509, 418 N.W.2d 833 (1988) (citation omitted).[28] We therefore conclude that the legislature did not intend the 1993 Amendment to invalidate the Original Compacts. This is consistent with our decision in *Panzer,* where this court held that the fact that § 565.01(6m)(c) explicitly exempted Tribal compacts from the definition of "lottery" prior to the passage of the 1993 Amendment signaled legislative approval of the Original Compacts. *Panzer,* 271 Wis. 2d 295, ¶ 101.

¶ 30. On June 30, 1992, the legislature considered and passed 1992 Assembly Joint Resolution 1. This was the first consideration of the resolution that eventually amended Article IV, Section 24. Approximately seven months later, 1993 Senate Joint Resolution 2, the second consideration of the constitutional amendment, was introduced. On January 26, 1993, SJR 2 passed the Senate, and the Assembly on February 17, 1993. The two joint resolutions (1992 SJR 1 and 1993 SJR 2) were combined into 1991 Enrolled Joint Resolution 27. The voters of

---

[28] We also note that to find otherwise would invalidate Wis. Stat. § 565.01(6m)(c) as unconstitutional because the statute would directly conflict with the 1993 Amendment, and therefore be inconsistent with this court's long-standing policy of finding statutes constitutional whenever possible. *Chappy v. LIRC,* 136 Wis. 2d 172, 185, 401 N.W.2d 568 (1987) ("[E]very presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality.") (citation omitted).

Wisconsin ratified the enrolled resolution on April 6, 1993.

¶ 31. A review of the drafting files for the constitutional amendment indicates that the legislators intended to preserve the Original Compacts as they existed at the time. These files demonstrate that the joint resolutions were based on an earlier proposal to amend the constitution with regard to gaming and a statute that was passed during the same legislative session.

¶ 32. In 1991, then-Governor Thompson called a special session to address amending the Wisconsin Constitution with regard to gaming. Governor Thompson submitted a drafting request for the special session proposal, 1991 AJR 1, requesting that the resolution be drafted to mirror an earlier legislative proposal[29] intended to "freeze" the state of gaming and to take into account differences between that proposal,[30] and Wis. Stat. § 565.01, which made most forms of gambling illegal, but explicitly excluded the Tribal casinos.[31]

---

[29] Then-Senator Lynn Adelman introduced 1991 Senate Joint Resolution 93, which was the original legislative attempt to amend Article IV, Section 24 to make unconstitutional most forms of gambling. Senator Adelman's proposal intended to "freeze" the state of gaming in Wisconsin as it existed in 1991. Jane R. Henkel, Senior Staff Attorney, Wisconsin Legislative Council, Memorandum to Senator Lynn Adelman (February 6, 1992).

[30] This proposed amendment passed the Senate but failed in the Assembly due to inaction. Joint Rule 83(c)(3), as amended by 1991 Senate Joint Resolution 1.

[31] Under Wis. Stat. § 565.01(6m)(c), the prohibition on most forms of gambling "shall not affect the provisions of any Indian gaming compact entered into before January 1, 1993, under s. 14.035." Wis. Stat. § 565.01(6m).

Drafting Request by Governor Thompson, June, 1992. According to the Legislative Reference Bureau's analysis of the bill, the constitutional amendment was based on that earlier legislation and incorporated Wis. Stat. § 565.01. Dr. H. Rupert Theobald, LRB Drafter's Note, June 16, 1992. Because the LRB's analysis of a bill is printed with and displayed on the bill when it is introduced in the legislature, the LRB's analysis is indicative of legislative intent. *Schilling,* 278 Wis. 2d 216, ¶ 25 n.9. *See also Cole,* 264 Wis. 2d 520, ¶ 36 n.12.

¶ 33. The legislative records also reveal that Wisconsin's legislators were uniformly informed that the amendment would not affect the Original Compacts. For example, prior to the June 30 vote, Attorney Jane Henkel of the Wisconsin Legislative Council, responding to a request for clarification from State Representative David Travis, concluded the constitutional amendment would not "prohibit casino-type gambling under the *existing 11* compacts between the state and Indian tribes." Jane R. Henkel, Deputy Director, Legislative Council, Letter to Representative David Travis, June 19, 1992 (emphasis in original).

¶ 34. Similarly, in preparation for the June 30, 1992, special session, then-State Representative John Medinger sought clarification from then-Attorney General Doyle regarding, among other things, the potential effects of the proposed constitutional amendment on the existing compacts. John D. Medinger, State Representative, Letter to Attorney General James E. Doyle, June 22, 1992. The Attorney General responded on June 24, 1992, and stated that because the amendment was presumed to be prospective and because the compacts did not have a provision that made the compacts ineffective upon a change in state law, the proposed amendment "would not affect compacts which already exist." James E. Doyle, Attorney General, Letter to

Representative Medinger, June 24, 1992. The Attorney General wrote similar letters to this effect to other legislators. *See, e.g.,* Letter to Representative Marlin Schneider, February 3, 1993.

¶ 35. After the June 30, 1992, vote, but prior to the second consideration, the Deputy Director for the Assembly Democratic Caucus informed the Democratic members of the Assembly that the "existing tribal-state gaming compacts will continue for seven years and will not be affected by the change." Dan Rossmiller, Assembly Democratic Caucus Deputy Director, Memorandum to Assembly Democrats, July 7, 1992.

¶ 36. These records clearly demonstrate that the legislators voted to pass the constitutional amendment with the understanding that the Original Compacts would survive the amendment. We thus conclude that the Wisconsin Legislature did not intend the 1993 Amendment to invalidate the Original Compacts.

b

¶ 37. We next turn to the ratification campaign that surrounded the voters' passage of the 1993 Amendment. This court presumes that, when informed, the citizens of Wisconsin are familiar with the elements of the constitution and with the laws, and that the information used to educate the voters during the ratification campaign provides evidence of the voters' intent. *State ex rel. Ekern v. Zimmerman,* 187 Wis. 180, 192–94, 204 N.W. 803 (1925). "[W]here such intention appears, the construction and interpretation of the acts must follow accordingly." *Id.*

¶ 38. Wisconsin citizens voted to ratify the 1993 Amendment to Article IV, Section 24 on April 6, 1993.

37

Public statements and news accounts leading to the April 6 vote demonstrate that voters were informed that the 1993 Amendment would not affect the Original Compacts, and polls released days prior to the April 6, 1993, vote indicate that most voters did not want to make the Tribal gaming casinos illegal.

¶ 39. The vast majority of news articles reported to the voters that the 1993 Amendment would not impact the Original Compacts.[32] For example, the Milwaukee Sentinel reported that then-Attorney General Doyle did "not believe enactment of the amendment would affect Indian casinos operating under terms of the current state-tribal gambling compacts signed in 1991 and 1992." Amy Rinard, *Gaming Question Stays Unanswered,* Milw. Sent., Mar. 29, 1993. Then-Governor Thompson and "other state lawyers and lawmakers agree[d]." *Id.*

¶ 40. The Milwaukee Journal also printed a letter to the editor by two lawmakers encouraging passage of the amendment, explaining that voters need not worry

---

[32] Some news reports did express concern about what the amendment would mean for Indian gaming. *See* Dan Ritsche, *The Evolution of Legalized Gambling in Wisconsin,* LRB-00–RB-1, 11–12 (1999); Ron Seely, *You Can Bet on It: Gaming Referendum Is Sure to Confuse,* Wis. St. Jour., Apr. 4, 1993 ("What, *really,* will happen [to Indian casinos] if the amendment passes? . . . The problem is that nobody *really* knows.") (emphasis in original); Steve Schultze, *Answers Help Shed Light on Amendment Questions,* Milw. Jour., Apr. 4, 1993 ("Q. How do I vote if I want to keep Indian casinos going but not expand gambling? A. Neither a yes nor a no vote provides any guarantees."). And, in fact, some expressed concern that the amendment could jeopardize the existing compacts. *See, e.g.,* Amy Rinard, *Gaming Question Stays Unanswered,* Milw. Sent., Mar. 29, 1993, quoting Glen Miller, then-Chairman of the Menominee Tribe.

about the amendment affecting the existing Tribal casinos because a " 'yes' vote [would] freeze the current level of gambling in Wisconsin and put a constitutional brake on new, expanded forms of gambling." Lynn Adelman & Peter Bock, Letter to Editor, *Vote 'Yes' on Question 7 to Limit Expansion,* Milw. Jour., Mar. 29, 1993.

¶ 41. Editors and columnists similarly concluded that the 1993 Amendment would not affect the Original Compacts. The Wisconsin State Journal explained to voters that "[a] 'yes' vote on the constitutional amendment is not a vote to board up Wisconsin Indian casinos," Tom Still, *Gambling Limit Wouldn't Hurt Tribes,* Wis. St. Jour., Mar. 22, 1993. The Wisconsin State Journal also encouraged any voter who wanted to ensure the continuation of Tribal casinos to vote in favor of the amendment. Editorial, *Don't Know How to Vote? Here Are Some Guidelines,* Wis. St. Jour., Apr. 4, 1993.

¶ 42. Voters in Eau Claire were similarly encouraged to vote for the amendment to "limit any further expansion of gambling" and stressed that *"[t]here would be no immediate impact on existing casinos* because the tribes negotiated compacts with the state that ensures the casinos will remain open for the next seven years." Editorial, *"Yes" Vote Won't be End to Casinos,* Eau Claire Leader Telegram, Apr. 2, 1993 (emphasis added). Green Bay voters were also informed that the "amendment will not affect Indian casinos." Editorial, *Vote "Yes"* . . . *to Freeze Gambling,* Green Bay Press Gazette, Mar. 30, 1993 (emphasis added).

¶ 43. In addition, according to a poll conducted by the St. Norbert College Survey Center, released just days before the April 6 vote, 65 percent of those polled believed that "Indian tribes should be allowed to oper-

ate gambling casinos on their reservations." John Patrick Hunter, *Survey: Taxes Top Worry, Gaming Views Split,* The Cap. Times, Mar. 30, 1993. A poll by the University of Wisconsin-Extension Survey Research Laboratory reported similar findings. *Id.*

¶ 44. We conclude that the vast number of news articles, which informed voters that the amendment would not impact the existing Indian gaming, clearly demonstrates that the voters who ratified the constitutional amendment were informed that the ratification of the 1993 Amendment would not affect the Original Tribal Gaming Compacts. Our "construction and interpretation" of the 1993 Amendment must follow accordingly. *Zimmerman,* 187 Wis. at 194.

3

¶ 45. We also find that subsequent legislative action demonstrates that the 1993 Amendment did not invalidate the Original Compacts. The legislature's subsequent actions are a crucial component of any constitutional analysis because they are clear evidence of the legislature's understanding of that amendment. *See Schilling,* 278 Wis. 2d 216, ¶¶ 16, 23. In the present case, laws enacted immediately following passage of the 1993 Amendment clearly relied on the continuation of the existing Indian gaming compacts.

¶ 46. The 1993 budget, enacted on August 10, 1993, was the first action by the Wisconsin Legislature that mentioned the Tribal gaming compacts subsequent to passage of the 1993 Amendment. The 1993 budget appropriated $330,800 in 1993–94 and $329,000 in 1994–95 from "[m]oneys received by the state from Indian tribes as reimbursement for state costs of regu-

lation of Indian gaming *under [the] Indian gaming compacts . . . ."* 1993 Wis. Act 16, §§ 153 & 3544(1m)(a) (emphasis added). The Budget Act, therefore, relied on funds from the Class III games authorized by the Original Compacts.

¶ 47. The legislature also passed 1993 Wisconsin Act 174, which made all gaming contracts (debts) void and unenforceable, but which explicitly stated that the "section does not apply to . . . state or federal laws relating to the conduct of gaming on Indian lands." 1993 Wis. Act 174, Wis. Stat. § 895.055. Further, 1993 Wisconsin Act 365 created a requirement for the Wisconsin Department of Justice to prosecute violations of the Tribal gaming compacts. 1993 Wis. Act 365, Wis. Stat. § 165.25(3r).

¶ 48. Of significance, the legislature passed 1993 Wisconsin Act 406, enacted on April 21, 1994, which explicitly validated any contract between the State and a federally-recognized Indian Tribe that was entered into prior to May 6, 1994. 1993 Wis. Act 406; Wis. Stat. § 992.20(1). This statute, passed one year after the voters ratified the 1993 Amendment, "signal[s] legislative approval of the original compacts." *Panzer,* 271 Wis. 2d 295, ¶ 100.

4

¶ 49. In sum, based on the 1993 Amendment's history and the earliest legislative interpretations of that Amendment, we conclude that the 1993 Amendment was not intended to preclude the Tribes from conducting Class III games pursuant to the Original Compacts. Because the Original Compacts are not invalidated by the 1993 Amendment, the terms agreed to in the Original Compacts remain in full effect.

41

## B

¶ 50. We next examine whether the Governor has the authority to renew the Original Compacts. Dairyland contends that the Class III games operated at the Tribes' casinos are unconstitutional, and therefore the State cannot lawfully renew the compacts. The Governor asserts that the 1993 Amendment cannot force the State to issue a notice of nonrenewal because this would unconstitutionally impair the State's compacts with the 11 Tribes.

¶ 51. Both the Wisconsin and the United States Constitutions prohibit states from impairing their contractual obligations.[33] Article I, Section 12 of the Wisconsin Constitution states: "[n]o bill of attainder, ex post facto law, nor any law impairing the obligation of

---

[33] We note that the Contracts Clause generally applies to contracts to which the State is a party. *Russell v. Sebastian,* 233 U.S. 195 (1914). When a state is acting, "not in its capacity as a sovereign, but in its proprietary capacity" as a party to a contract, the state "is bound by the same rules as those which it applies to its citizens." *Fulton v. First Volunteer Co. of Oconto,* 204 Wis. 355, 362, 236 N.W. 120 (1931) (citation omitted). Moreover,

> [W]hen the state appears as a suitor in her courts to enforce her rights of property, she comes shorn of her attributes of sovereignty, and as a body politic, capable of contracting, suing, and holding property, is subject to those rules of justice and right which in her sovereign character, she has prescribed for the government of her people.

*Id.* (citation omitted). *See also U.S. Trust Co. of New York v. New Jersey,* 431 U.S. 1, 25 n.23 (1977); *Hall v. Wisconsin,* 103 U.S. 5, 11 (1880) ("When a State descends from the plane of its sovereignty, and contracts with private persons, it is regarded pro hac vice as a private person itself, and is bound accordingly.") (citation omitted).

contracts, shall ever be passed[.]" Similarly, Article I, Section 10 of the United States Constitution states, in relevant part: "No state shall . . . pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts[.]" Although our interpretation of the Contract Clause of the Wisconsin Constitution need not parallel federal interpretations of the Contract Clause of the United States Constitution, "our prior decisions [regarding Contract Clause issues] have relied upon the decisions of the United States Supreme Court." *Chappy v. LIRC*, 136 Wis. 2d 172, 186, 401 N.W.2d 568 (1987) (citations omitted).

¶ 52. We recognize that the Contract Clause does not place an absolute barrier to a state's power to modify its own contracts. *See Wisconsin Professional Police Ass'n, Inc. v. Lightbourn,* 2001 WI 59, ¶ 149, 243 Wis. 2d 512, 627 N.W.2d 807. Indeed, "courts will scrutinize the ability of the State to enter into an agreement that limits its power to act in the future." *Id.* (quotation omitted). We further recognize that a state

In *Russell,* the United States Supreme Court precluded a state's constitutional amendment from being applied retroactively to a contract between the state and a private company that pre-existed the constitutional amendment. *Russell,* 233 U.S. at 210. The Court concluded that the constitutional amendment could not be applied retroactively to a contract to which the State was a party in an attempt to "deny the right of expansion to a utility already lawfully doing business in the municipality after the company had expended large sums in preparation for the expansion." *Dixie Elec. Membership Corp. v. City of Baton Rouge,* 440 F. 2d 819, 822 (5th Cir. 1971) (citing *Russell,* 233 U.S. 195; noting that retroactive application of the amendment was an attempt to change the rules of the game at the expense of the utility). *Contrast,* Justice Roggensack's concurrence/dissent, ¶ 305.

43

cannot contract away its police powers. *Stone v. Mississippi,* 101 U.S. 814, 818 (1879). *See also City of Superior v. Roemer,* 154 Wis. 345, 357, 141 N.W. 250 (1913). States may similarly adjust their contractual obligations to safeguard the public welfare.[34] Moreover, a state's power to impair pre-existing contracts is not limited to those contracts that are hostile to public morals, health, or safety. *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 437 (1934).

¶ 53. Yet, if a state could change the rules governing its contractual obligations whenever it saw fit, the Contract Clause would offer no protection at all.[35] Indeed, as the United States Supreme Court has explicitly recognized:

---

[34] *See Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 437 (1934) ("[E]conomic interests of the state may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts.").

[35] Justice Roggensack contends that we "choose[] to ignore controlling precedent of the United States Supreme Court." Justice Roggensack's concurrence/dissent, ¶ 287. Justice Roggensack asserts that the Contracts Clause has "*never* been interpreted by the United States Supreme Court to preclude a state from legislating to protect the public health or morals[.]" *Id.,* ¶ 308 (emphasis in original) (citing *Stone v. Mississippi,* 101 U.S. 814, 818 (1879)). She reviews decisions by the United States Supreme Court where, she concludes, the court allowed a State's police powers to trump the State's contractual obligations. *See id.,* ¶¶ 309–320. Justice Roggensack's analysis overstates the United States Supreme Court's precedent. The United States Supreme Court has not concluded that a State can *never* limit its right to exercise its police powers.

In addition, Justice Roggensack asserts that this decision takes away the State's sovereign police power to regulate gambling "within its jurisdiction," Justice Roggensack's concurrence/dissent, ¶ 318. However, Tribes are not within the State's jurisdiction: States do not have jurisdiction over Tribes

44

> If the Contract Clause is to retain any meaning at all . . . it must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power. . . . Even when the public welfare is invoked as an excuse. . . , the security of a mortgage cannot be cut down without moderation or reason or in a spirit of oppression."

*Wipperfurth v. U-Haul Co. of W. Wisconsin,* 101 Wis. 2d 586, 594–95, 304 N.W.2d 767 (1981) (citing *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 242–43 (1978) (citations omitted) (emphasis in original)). An historical analysis of the Contract Clause further explains courts' attempts to balance the state's police powers against the freedom to contract:

> [T]he [United States Supreme] Court developed the theory that with regard to public contracts, there were certain attributes of state sovereignty that could not be contracted away. . . . The Court, when it could, construed the underlying contract as not providing for the giving up of the sovereign power. . . . If the state did in fact contract away certain powers, then the Court would hold that certain attributes of state power could not be contracted away at all. This Sovereign Power limitation became an important gloss on the Contract Clause. *The more modern Public Purpose Balancing Test, developed later, largely supplants the need for this exception,* but it is still of *some* importance.

unless specifically granted such jurisdiction by Congress. *Cohen's Handbook of Federal Indian Law* § 12.02[5], 865 (2005 ed.). Moreover, without a valid compact, state laws have no regulatory power over gaming on Tribal land, and states have no authority to police Tribal casinos. *See Sycuan Band v. Roche,* 54 F.3d 535 (9th Cir. 1994); *Florida v. Seminole Tribe,* 181 F.3d 1237 (11th Cir. 1999).

James M. McGoldrick, Jr., *Limits on States*, 17 (2005) (emphasis added).

¶ 54. Attempting to strike a balance between the states' contractual obligations and the public welfare, the United States Supreme Court has established a three-step methodology used in analyzing impairment of contract claims. *Lightbourn,* 243 Wis. 2d 512, ¶ 146 (citation omitted). This balancing test is rooted in "the Framers' intent to protect contract rights from the 'fluctuating policy' of the state." McGoldrick, *supra,* 31.[36] This court generally follows this three-step methodology in evaluating impairment of contract claims. *Lightbourn,* 243 Wis. 2d 512, ¶ 146.

¶ 55. To demonstrate that a contract has been unconstitutionally impaired, a complaining party must first establish beyond a reasonable doubt that the legislature changed the law after the formation of the contract and that the operation of the contract is substantially impaired by this change. *See Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411 (1983) (citation omitted); *Reserve Life Ins. Co. v. La Follette,* 108 Wis. 2d 637, 644, 323 N.W. 2d 173 (Ct. App. 1982). The impairment must be substantial; a minimal change of contractual obligations may end the inquiry. *Lightbourn,* 243 Wis. 2d 512, ¶ 147. On the other hand, the severity of the impairment increases the level of scrutiny to which the legislation will be subjected. *Energy Reserves Group,* 459 U.S. at 411.

---

[36] *Contrast* Justice Roggensack's concurrence/dissent, ¶¶ 309, 318–19 (asserting that the Contract Clause analysis is not applicable to "legislating to protect the public health or morals").

¶ 56. Second, if a law substantially impairs an already existing contractual relationship, the state, in justification, must have a significant and legitimate public purpose for the legislation. *Id. See also Spannaus,* 438 U.S. at 244; *Lightbourn,* 243 Wis. 2d 512, ¶ 148.

¶ 57. Finally, if a significant and legitimate public purpose exists for the legislation, the question becomes whether the legislature's impairment of contract is reasonable and necessary to serve that purpose. *Lightbourn,* 243 Wis. 2d 512, ¶ 149. In assessing the reasonableness of a constitutional amendment, the United States Supreme Court evaluates whether the social concerns that prompted the changes were foreseeable when the state entered into the compact, and whether the conditions have changed sufficiently since the state entered the contract. *See U.S. Trust Co. of New York v. New Jersey,* 431 U.S. 1, 31–32 (1977).

¶ 58. In the present case, the State of Wisconsin and the 11 Tribes have had an ongoing relationship since the parties entered into the Original Compacts more than a decade ago.[37] As this court recognized in *Panzer,* the parties clearly have a reliance interest in the

---

[37] Pursuant to IGRA, the parties entered into compacts to form relationships in an effort to balance the interests of the Indian Tribes' desires to become more self-sufficient and the State's desires to regulate Class III games. *See, e.g.,* Bad River/State of Wisconsin Gaming Compact of 1991, § XXXI.A.1–2.

The Tribes' interests in promoting economic development and self-sufficiency continue. The Tribes' casinos have become "a means to achieve what no state or federal economic develop-

continuation of the Original Compacts, and this court has already recognized that "[a]ny attempt at this point to impair these compacts would create serious constitutional questions." *Panzer,* 271 Wis. 2d 295, ¶ 99.

¶ 59. In the following analysis, we examine whether the 1993 Amendment applies to renewals of the Original Compacts. We then examine whether the Contract Clause precludes interpreting the 1993 Amendment as a statement of public policy against gaming that forces the State to exercise its right of nonrenewal. Finally, we examine whether the Amendment applies to the scope of Class III games negotiated under the terms of the Original Compacts.

1

¶ 60. Because we have concluded that the 1993 Amendment does not invalidate the Original Compacts, whether the 1993 Amendment applies to renewals of the Original Compacts depends upon whether the "renewal" constitutes a new contract or a continuation of the pre-existing contractual relationship. This is because, in general, the laws in existence at the time of the contract are incorporated into that contract:

---

ment program has been able to achieve for Indian people in 200 years—the return of self-respect and economic self-sufficiency." Judy Zelio, *The Fat New Buffalo, State Legislatures,* 38–41 (June 1994) (quoting JoAnn Jones, Tribal Chair of the Wisconsin Winnebago Tribe (renamed the Ho Chunk Nation in November 1994)).

The State's interest in regulating Class III gaming likewise persists. The State has continually relied on receipts from Indian gaming in its budgeting process. *See, e.g.,* 1993 Wis. Act 16, 2003 Wis. Act 33.

[T]he laws which subsist at the time and place of the making of a contract . . . enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and enforcement.

*See Von Hoffman v. City of Quincy,* 71 U.S. 535, 550 n.30 (1866). Subsequent changes to a law will not interfere with an existing contract. *Reserve Life,* 108 Wis. 2d at 645–47. When a law changes, however, contracts entered into after the date of a change in law are subject to the new law. *Bronson v. Kinzie,* 42 U.S. 311, 321 (1843).

■■■

¶ 61. Our analysis of a contractual renewal provision focuses primarily upon the intent of the parties when they entered into the contract.[38] *Reserve Life,* 108 Wis. 2d at 645 (interpreting insurance contracts); *Meyers v. Wells,* 252 Wis. 352, 357, 31 N.W. 2d 512 (1948)

---

[38] Because our interpretation of the renewal provision contained in the Original Compacts depends upon the parties' intent, *Reserve Life Ins. Co. v. La Follette,* 108 Wis. 2d 637, 645, 323 N.W. 2d 173 (Ct. App. 1982), the analysis is not one of constitutional interpretation and therefore does not require an examination of the ratification campaign surrounding the voters' passage of the 1993 Amendment. *Compare State ex rel. Ekern v. Zimmerman,* 187 Wis. 180, 192–94, 204 N.W. 803 (1925).

We nonetheless note that the history surrounding the legislative enactment and voter ratification of the 1993 Amendment demonstrates that, although the intent was to leave the Original Compacts untouched, there was considerably more confusion regarding the application of the 1993 Amendment to the renewal process. The general consensus of the news reports to voters was that the 1993 Amendment may affect renewal of the Original Compacts. Upon determining that the Original Compacts would not be affected, news reporters opined about the potential impact of the 1993 Amendment on renewal of the

(interpreting employment contracts); *Seefeldt v. Keske,* 14 Wis. 2d 438, 442, 111 N.W. 2d 574 (1961) (interpreting lease agreements). The parties' intent can be determined through the language of the contract itself. *See Swan Sales Corp. v. Jos. Schlitz Brewing Co.,* 126 Wis. 2d 16, 25, 374 N.W. 2d 640 (Ct. App., 1985); *Reserve Life,* 108 Wis. 2d at 645.

¶ 62. In the present case, each of the Original Compacts contains a provision that addresses Tribal ordinances and State law: "To the extent that State law or Tribal ordinances, or any amendments thereto, are inconsistent with any provision of this Compact, this Compact shall control."[39]

■■■

¶ 63. Under the plain terms of the Original Compacts, therefore, changes in State law do not impact the compacts. The parties clearly intended to preserve the law as it existed in 1991–92, and to prevent the application of changes to the State's or Tribes' laws to the Original Compacts.

---

compacts. For example, a Milwaukee Journal reporter concluded that although any "threat to closing Wisconsin Indian casinos if the amendment passes won't hit for six more years," there was the potential that "when the compacts come up for renewal in 1998 and 1999 that the amendment could be used to shut down the tribal casinos." Schultze, *Answers Help Shed Light, supra,* at n.7.

The Wisconsin State Journal similarly noted that passage of the Amendment would not affect the compacts for at least six years, but that tribal members feared the State would not renew the compacts. Seely, *Gaming Referendum is Sure to Confuse, supra.* The Milwaukee Sentinel also cautioned that "ratification of the amendment . . . could be used to back up the state's case should the next governor decide not to renew," Rinard, *Gaming Question Stays Unanswered, supra,* ¶ 39.

[39] *See, e.g.,* Forest County Potawatomi Compact § XXVI.

¶ 64. In addition, if renewals of the compacts constitute extensions of the Original Compacts, because the 1993 Amendment does not apply to the Original Compacts, the Amendment would not apply to extensions of the same. Courts have found that renewal of a contract that contains language which explicitly provides for automatic renewal, and does not, therefore, require an affirmative act by either party in order to renew, constitutes a continuation of the pre-existing contractual relationship and not a "fresh decision" to continue. *Swan Sales,* 126 Wis. 2d at 26. *Contrast Kealey Pharm. v. Walgreen Co.,* 539 F. Supp. 1357, 1363 (W.D. Wis. 1982), *affirmed in part and vacated in part,* 761 F.2d 345 (7th Cir. 1985) (concluding the renewal of a pre-existing contract constituted a new contract because the contract contained no provisions for renewal). Thus, we begin with the language of the Original Compacts to determine whether the State and the Tribes intended the renewal at the expiration of the compact term to constitute a continuation of the pre-existing compact, or whether they intended that a renewal constitute a new agreement between the parties.

¶ 65. The parties' intent is clearly evinced through the language of the Original Compacts. The Original Compacts state that the compact is "automatically extended" unless either party exercises its right of nonrenewal.[40] The plain language of the compacts demonstrates that the parties intended the compacts to continue unless terminated. The use of the word "ex-

---

[40] Bad River Band Compact § XXV(B); Forest County Potawatomi Compact § XXV(B); Winnebago [Ho-Chunk] Compact § XXVI; Lac Courte Oreilles Compact § XXV(B); Lac du Flam-

51

tended" signifies a continuation of the existing contract rather than the creation of a new one; the pertinent dictionary definition of "extended" is "[c]ontinued for a long period of time." *The American Heritage Dictionary of the English Language* 55 (3d ed. 1992). Renewal occurs automatically, and only an affirmative act by one of the parties terminates the continuation of the compacts. Like *Swan Sales,* the Original Compacts automatically renew; subsequent renewals are not "fresh decisions" by the parties to conduct business, but merely a continuation of pre-existing relationships. *See Swan Sales,* 126 Wis. 2d at 25, 26.

¶ 66. We therefore conclude that "renewals" constitute continuations of the Original Compacts and do not constitute new, independent contracts. Because the 1993 Amendment did not apply to the Original Compacts, the Amendment does not apply to continuations or extensions of the Original Compacts.

2

■■■■■

¶ 67. We have already concluded that the 1993 Amendment does not invalidate the Original Compacts, extensions, or continuations thereof. Therefore, the terms agreed upon in the Original Compacts, and the laws in effect at the time the contract was entered into, control the Tribal casinos operating under the authority of Original Compacts.[41] Nevertheless, Dairyland asserts that the 1993 Amendment forces the State to

beau Band Compact § XXV(B); Menominee Compact § XXVI(1)(B); Oneida Compact XXV(B); Red Cliff Compact § XXV(B); Sokaogon Chippewa Compact § XXVB; St. Croix Chippewa Compact § XXV(B); Stockbridge-Munsee Compact § XXV(B).

[41] *See Von Hoffman v. City of Quincy,* 71 U.S. 535, 550 (1866).

affirmatively exercise its right of nonrenewal. According to Dairyland, because the 1993 Amendment makes the Class III games currently operated at the Tribal casinos unconstitutional, even if the 1993 Amendment does not apply to the Original Compacts, the State cannot continue to operate under a contract that is in violation of the constitution and, therefore, the State must exercise its right of nonrenewal. Dairyland contends that requiring nonrenewal does not impair the compacts because each compact contains a provision that allows either party to terminate each compact. We therefore examine whether forcing the State to take the affirmative step and exercise its right of nonrenewal constitutes an unconstitutional impairment of the Original Compacts.

¶ 68. As discussed above, each of the Original Compacts includes a provision that allows either party to give a written notice of nonrenewal that would require the Tribe to cease all Class III gaming upon the expiration date of the compact.[42] Upon a party's exercising the right of nonrenewal, the compacts instruct the parties to enter into negotiations for successor compacts.[43] A successor compact constitutes a new compact.

---

[42] For example, in the Gaming Compact of 1992 between the Forest County Potawatomi Community of Wisconsin and the State, section XXV provides that in the event of written notice of nonrenewal by either party *as set forth in this section,* the Tribe shall cease all Class III gaming under this Compact upon *its* expiration date or upon the date the procedures in subsec. E. are concluded and a successor compact, if any, is in effect." (emphasis added). Subsection E. allows the parties to enter into negotiations for a successor compact if one of the parties gives written notice of nonrenewal.

[43] *Id.*

¶ 69. Assuming that the 1993 Amendment precludes those Class III games explicitly prohibited by Art. IV, sec. 24[44] in any compact negotiated after 1993,[45] no Class III casino game can be the proper subject of any new compact negotiation,[46] save the few specifically exempted Class III games: bingo games operated by

[44] "Except as provided in this section, the legislature may not authorize gambling in any form." Wis. Const. art. IV, § 24. In addition, clause 6 specifically defines the state-operated lottery to exclude casino-style games, including blackjack, poker, roulette, craps, keno, slot machines, and video gaming.

[45] We note that the 1993 Amendment may impact successor compacts and other new gaming compacts between the State and the Tribes.

However, under the prohibitory/regulatory analysis from *Lac du Flambeau*, the State may nonetheless be required to negotiate over all Class III games. *Lac du Flambeau*, 770 F. Supp 487–88. Although this court in *Panzer* called into question the *Lac du Flambeau* prohibitory/regulatory distinction, the court did not explicitly conclude that *Lac du Flambeau* was in error. *Panzer*, 271 Wis. 2d 295, ¶ 92 n.36. Furthermore, the Seventh Circuit recently affirmed the *Lac du Flambeau* rationale and reasoned that Wisconsin's lottery signals the State's broader public policy of tolerating gaming. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. United States*, 367 F.3d 650, 664 (7th Cir. 2004). *See also Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1031 (2nd Cir. 1990) (concluding that casino-style games were not totally repugnant to the state's public policy, because Connecticut law not only allowed charities to conduct "Las Vegas Nights," but also permitted other forms of gambling, including a state-operated lottery). Because the resolution of the prohibitory/regulatory distinction is a matter of federal law, we decline to further address the issue.

[46] *See Von Hoffman*, 71 U.S. 535, 550 ("[T]he laws which subsist at the time and place of the making of a contract . . . enter into and form a part of it"); *Bronson v. Kinzie*, 42 U.S. 311, 321 (1843) (concluding that contracts entered into after the date of a change in law are subject to the new law).

charitable and religious organizations,[47] raffle games operated by charitable and religious organizations,[48] pari-mutuel on-track betting,[49] and the state-operated lottery.[50] As a result, forcing the State to exercise its right of nonrenewal, thereby forcing the State to negotiate new compacts, would remove the State's authority to negotiate for any Class III games, except the limited games specifically authorized by the Constitution.

¶ 70. The operation of Class III games on Tribal land was a material consideration in the compact negotiations:

> The parties acknowledge that the mutual compromises with respect to the types of games the Tribe is authorized to operate during the term of this Compact and with respect to the duration of this Compact were significant material considerations in reaching agreement and are the essence of this Compact.[51]

Forcing nonrenewal, thereby requiring the parties to negotiate for new compacts under which most forms of Class III games are non-negotiable, would therefore constitute a "severe disruption of contractual expectations." *See Wipperfurth*, 101 Wis. 2d at 598. *Compare*

---

[47] Wis. Const. art. IV, § 24, cl. 3.

[48] *Id.*, cl. 4.

[49] *Id.*, cl. 5.

[50] *Id.*, cl. 6.

[51] This or a similar provision was explicitly included in seven of the eleven Original Compacts. Bad River Compact § XXXI(A)(2); Lac Courte Oreilles Compact § XXXI(A)(2); Menominee Compact § XXXII(A)(2); Red Cliff Compact § XXXI(A)(2); Sokaogon Chippewa Compact § XXXI(A)(2); St. Croix Chippewa Compact § XXXI(A)(2); Stockbridge-Munsee Compact § XXXI(A)(2).

Justice Prosser's concurrence/dissent, ¶ 262. The compacts would be substantially impaired because forcing nonrenewal would put the parties in a position where they could no longer contract for the games that were part of the Original Compacts because of the Amendment. Forcing the State to negotiate new compacts would thus severely impair, indeed eliminate, the State's contractual rights to continue any Class III games excluded by the Amendment. *See State ex rel. Cannon v. Moran,* 111 Wis. 2d 544, 558, 331 N.W.2d 369(1983) (citing *Spannaus,* 438 U.S. 234). Because applying the 1993 Amendment to the Original Compacts interferes "with freedom of contract guaranteed by the Fourteenth Amendment," we have a duty to inquire further. *Fairmont Creamery Co. v. State of Minn.,* 274 U.S. 1, 11 (1927).

¶ 71. The United States Supreme Court has concluded that the severe impairment of a contract is entitled to heightened scrutiny. *Spannaus,* 438 U.S. at 245 ("The severity of the impairment measures the height of the hurdle the state legislation must clear."). Furthermore, because the State is a party to the contract in question, this court gives less deference to the legislature's "assessment of reasonableness and necessity . . . because the State's self-interest is at stake." *Energy Reserves Group,* 459 U.S. at 412–13 n.14 (quotation and citation omitted). Therefore, the remaining analyses as to whether the State had a significant and legitimate public purpose, and whether the Amendment was reasonable and necessary to meet that purpose, are subject to a heightened level of scrutiny. *Cannon,* 111 Wis. 2d at 559.

¶ 72. Under the impairment of contracts analysis, the State is not prohibited from passing a law that substantially impairs an existing contractual obligation as long as the impairment is justified under a significant and legitimate public purpose, and the constitutional amendment is reasonable and appropriate to advance that purpose. *Lightbourn,* 243 Wis. 2d 512, ¶ 148; *Cannon,* 111 Wis. 2d at 559; *U.S. Trust,* 431 U.S. at 25–26. We therefore examine whether any legitimate public purpose would justify impairing the State's contractual obligation to the Tribes under the Original Compacts, and whether impairment would be reasonable.

¶ 73. We note that the State's interests are less compelling when the inquiry involves Tribal sovereigns because state laws and policies do not extend to Tribal lands unless authorized by Congress. *Cohen's Handbook of Federal Indian Law,* at 865, *supra,* n.35; S. Rep. No. 446, 100th Cong., 2nd Sess. 5 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3075. Congress passed IGRA to establish federal standards for gaming on Indian lands, 25 USC § 2702(3), and to allow state involvement through compacts with regard to Class III gaming. *Panzer,* 271 Wis. 2d 295, ¶ 15. However, IGRA blocks the operation of state policy with regard to a valid compact once that compact has been executed under IGRA's authority. *See Gaming Corp. of Am. v. Dorsey & Whitney,* 88 F.3d 536, 544–45 (8th Cir. 1996). Moreover, without a valid compact, state laws have no regulatory power over gaming on Tribal land, and states have no authority to police Tribal casinos. *See Sycuan Band v. Roche,* 54 F.3d 535 (9th Cir. 1994); *Florida v. Seminole Tribe,* 181 F.3d 1237 (11th Cir. 1999).

¶ 74. We recognize that regulation of gambling is a legitimate public purpose.[52] We also recognize that this Amendment could be construed as a strong state policy against all gaming. *See Panzer*, 271 Wis. 2d 295, ¶ 94. However, the purpose of the 1993 Amendment was to make only *some* forms of Class III games unconstitutional in Wisconsin, but excluded pari-mutuel on-track betting, the state lottery, and Class III games operated pursuant to the Original Compacts. Neither the legislature nor Wisconsin's citizens intended the 1993 Amendment to invalidate the games operated pursuant to the Original Compacts. Therefore, even if the Amendment embodies a strong public policy against some games, it does not embody a public policy against the games operated by the Tribes under the authority of the Original Compacts. Although Wisconsin was not precluded from doing so, the State did not exercise its sovereign police power in an effort to ban gaming under the Original Compacts. *Contrast* Justice Roggensack's concurrence/dissent, ¶¶ 318–19. Wisconsin did not abrogate its sovereign police powers with regard to gaming; the State simply decided to exclude the Original Compacts from the constitutional prohibition on gaming.

¶ 75. We further conclude that it would be unreasonable for the 1993 Amendment to interfere with the provision that allows for extending or continuing the Original Compacts. *See Lightbourn,* 243 Wis. 2d 512,

---

[52] The United States Supreme Court has concluded that a "legitimate public purpose" includes broad and general social or economic interests, as opposed to benefiting a narrow special interest. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 412 (1983).

¶ 148. To determine the reasonableness of a constitutional amendment, we evaluate whether the social concerns that prompted the changes were foreseeable when the State entered into the compact, and whether the conditions have changed sufficiently since the State entered the contract. *See U.S. Trust*, 431 U.S. at 31–32.

¶ 76. To a certain extent, because gaming had been regulated in the past, it was not entirely unforeseeable that the State might regulate gaming in the future.[53] Yet, the parties anticipated future regulations on Tribal gaming and negotiated to exclude changes in State and Tribal law from impacting the Original Compacts:[54] "To the extent that State law or Tribal ordinances, or any amendments thereto, are inconsistent with any provision of this Compact, this Compact shall control."[55]

¶ 77. It was *not* foreseeable, however, that the 1993 Amendment would invalidate the future operations of the Tribal casinos. The Governor and legislature considered the constitutional amendment during the same time period that the Governor was engaged in compact negotiations with the Tribes. In addition, as discussed above, according to legislative records and most news accounts, the 1993 Amendment was not

---

[53] *Hudson County Water Co. v. McCarter*, 209 U.S. 349, 357 (1908) ("One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.").

[54] *See* James M. McGoldrick, Jr., *Limits on States* 49 (2005).

[55] Bad River Compact § XXVI; Forest County Potawatomi Community of Wisconsin Compact § XXVI; Winnebago [Ho-Chunk] Compact § XXVIII; Lac Courte Oreilles Compact § XXVI; Lac du Flambeau Compact § XXVI; Menominee Compact § XXVII; Oneida Compact § XXVI; Red Cliff Compact § XXVI; Sokaogon Chippewa Compact § XXVI; St. Croix Chippewa Compact § XXVI; Stockbridge-Munsee Compact § XXVI.

intended to invalidate the Original Compacts. The legislature also discussed that the Contract Clause would prevent the amendment from closing down Tribal casinos. *See* Justice Prosser's concurrence/ dissent, ¶ 232. Moreover, shortly after the 1993 Amendment was ratified, the Tribes made significant investments to construct and operate casinos pursuant to the terms of the Original Compacts,[56] and the State legislature enacted laws that explicitly validated the Original Compacts and relied on proceeds from the casinos.[57] These records, and the parties' performance following the ratification of the compacts, reveal that the parties did not foresee that the 1993 Amendment would invalidate the extension provisions.

¶ 78. Additionally, the conditions have not changed substantially since passage of the 1993 Amendment. Neither party has altered its reliance on the compacts. The parties' actions demonstrate that there was little doubt as to the continued legality of the casino gaming pursuant to the Original Compacts. The State has continued to rely on revenue from the compacts,[58] and the Tribes have continued to invest in and operate the casinos.[59]

---

[56] *See, generally,* Wisconsin Gaming Board, Audit by the 1997–98 Joint Legislative Audit Committee Members, August 1997.

[57] *See* 1993 Wis. Act 16, §§ 153 & 3544(1m)(a) (appropriating $330,800 in 1993–94 and $329,000 in 1994–95 from "[m]oneys received by the state from Indian tribes as reimbursement for state costs of regulation of Indian gaming *under [the] Indian gaming compacts* . . . .") (emphasis added).

[58] In fiscal year 2003–04, Wisconsin collected $69.6 million from the Tribes. Department of Administration, Division of Gaming, Audit at 6 (June 2005). *See also* 2005 Wis. Act. 25.

[59] Division of Gaming Audit, at 5, *supra,* at n.58.

¶ 79. Therefore, although the prohibition of casino gaming can be a significant and legitimate State interest, we conclude that the State's interest in prohibiting gaming does not pass the heightened scrutiny test with respect to gaming on Tribal land because the 1993 Amendment did not apply to games operated pursuant to the Original Compacts, and because a retroactive prohibition on Tribal gaming would unreasonably interfere with the Original Compacts.

IV

■■■■

¶ 80. We have concluded, both in this case and in *Panzer*,[60] that the 1993 Amendment does not invalidate the Original Compacts. We have also concluded that the 1998–99 extensions are valid continuations of the Original Compacts, and therefore not invalidated by the 1993 Amendment. Dairyland nonetheless asks us to conclude that the 1993 Amendment prohibits the State from amending the compacts to include any Class III game that was not included in the Original Compacts.[61]

---

[60] *Panzer*, 271 Wis. 2d 295, ¶ 102.

[61] In the present case, we reach the question as to the scope of gaming provisions in the Original Compacts because this issue is "of sufficient public interest," and because the parties have explicitly asked the courts to review the scope of gaming issue. *See State v. Moran*, 2005 WI 115, ¶ 31, 284 Wis. 2d 24, 700 N.W.2d 884 ("[W]hen an issue involves a question of law, has been briefed by the opposing parties, and is of sufficient public interest to merit a decision, this court has discretion to address the issue."). In its court of appeals brief, Dairyland asserted that the Governor had no authority to amend or extend compacts authorizing casino gambling in 1998 or 2003. The Governor argued that the original compacts, including the scope of gaming provisions, continued until they were terminated.

¶ 81. Because the 1993 Amendment does not apply to the Original Compacts, the terms of the compacts

We note that the Class III games added in 2003 include: roulette, big wheel and other wheel games, craps, poker and similar non-house banked card games, games played at blackjack- style tables, such as Let-It-Ride, Casino Stud, and Casino War, electronic keno, pari-mutuel wagering on live simulcast, horse, harness and dog racing events, including participation in interstate betting pools, all other banking, percentage and pari-mutuel card games, all other banking and non-banking dice games, Wheel of Fortune, Baccarat-chemin de fer, all finite lottery and lottery games, any other game whether played as a table game or played on an electronic or mechanical device, including devices that operate like slot machines, which consist of the elements of prize, chance and consideration, Caribbean Stud Poker, Let-It-Ride, and Pai-Gow Poker.

In its briefs to this court, Dairyland asserted that the amendments in 2003 are invalid. The Governor advocated that this Court overrule the portion of *Panzer* dealing with the scope of permissible Tribal gaming in Wisconsin. In addition, at oral argument Dairyland asserted that the issue and focus of this case was "how can a governor in the year 2003 and also in 1998, how can that governor authorize casino gaming for anybody when the casino gambling had been expressly prohibited by Article IV, Section 24 of the Wisconsin Constitution when it was amended in 1993?" When asked to clarify which compact extensions Dairyland wanted addressed, Dairyland stated: "The one in 1998. I think more importantly, the one in 2003." Later, Dairyland also asserted that the 1998 amendments were not valid, but that they were not as important as the 2003 amendments.

Justice Prosser similarly asserts that the 1998–99 amendments were not substantial enough to be unconstitutional, and advocates for the conclusion that the 2003 extensions are unlawful because the amendments went too far, observing that the games that were added in 2003 are explicitly listed in the constitution as prohibited forms of gaming under Article IV, section 24, clauses 3 to 6. *See* Justice Prosser's concurrence/dissent, ¶ 239.

control whether the parties can amend the compact to expand the scope of Class III gaming. This analysis depends upon the intent of the parties when they entered into the compact. *See DeWitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd. P'ship,* 2004 WI 92, ¶ 44, 273 Wis. 2d 577, 682 N.W.2d 839 ("The ultimate aim of all contract interpretation is to ascertain the intent of the parties.") (citations omitted). The intent of the contracting parties can be evinced through the plain language of the Original Compacts and the history of the compact negotiations.

¶ 82. The parties included provisions in each of the compacts that relate to future amendments to the types of games allowed on Tribal land. Each of the 11 compacts states: "The Tribe may not operate any Class III gaming not expressly enumerated in this section of this Compact unless this Compact is amended pursuant to section XXX."[62] The Compacts further provide that: "This Compact shall not be modified,

Justice Roggensack asserts that "[t]he majority opinion concludes that the games added to the compacts in 2003 do not violate Wisconsin law." Justice Roggensack's concurrence/dissent, ¶ 285. That is incorrect. We do not reach the 2003 gaming compacts.

While we recognize these arguments, we are simply ruling on the scope of gaming provisions contracted for in the Original Compacts.

[62] Bad River Compact § IV(B); Forest County Potawatomi Compact § IV(B); Winnebago [Ho-Chunk] Compact § IV(C); Lac Courte Oreilles Compact § IV(B); Lac du Flambeau Compact § IV(B); Menominee Compact § IV(B); Oneida Tribe Compact § IV(B); Red Cliff Compact § IV(B); Sokaogon Chippewa Compact § IV(B); St. Croix Chippewa Compact § IV(B); Stockbridge-Munsee Compact § IV(B) (emphasis added).

amended or otherwise altered without the prior written agreement of both the State and the Tribe."[63] This language clearly reveals that the Compacts allow the parties to agree to amend the scope of Class III games. These provisions create a contractual obligation to allow new games should the parties agree to amend the scope of gaming.[64]

¶ 83. These provisions demonstrate the parties' intent to allow for amendments, including to the scope of gaming; the compacts do not contain "an agreement to agree." *Contrast Dunlop v. Laitsch,* 16 Wis. 2d 36, 42, 113 N.W.2d 551 (1962).[65] In *Dunlop,* the parties promised to form another contract in the future. *Id.* In this case, there is no comparable provision. The compacts

---

[63] Bad River Compact § XXX; Forest County Potawatomi Community of Wisconsin Compact § XXX; Winnebago [Ho-Chunk] Compact § XXXII; Lac Courte Oreilles Compact § XXX; Lac du Flambeau Compact § XXX; Menominee Compact § XXXI; Oneida Compact § XXX; Red Cliff Compact § XXX; Sokaogon Chippewa Compact § XXX; St. Croix Chippewa Compact § XXX; Stockbridge-Munsee Compact § XXX.

[64] Justice Roggensack asserts that the majority has concluded that the "compacts contain an obligation to amend the compacts to permit the addition of new types of gambling[.]" Justice Roggensack's concurrence/dissent, ¶ 323. This is a misstatement of the holding of this case. We conclude that the compacts contain an obligation *for the parties to honor modifications to the scope of gaming* should the parties agree to amend the compacts in that regard.

We also note that should the parties agree to amend the scope of gaming and one party violates this agreement, the other party may seek contractual remedies. *See, e.g.,* Bad River Compact § XXII ("Dispute Resolution"). *Contrast* Justice Roggensack's concurrence/dissent, ¶ 328.

[65] The offending provision in the contract at issue in *Dunlop* stated:

contain a provision stating that the compacts can be amended. There is no putative promise to actually amend the Compacts in the future; they simply provide that such an amendment is permissible.

¶ 84. In addition, even if we determined that these provisions are indefinite, the parties' subsequent conduct clearly evinces their intent to amend the scope of gaming. *See Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 179–80, 557 N.W.2d 67 (1996). Moreover, because the scope of gaming is a material provision in the compacts, *see supra,* ¶ 70, if we were to find these material provisions to be indefinite, the compacts would be void and unenforceable. *Management Computer,* 206 Wis. 2d at 178. *See also Dunlop,* 16 Wis. 2d at 43a.[66] Instead, we conclude that, should the parties agree to amend the scope of gaming, the compacts clearly obligate the parties to abide by such amendments.

¶ 85. Furthermore, when the Governor and the various Tribes first attempted to negotiate gaming com-

---

[The parties] shall at a future date mutually agree and come to a common understanding as to the use of their respective lands surrounding the lake which shall be formed on their lands and as to the type and structure of any buildings which shall be erected on their respective lands surrounding said lake.

*Dunlop v. Laitsch,* 16 Wis. 2d 36, 39, 113 N.W.2d 551 (1962).

[66] In *Dunlop,* this court reasoned:

If the parties, particularly Dunlop, had not relied on Laitsch's agreement to agree (Agreement "B") there would have been no Agreement "A" and no dam. We think that the failure to agree goes to the heart of Agreement "A" and when Agreement "B" falls because unenforceable and void, "A" goes with it because of the absence of a meeting of the minds as to an essential term.

*Dunlop,* 16 Wis. 2d at 43a.

65

pacts, the Governor refused to negotiate over Class III games, asserting that such games were illegal under Wisconsin law and therefore not a proper subject of negotiation. *Lac du Flambeau,* 270 F. Supp. at 481. The Lac du Flambeau Tribe of Lake Superior Indians and the Sokaogon Chippewa Community sued the Governor for failing to negotiate in good faith. *Id.* at 484. The United States District Court for the Western District of Wisconsin concluded that because Wisconsin did not prohibit outright all Class III games, Wisconsin was a regulatory state and, therefore, the State was required to negotiate with the Tribes for any game of prize, chance, and consideration that was not expressly prohibited by Wisconsin law. *Lac du Flambeau,* 270 F. Supp. at 488; *Panzer,* 271 Wis. 2d 295, ¶ 99. Therefore, the parties negotiated for the amendment provision under the auspices of the law as interpreted by the court in *Lac du Flambeau,* under which all Class III games are negotiable.[67]

---

[67] As noted above, *Panzer* questioned the prohibitory/ regulatory distinction from *Lac du Flambeau. Panzer,* 271 Wis. 2d 295, ¶ 92 n.36. However, this analysis focuses on the intent of the parties during the compact negotiations, and at the time of the compact negotiations, *Lac du Flambeau* was controlling. *See* Justice Prosser's concurrence/dissent, ¶ 191 n.25 (noting that *Lac du Flambeau* binds the parties to the particular action in which it was issued).

In his concurrence/dissent, Justice Prosser similarly questions the prohibitory/regulatory distinction as applied in *Lac du Flambeau.* Justice Prosser examines the history of the Wisconsin Constitution, and the history of IGRA, in an attempt to demonstrate that *Lac du Flambeau* was incorrectly decided. *Id.,* ¶¶ 139–207. His analysis is flawed. Justice Prosser asserts that the term "lottery" was intended to be interpreted narrowly in the original Wisconsin Constitution, and therefore the constitutional amendment to allow a state lottery should not have led

¶ 86. We therefore conclude that the parties intended to allow the compacts to be amended, including authorizing additional forms of Class III gaming.

---

the *Lac du Flambeau* court to conclude that Wisconsin was a regulatory state. *Id.*, ¶¶ 191–205. However, for over six decades, this court, the Wisconsin Attorney General, and the Wisconsin Legislature have consistently employed a broad interpretation of the term "lottery," to include all games of prize or chance. *See State ex rel. Trampe v. Multerer,* 234 Wis. 50, 289 N.W. 600 (1940); *Kayden Industries, Inc. v. Murphy,* 34 Wis. 2d 718, 150 N.W.2d 447 (1967). *See also* Justice Prosser's concurrence/dissent, ¶¶ 170–71. Therefore, the *Lac du Flambeau* court merely followed the Wisconsin courts, Attorney General, and legislature in concluding that the State was a regulatory state because it authorized a state-operated lottery.

In addition, Justice Prosser's analysis of IGRA is overstated. Justice Prosser concludes that Congress *clearly* intended to grant states the authority to limit Tribal gaming to the same forms of gaming activity conducted within the state. Justice Prosser's concurrence/dissent, ¶¶ 196–205 (emphasis added). Yet, Congressional intent is not so clear. As Justice Prosser correctly notes, some Senators stated that they intended IGRA to prohibit Tribal gaming from exceeding the games allowed for non-Indians in that state. *Id.*, ¶¶ 196–98. However, Senator Evans explained that IGRA was intended to transfer *limited* state jurisdiction over Tribes. IGRA Hearing on S. 555, 100th Cong. (1988). Senator Inouye clearly emphasized the importance of preserving Tribal sovereignty and that any extension of state jurisdiction must be limited:

> Indian tribes are sovereign governments and exercise rights of self-government over their lands and members. This bill does not seek to invade or diminish that sovereignty . . . the committee was fully cognizant of the strenuous objections that would be raised by tribes to any outright transfer of state jurisdiction, even for the limited purposes of regulating class III gaming.

*Id.* Justice Prosser's conclusion, therefore, is not the only reasonable conclusion that can be drawn from the legislative debates regarding Congress's intent in passing IGRA.

¶ 87. Justice Prosser, in his concurrence/dissent, contends: "if state law prohibits a Class III gaming activity, the governor's power to negotiate that activity is circumscribed." Justice Prosser's concurrence/ dissent, ¶ 243 (citing *Panzer*, 271 Wis. 2d 295, ¶ 89). Justice Prosser summarizes his conclusion:

> [T]he Wisconsin state government, including Wisconsin governors, may agree to amendments of gaming compacts to add forms of gaming activity that are permitted by state law 'for any purpose by any person, organization, or entity,' but may not add forms of gaming activity that are prohibited by state law for all purposes to all persons, organizations, and entities.

*Id.,* ¶ 107 (citations omitted).

¶ 88. Justice Prosser's arguments regarding the scope of gaming are structurally unsound. Although the Wisconsin Constitution prohibits blackjack, slot machines, and video gaming machines, art. IV, sec. 24(6)(c),[68] and even though Justice Prosser and the *Panzer* majority conclude that the Governor lacks the

---

Moreover, if we were to conclude that *Lac du Flambeau* was incorrectly decided, as Justice Prosser advocates, the State and Tribes would have illegally authorized blackjack, slot machines, and video gaming machines in the Original Compacts, and the Original Compacts and 1998–99 extensions would be in violation of the Wisconsin Constitution.

[68] The Wisconsin Constitution, as amended, reads, in relevant part, "Except as provided in this section, the legislature may not authorize gambling in any form." Wis. Const. art. IV, § 24. Clauses 3 through 6 list exceptions to the broad prohibition, including: 1) bingo games operated by charitable and religious organizations; 2) raffle games operated by charitable and religious organizations; 3) pari-mutuel on-track betting; and 4) the state-operated lottery. *Id.* Furthermore, as amended, Clause 6 specifically defines the state-operated lottery to *ex-*

authority to approve amendments to the Original Compacts that are "explicitly prohibited by the Wisconsin Constitution," Justice Prosser's concurrence/dissent, ¶ 240, *Panzer,* 271 Wis. 2d 295, ¶ 96, these conclusions conveniently neglect to mention that blackjack, slot machines, and video gaming machines are also explicitly prohibited by the Constitution.

¶ 89. The only way to conclude that the 1993 Amendment limits the scope of gaming allowable under the Original Compacts is to conclude that the 1993 Amendment applies to the Original Compacts.[69] Under the analysis proposed by Justice Prosser, if the amendment applies to the scope of gaming, then blackjack, slot machines, and video gaming machines included in the Original Compacts are now unconstitutional. Yet, Justices Prosser and Roggensack deem blackjack, slot machines, and video gaming machines, authorized under the Original Compacts, to be lawful.[70] Similarly, if the Amendment applies to the Original Compacts, the addition of 800 slot machines to the Potawatomi Compact, and the decision to allow for the first time blackjack games at the Potawatomi Tribe's casino in Menomonee Valley, which were both included in the 1998–99

_clude_ casino-style games, including _blackjack,_ poker, roulette, craps, keno, _slot machines,_ and _video gaming. Id._ (emphasis added).

[69] _See_ Justice Prosser's concurrence/dissent, ¶¶ 240–45; Justice Roggensack's concurrence/dissent, ¶ 288 (concluding that although the 1993 Amendment has no effect on the types of gaming compacted prior to 1993 or the 1998–99 compact extensions, the 1993 Amendment precludes new types of games that were not included in the Original Compacts or the 1998–99 extensions).

[70] _See_ Justice Prosser's concurrence/dissent, ¶¶ 106, 239; Justice Roggensack's concurrence/dissent, ¶ 288.

extensions, are constitutionally prohibited forms of Class III gaming. Taken to its logical conclusion, under the analysis proposed by Justice Prosser's concurrence/dissent, the Tribes cannot conduct these games because they are now unconstitutional.

¶ 90. Either the Original Compacts are fully in force or they are not—it cannot be both ways. This court cannot, and should not, impose the court's own values by deciding that some Class III games are not as substantial, and therefore protected by the Original Compacts, and that other games are too substantial to be protected.

¶ 91. Because we conclude that the Original Compacts were not invalidated by the 1993 Amendment, and that the compacts have been lawfully extended, the Original Compacts are in full force. The Original Compacts specifically contemplated amending the compacts, including the type of Class III games that can be conducted on Tribal land.[71] In addition, as this court has previously stated, "if the provision of the constitution or the legislative act of a state" impairs a substantial contractual right, the constitutional provision or statute is "utterly void. They are, for all the purposes of the contract which they impair, as if they had never

---

[71] Each of the Compacts states: "To the extent that State law or Tribal ordinances, or any amendments thereto, are inconsistent with any provision of this Compact, this Compact shall control."

Bad River Compact § XXVI; Forest County Potawatomi Community of Wisconsin Compact § XXVI; Winnebago [Ho-Chunk] Compact § XXVII; Lac Courte Oreilles Compact § XXVI; Lac du Flambeau Compact § XXVI; Menominee Compact § XXVII; Oneida Compact § XXVI; Red Cliff Compact § XXVI; Sokaogon Chippewa Compact § XXVI; St. Croix Chippewa Compact § XXVI; Stockbridge-Munsee Compact § XXVI.

existed." *Peninsular Lead & Color Works v. Union Oil & Paint Co.*, 100 Wis. 488, 493, 76 N.W. 359, 361 (1898). In other words, the law at the time the Original Compacts were entered into controls the compacts.[72] The parties negotiated under the *Lac du Flambeau* decision, under which all Class III games were negotiable. Therefore, the Class III games that the State and Tribes agreed to in their compact extension negotiations are lawful.[73] We withdraw any language to the contrary in *Panzer* that would limit the State's ability to negotiate for Class III games under the Original Compacts.[74]

¶ 92. Justice Roggensack criticizes this decision for failing to follow *Panzer* in its entirety. She contends that decisions of this court are final unless they are set aside on a motion for reconsideration or overturned by a federal court on a federal question. Justice Roggensack's concurrence/dissent, ¶ 286. Because *Pan-*

---

[72] *See also Reserve Life,* 108 Wis. 2d at 645–47; *Von Hoffman,* 71 U.S. at 550 ("[T]he laws which subsist at the time and place of the making of a contract . . . enter into and form a part of it").

[73] Justice Prosser asserts that this decision opens the door to an explosion of gaming. Concurrence/dissent, ¶ 109. We share Justice Prosser's concern regarding the potential for the expansion of gaming in this State. However, it is up to the Governor and the legislature to determine the amount of gaming as they see fit. Gaming can be expanded only to the extent that the State and Tribes negotiate for additional Class III games. Therefore, the "explosion" will only expand as far as the State and Tribes permit. This court cannot impose its judgment regarding what Class III games we believe the State should allow. This would place the court in the activist position of imposing our policy judgments over those of the Governor, the legislature and the Wisconsin citizens. We refuse to do so. This determination is for the State and the Tribes.

[74] *See, e.g., Panzer,* 271 Wis. 2d 295, ¶¶ 93, 96.

*zer* concluded that the 2003 compact extensions were unconstitutional, she asserts that *Panzer* only left open the question as to whether the types of games lawfully compacted in 1991–92 retained their lawful status after 1993. *Id.,* ¶ 290. Justice Roggensack accuses the majority of surrendering the judicial independence of the court to the demands of the Governor because we address the scope of gaming. *Id.,* ¶ 286.

■■■■■■■■■

¶ 93. It is true that, in general, this court adheres to stare decisis to maintain confidence in the reliability of court decisions, promote evenhanded, predictable, and consistent development of legal principles, and contribute to the actual and perceived integrity of the Wisconsin judiciary. *Johnson Controls, Inc. v. Employers Ins. of Wausau,* 2003 WI 108, ¶ 95, 264 Wis. 2d 60, 665 N.W.2d 257 (citations omitted). However, this court has also concluded that prior decisions should not be perpetuated if they were wrongly decided in the first place. "We do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision." *Id.,* ¶ 100.

¶ 94. We again note that these contract impairment concerns were explicitly left unresolved by this court in *Panzer,* 271 Wis. 2d 295, ¶ 102. We find it disingenuous that some members of the *Panzer* majority refused to reach the Contract Clause analysis that was properly before it,[75] and now criticize the *Dairy-*

---

[75] *See, e.g., Hilton v. DNR,* 2006 WI 84, 293 Wis. 2d 1, 717 N.W.2d 166.

When the Wisconsin Supreme Court elects to hear only ten percent of the cases presented to it for review, the public expects and deserves that the court "take cases to decide the substantive

*land* majority opinion for deciding the issue. This decision has nothing to do with making one Governor look bad and another Governor look good.[76] We have simply reached the issue left unresolved by this court in *Panzer.*

## V

¶ 95. Upon examining the impairment of contracts issues raised by the 1993 Amendment to the Wisconsin Constitution with regard to the Original Compacts between the State and Tribes, we conclude that the 1993 Amendment to Article IV, Section 24 of the Wisconsin Constitution did not invalidate the Original Compacts. Because the Original Compacts contemplated extending and amending the scope of Indian

issues presented and provide meaningful analysis and guidance on important issues, not to avoid deciding them by judicially created avoidance doctrines."

*Hilton,* 293 Wis. 2d 1, ¶ 54 (Prosser, J. concurrence) (quoting Patience D. Roggensack, *Elected to Decide: Is the Decision-Avoidance Doctrine of Great Weight Deference Appropriate in this Court of Last Resort?,* 89 Marq. L.Rev. 541, 544 (2006)).

We also note that the petitioners in *Panzer* initially conceded that the Contract Clause precluded invalidating a pre-existing contract:

Petitioners do not claim that the 1993 Constitutional Amendment invalidated any compact in place at that time. This is not an issue in this case in part because Wisconsin, under the Impairment of Contracts Clause of the U.S. Constitution Art. I, § 10 cl. 1, lacks authority to invalidate an existing agreement.

Page 31 of Brief-in-chief of Petitioners Mary E. Panzer, John G. Gard and Joint Committee on Legislative Organization, filed in *Panzer,* 271 Wis. 2d 295 (dated October 22, 2003).

[76] *Compare* Justice Roggensack's concurrence/dissent, ¶ 294–298.

gaming, the parties' right of renewal is constitutionally protected by the Contract Clauses of the United States and Wisconsin Constitutions; and amendments to the Original Compacts that expand the scope of gaming are likewise constitutionally protected by the Contract Clauses of the Wisconsin and United States Constitutions. Therefore, we affirm the order of the circuit court. Accordingly, gaming can be expanded to the extent that the State and Tribes negotiate for additional Class III games. We withdraw any language to the contrary in *Panzer* that would limit the State's ability to negotiate for Class III games under the Original Compacts.[77]

*By the Court.*—The order of the circuit court for Dane County is affirmed.

¶ 96. N. PATRICK CROOKS, J. *(concurring)*. While I join the majority, I write separately to reaffirm the conclusions reached in our dissent in *Panzer v. Doyle,* 2004 WI 52, 271 Wis. 2d 295, 680 N.W.2d 666 (Abrahamson, C.J., Bradley, J. and Crooks, J. dissenting), as well as my position in *Dairyland Greyhound Park, Inc. v. Doyle,* 2004 WI 34, 270 Wis. 2d 267, 677 N.W.2d 275.

¶ 97. Our conclusions in *Panzer* are equally valid with regard to the case before us today. First, "[w]hile the amendment to Article IV, § 24 did change Wisconsin's law with respect to gaming, it did not affect the compact before us." *Panzer,* 271 Wis. 2d 295, ¶ 206 (Abrahamson, C.J., Bradley, J. and Crooks, J. dissenting). In fact, the legislative history makes clear that Article IV, Section 24 of the Wisconsin Constitution was neither intended to apply, nor had the effect of applying, to then existing Indian gaming compacts. *See* majority op., ¶¶ 36, 44, 49, 66.

---

[77] *See, e.g., Panzer,* 271 Wis. 2d 295, ¶¶ 93, 96.

¶ 98. Second, as we determined in our dissent in *Panzer*, "the Governor properly exercised his power pursuant to Wis. Stat. § 14.035" both in entering into the Original Compacts, as well as negotiating the 1998 and 2003 amendments. *Panzer*, 271 Wis. 2d 295, ¶ 124. As we explained in that case "as long as a compact does not contravene a statute or constitutional provision, the governor may enter into it under Wis. Stat. § 14.035, embracing those conditions and provisions the governor deems will best promote the interests of the government." *Id.,* ¶ 153.

¶ 99. Third, in *Panzer* we concluded that an application of the 1993 constitutional amendment to the compacts would "substantially impair the contractual relationship between the State and the Tribe and violate the impairment of contracts clause." *Id.,* ¶ 256. The clear language of the compacts demonstrated that the parties intended to be bound by the laws of Wisconsin as they existed in 1992. *Id.,* ¶ 194. "Regardless of future laws or amendments to preexisting laws, the parties agreed to let the terms of the compact control their relationship." *Id.*

¶ 100. "At the time the parties entered into the compact, all Class III games could be negotiated for and were permitted under the compact." *Id.,* ¶ 195. As our *Panzer* dissent explained, because the state was permitted to negotiate with respect to Class III games, "any attempt to read Article IV, § 24 as altering the types of games that may be negotiated for under the compact would impair the compact to which the parties agreed, and would, therefore, run afoul of the United States and Wisconsin constitutional clauses against impairment of contract." *Id.,* ¶ 209.

¶ 101. Our reasoning and conclusions in *Panzer* are consistent with the majority's holding in the case at

bar. Ultimately we conclude, as we did in our *Panzer* dissent, that Article IV, Section 24 of the Wisconsin Constitution does not apply to then existing Indian gaming compacts, that the Governor properly exercised his authority to enter into the Original Compacts, and negotiate the amendments in both 1998 and 2003, and that any application of the 1993 constitutional amendment to the compacts violates both the state and federal impairment of contracts clause. *Id.*, ¶¶ 124, 256.

¶ 102. For the aforementioned reasons, I join the majority opinion, reaffirm our conclusions in our *Panzer* dissent, and respectfully concur.

¶ 103. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this concurrence.

¶ 104. DAVID T. PROSSER, J. (*concurring in part, dissenting in part*). In *Panzer v. Doyle*, 2004 WI 52, 271 Wis. 2d 295, 680 N.W.2d 666, this court was asked to review four amendments to the 1992 gaming compact between the State of Wisconsin and the Forest County Potawatomi Community. The court concluded that three of the amendments were invalid. At the same time, the court upheld the original gaming compact and, by implication, 10 similar gaming compacts; and it implied that a 1993 constitutional amendment restricting gambling in Wisconsin did not impair these compacts or bar their extension.[1] In this case, petitioner seeks a definitive interpretation of the 1993 constitutional amendment, asking explicitly whether the Gov-

---

[1] For an extensive discussion of *Panzer v. Doyle*, 2004 WI 52, 271 Wis. 2d 295, 680 N.W.2d 666, see James J. Wawrzyn, *Panzer v. Doyle: Wisconsin Constitutional Law Deals the Governor A New Hand*, 89 Marq. L.Rev. 221 (2005).

ernor has authority to amend or extend Indian gaming compacts to allow forms of gambling that are prohibited under Wisconsin law.

¶ 105. My conclusions are as follows.

¶ 106. First, the Wisconsin state government, including Wisconsin governors, have not violated and will not violate Article IV, Section 24 of the Wisconsin Constitution by *extending* the Original Compacts, so that Wisconsin Indian tribes may engage in the same forms of gaming activity that they negotiated in their original compacts. Consequently, Wisconsin governors are not obligated to nonrenew these gaming compacts. In this regard, the majority opinion is correct.

¶ 107. Second, the Wisconsin state government, including Wisconsin governors, may agree to amendments of gaming compacts to add gaming activities that are permitted by state law "for any purpose by any person, organization, or entity," 25 U.S.C. § 2710(d)(1)(B), but may not add gaming activities that are prohibited by state law for all purposes to all persons, organizations, and entities. Wisconsin governors have no authority to approve new gaming activities that are prohibited by Article IV, Section 24 of the Wisconsin Constitution or state criminal law.

¶ 108. Third, the majority's determination that the 1993 amendment to Article IV, Section 24 had no effect whatever on the 11 original Indian gaming compacts is mistaken; and its holding that Wisconsin governors have power, by virtue of the compacts, to amend the compacts to add *any* gaming activities not prohibited by *federal* law, contradicts both the Wisconsin Constitution *and* federal law.

¶ 109. The majority opinion is far-reaching. It involves much more than overruling portions of the *Panzer* decision and giving Wisconsin tribes the right to

play poker, roulette, craps, and keno at their casinos in Indian country. The opinion could lead to an explosion of new gaming activities.

¶ 110. The majority concludes that a governor's source of authority to negotiate new gaming amendments is not Wis. Stat. § 14.035 but rather the provisions in existing gaming compacts buttressed by the impairment of contracts clauses of the United States and Wisconsin Constitutions. Under this analysis, a governor's authority is not limited by the Wisconsin Constitution or state criminal law. This determination will permit Wisconsin governors to negotiate and approve such major gambling expansions as *off*-track pari-mutuel betting, betting on sporting events, jai alai, and all banking card games, which are barred by the Wisconsin Constitution but not prohibited by federal law.

¶ 111. If the majority's determination that the Wisconsin Constitution does not check a governor's power to negotiate gaming compacts is correct, then the majority has overruled, sub silentio, *Panzer* insofar as it declared invalid the 2003 duration amendment and the 2003 amendment waiving sovereign immunity. Three of the four members of the majority supported these amendments in their *Panzer* dissent.

¶ 112. This partial dissent requires a full explanation. In offering this explanation, I believe it is essential to understand the history of Article IV, Section 24 and events leading up to this litigation. As sociologist Robert Nisbet once observed, "We cannot know where we are, much less where we are going, until we know where we have been."

¶ 113. To assist the reader, my dissent is organized under the following headings:

78

I. Methodology for Interpreting the Wisconsin Constitution

II. Interpreting Article IV, Section 24 as Created in the 1848 Constitution

III. Interpreting Article IV, Section 24 as Amended in 1987

IV. The United States District Court's Decision in the *Lac du Flambeau* Case

V. The Legislative Response to the *Lac du Flambeau* Decision

VI. Interpreting Article IV, Section 24 as Amended in 1993

VII. The Effect of Article IV, Section 24 on Indian Gaming

## I. METHODOLOGY FOR INTERPRETING THE WISCONSIN CONSTITUTION

¶ 114. This court interprets provisions of the Wisconsin Constitution de novo. *Thompson v. Craney,* 199 Wis. 2d 674, 680, 546 N.W.2d 123 (1996) (citing *Polk County v. State Pub. Defender,* 188 Wis. 2d 665, 674, 524 N.W.2d 389 (1994)). Our methodology in interpreting a constitutional provision is not identical to our methodology in interpreting a statute. In interpreting a statute, the court focuses on "statutory meaning" as opposed to "legislative intent." *See State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶¶ 36–52, 271 Wis. 2d 633, 681 N.W.2d 110. In doing so, the court relies heavily on "intrinsic" sources such as the words of the statute, including dictionary definitions, plus statuory context, scope, and purpose. As a rule, Wisconsin courts do not consult "extrinsic" sources of statutory interpretation unless the statute is ambiguous, *id.,* ¶ 50, although extrinsic sources may be used to

confirm or verify plain statutory meaning. *Id.,* ¶ 51. The plain meaning rule of statutory interpretation prevents courts from tapping legislative history to show that an unambiguous statute is ambiguous. *Id.*

¶ 115. Our methodology in interpreting a constitutional provision envisions more intense review of extrinsic sources than our methodology in statutory interpretation. The court has explained that:

> The purpose of construction of a constitutional [provision] is to give effect to the intent of the framers and the people who adopted it; and it is a rule of construction applicable to all constitutions that they are to be construed so as to promote the objects for which they were framed and adopted.

*State v. Cole,* 2003 WI 112, ¶ 10, 264 Wis. 2d 520, 665 N.W.2d 328 (quoting *Kayden Indus., Inc. v. Murphy,* 34 Wis. 2d 718, 729–30, 150 N.W.2d 447 (1967)).

¶ 116. The reasons we employ a different methodology for constitutional interpretation are evident. Constitutional provisions do not become law until they are approved by the people. Voters do not have the same access to the "words" of a provision as the legislators who framed those words; and most voters are not familiar with the debates in the legislature. As a result, voters necessarily consider second-hand explanations and discussion at the time of ratification. In addition, the meaning of words may evolve over time, obscuring the original meaning or purpose of a provision. The original meaning of a provision might be lost if courts could not resort to extrinsic sources. Finally, interpreting a constitutional provision is likely to have a more lasting effect than the interpretation of a statute, inasmuch as statutory language can be more easily changed than constitutional language. Thus, it is vital for court decisions to capture accurately the essence of a constitutional provision.

¶ 117. Against this background, our traditional methodology[2] on constitutional interpretation may be restated as follows:

1. Courts should give priority to the plain meaning of the words of a constitutional provision in the context used. *Buse v. Smith,* 74 Wis. 2d 550, 568, 247 N.W.2d 141 (1976). The plain meaning of the words is best discerned by understanding their obvious and ordinary meaning at the time the provision was adopted, taking into account other (especially contemporary) provisions of the constitution. *See State ex rel. Bare v. Schinz,* 194 Wis. 397, 403–04, 216 N.W. 509 (1927).

2. Courts may view the "historical analysis of the constitutional debates and of what practices were in existence in 1848 which the court may reasonably presume were also known to the framers of the 1848 constitution." *Id.* This principle permits courts to consider the debates surrounding amendments to the constitution and the circumstances at the time these

---

[2] This methodology was summarized by Justice Connor T. Hansen in *Buse v. Smith,* 74 Wis. 2d 550, 568, 247 N.W.2d 141 (1976):

> In its interpretation of constitutional provisions this court is committed to the method of analysis utilized in Board of Education v. Sinclair, [65 Wis. 2d 179, 222 N.W.2d 143 (1974)]. The court will view:
>
> (1) The plain meaning of the words in the context used;
>
> (2) The historical analysis of the constitutional debates and of what practices were in existence in 1848, which the court may reasonably presume were also known to the framers of the 1848 constitution ... and
>
> (3) The earliest interpretation of [the] section by the legislature as manifested in the first law passed following the adoption of the constitution.

*Id.* (citations omitted).

amendments were adopted. We have said that courts may examine "the history of the times," meaning not only the legislative history of a provision (including word changes in the drafts of amendments) but also "the state of society at the time," with special emphasis on the "practices and usages" then in existence, so as to identify the concerns the provision sought to address. *See Bd. of Educ. v. Sinclair,* 65 Wis. 2d 179, 184, 222 N.W.2d 143 (1974) (quoting *State ex rel. Zimmerman v. Dammann,* 201 Wis. 84, 89, 228 N.W. 593 (1930)). These concerns are often illuminated by contemporary debates and explanations of the provision both inside and outside legislative chambers.

3. Courts may scrutinize the earliest interpretations of the provision by the legislature as manifested in the first laws passed following adoption of the provision. *Buse,* 74 Wis. 2d at 568 (citing *Payne v. Racine,* 217 Wis. 550, 259 N.W. 437 (1935)). Legislation that implements a constitutional provision is thought to be a fair gauge of contemporary interpretation and is entitled to great deference.

¶ 118. The methodology stated here is the methodology I will employ in interpreting Article IV, Section 24 as it was created in 1848, as it was amended in 1987, and as it was amended again in 1993.

## II. INTERPRETING ARTICLE IV, SECTION 24 AS CREATED IN THE 1848 CONSTITUTION

¶ 119. Article IV, Section 24 originated in the Wisconsin Constitution of 1848.[3] The original provision was not intended to cover all forms of gambling. This conclusion is based on the language of the provision, the

---

[3] In its original form, Article IV, Section 24 provided: "The legislature shall not authorize any lottery, or grant any divorce."

purpose of the provision, and the historical context of the provision, including legislative activity before and after the provision was adopted.

¶ 120. First, we focus on the words. Noah Webster's *An American Dictionary of the English Language* (1828) defined "lottery" as follows:

> 1. A scheme for the distribution of prizes by chance, or the distribution itself. *Lotteries* are often authorized by law, but many good men deem them immoral in principle, and almost all men concur in the opinion that their effect are pernicious.
>
> 2. Allotment.

Noah Webster, *An American Dictionary of the English Language* (1828) (unpaginated).[4]

¶ 121. "*A* scheme for the distribution of prizes by chance" does not implicate *all* schemes or *all* games that involve prize, chance, and consideration. For instance, in Webster's 1853 dictionary, Noah Webster, *An American Dictionary of the English Language* (1853), Webster defined "gambling" and other terms:

> Gamble: "To play or game for money or other stake." Webster, *supra* 492.[5]
>
> Gambling: "Gaming for money." Webster, *supra* 492.[6]
>
> Gaming: "The act or art of playing any game, in a contest for a victory, or for a prize or stake."

---

[4] *See also* Noah Webster, *An American Dictionary of the English Language* 677 (1853).

[5] *See also* Noah Webster, *An American Dictionary of the English Language* (1828) (unpaginated).

[6] *Id.*

2. "The practice of using cards, dice, billiards, and the like, according to certain rules, for winning money, &c." Webster, *supra* 493.[7]

Roulette: "A game of chance, in which a small ball is made to move round rapidly on a circle divided off into red or black spaces, and as it stops on the one or the other, the player wins or loses." Webster, *supra* 965.

Webster did not use the word "lottery" in these definitions. He did not use "lottery" and "gaming" interchangeably. In 1848, as now, people did not associate dice and billiards with a lottery. Moreover, in the mid-1800s, other forms of gaming were not "often authorized by law," although some gambling was not prohibited. Thus, Douglas Farnsley was correct when he wrote, "In common usage a lottery is synonymous with a raffle, and in Wisconsin law the term is usually given this meaning." Douglas Charles Ellerbe Farnsley, *Gambling and the Law: The Wisconsin Experience, 1848–1980,* 1980 Wis. L. Rev. 811, 812.

¶ 122. Second, we examine the historical context. Most states adopted anti-lottery amendments or legislation because of notorious scandals involving lotteries, including the Grand National Lottery authorized by Congress. *Panzer,* 271 Wis. 2d 295, ¶ 7.[8] Farnsley explains that:

Following the Revolutionary War, most states had relied heavily on lotteries as a means of financing public works and supporting institutions such as orphanages and hospitals. These states had also *authorized* various philanthropic organizations such as churches and uni-

---

[7] *Id.*

[8] John Scarne, *Scarne's New Complete Guide to Gambling* 150, 152 (1974); *see also Clark v. Washington,* 12 Wheat. 40, 25 U.S. 40 (1827).

versities to conduct lotteries. States and organizations had usually relied upon management companies to conduct the lotteries. The companies would then turn over a percentage of the profits to the sponsor. Thus, while the lotteries may have been fundraising schemes for the sponsor, they were commercial gambling in relation to the management company. In 1833, Pennsylvania, Massachusetts, and New York had abolished lotteries due in large measure to fraudulent practices by lottery management companies. Many other states followed their lead. Prior to the War Between the States all but three states had barred lotteries. *The drafters of Wisconsin's Constitution acted within this historical context in banning lotteries.*

Farnsley, *supra,* at 854 (emphasis added).

¶ 123. Farnsley's observation about "historical context" explains why the "lottery" provision is contained within Article IV. Article IV is the constitutional article on "Legislative" power. It is a fundamental precept of state constitutional law that state legislative power is plenary in nature. *Cutts v. Dep't of Pub. Welfare,* 1 Wis. 2d 408, 416, 84 N.W.2d 102 (1957). The Wisconsin Constitution does not grant legislative power;[9] it limits legislative power or directs how legislative power should be exercised. In 1848 Article IV, Section 24 ("The legislature shall not authorize any lottery, or grant any divorce") contained two specific

---

[9] "We suppose it to be a well-settled political principle that the constitution of the state is to be regarded not as a grant of power, but rather as a limitation upon the powers of the legislature, and that it is competent for the legislature to exercise all legislative power not forbidden by the constitution or delegated to the general government, or prohibited by the constitution of the United States."

*Cutts v. Dep't of Pub. Welfare,* 1 Wis. 2d 408, 416, 84 N.W.2d 102 (1957) (quoting *Bushnell v. Beloit,* 10 Wis. 195, 225 (1860)).

limitations on legislative power, not moral pronouncements on gaming and divorce.[10]

¶ 124. The New York Constitution of 1846 often served as a model for the Wisconsin drafters.[11] Article I, Section 10 of that constitution provided that, "No law shall be passed abridging the right of the people peaceably to assemble and petition the government . . . nor shall any divorce be granted, otherwise than by due judicial proceedings; nor shall any lottery hereafter be authorized or any sale of lottery tickets allowed within this state." The 1846 New York Constitution linked the legislative proscription on authorizing "any lottery" to the legislative proscription on granting "any divorce,"[12] as did the 1848 Wisconsin Constitution.

---

[10] The *Tri-Weekly Express* (Madison, Wisconsin) of January 8, 1848, carried part of the convention debate about the "divorce" language in Article IV, Section 24. The paper reported that Edward Whiton, later chief justice of this court, supported the prohibition on legislative divorces, indicating that legislatures frequently granted divorces on ex parte evidence or on no evidence at all. Whiton related an instance of a man and wife who had lived together many years having been divorced, without their knowledge or wish, upon the petition of various individuals. "He said the courts by our law have discretionary power." *The Attainment of Statehood* 439 (Milo M. Quaife, ed., 1928). The constitutional provision on divorce was grounded in concern about legislative abuse in granting divorces, not outright opposition to divorce.

[11] *See, e.g., Attorney Gen. ex rel. Schantz v. Brunst*, 3 Wis. 689 [*787], 692 [*790] (1854).

[12] The same linkage is found in the 1845 Louisiana Constitution. Under Title VI (General Provisions) of the 1845 Constitution, Article 116 provided: "No lottery shall be authorized by this State, and the buying or selling of lottery tickets within this State, is prohibited." Article 117 then added: "No divorce shall be granted by the Legislature."

¶ 125. What is especially significant about this probable source of Article IV, Section 24 is that the New York lottery provision was construed in *Reilly v. Gray*, 28 N.Y.S. 811 (1894), *not* to apply to betting on horse races. The court explained the purpose of the New York provision:

> For many years prior to 1821 there had existed laws for the prohibition of all lotteries other than such as should be authorized by the Legislature. The Legislature, however, had by special acts authorized them to such an extent as to call for a constitutional prohibition. Evidently it was not deemed wise to trust the Legislature on the subject.
>
> . . . It seems . . . very clear that it was not the intention of the framers of the Constitution . . . in the use of the word "lottery," to include in it the subject of betting as then prohibited by statute. They were distinct subjects upon the statute book and in the public mind, and, if the design had been to cover both, they would have been named.

*Id.* at 815 (citation omitted).

¶ 126. There is no record of discussion at Wisconsin's Constitutional Convention about the "lottery" language. The absence of controversy suggests that the framers were borrowing old concepts from New York and other states rather than originating new ones.[13]

---

[13] A recent treatise on the Maryland State Constitution describes the Maryland parallel:

> Maryland's history mirrors the national trend. The original 1776 Maryland Constitution did not mention lotteries although lotteries to raise funds for local government projects were common. Under these lottery grants, the General Assembly would name specific individuals who were required to post bond and conduct the lottery

¶ 127. Farnsley's use of the word "authorize" in his historical explanation matches the constitutional language in Article IV, Section 24. Farnsley, *supra,* at 854. This word implies that the Wisconsin framers had a specific concern about official legislative authorization of lotteries, as opposed to a broad concern about all gambling. The legislature had ample police power to regulate or prohibit all gambling. Thus, the purpose of the constitutional provision was to deny our legislature the authority to give its imprimatur to lotteries as a source of government or private revenue because so many lotteries had proven to be unreliable or corrupt. *Id.*

¶ 128. Third, building on the second point, the language in contemporaneous state constitutions almost always included language on lottery "tickets," indicating mass participation as opposed to participation by a small number of people. For instance, Article 12, Section 6 of the 1835 Michigan Constitution provided: "The legislature shall not authorize any lottery nor permit the sale of lottery tickets." Article IV, Section 29 of the 1846 Iowa Constitution stated: "No lottery shall be authorized by this State, nor shall the sale of lottery tickets be allowed." The 1849 California Constitution provided in Article IV, Section 19 that "No lottery shall be allowed by this State, nor shall the sale of lottery tickets be allowed." The 1859 Kansas Constitu-

to raise a stated amount. As early as 1817, the legislature began to try to regulate the proliferation of lottery grants. Constitutional amendments in 1835 and 1840 provided for the phasing-out of state lottery grants. The 1851 constitution prohibited lottery grants and provided for a phase-out of existing lottery grants suggesting that the previous amendment was ineffective in banning lotteries.

Dan Friedman, *The Maryland State Constitution, A Reference Guide* 120 (2005).

tion (Article 15, Section 3) declared that "Lotteries and the sale of lottery tickets are forever prohibited."[14]

¶ 129. In 1870 a revised Illinois Constitution provided in Article IV, Section 27: "The General Assembly shall have no power to authorize lotteries or gift enterprises, for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise *tickets* in this State[.]" (Emphasis added.) The Illinois Constitution shows that more than 20 years after the Wisconsin Constitution was adopted, our neighbors to the south saw lotteries as a specific form of gambling that utilized tickets.

¶ 130. The Louisiana Constitution of 1921 is also instructive. Article XIX, Section 8 provided:

> Gambling is a vice and the Legislature shall pass laws to suppress it.
>
> Gambling in futures on agricultural products or articles of necessity, where the intention of the parties is not to make an honest and bona fide delivery, is declared to be against public policy; and the Legislature shall pass laws to suppress it.
>
> Lotteries and the sale of lottery tickets are prohibited in this State.

---

[14] This lottery provision did not bar other types of gambling in such frontier towns as Dodge City. According to a September 1, 1877, article in the *Dodge City Times*, "Gambling ranges from a game of five-cent chuck-a-luck to a thousand dollar poker pot. Nothing is secret, but with open doors upon the main street the ball rolls on uninterruptedly." *See* www.spartacus.schoolnet. co.uk/WWdodge.htm.

This is not a trivial point. Casino-type gambling was widespread on riverboats and in much of the West during parts of the 19th Century, notwithstanding lottery prohibitions in individual states. The familiar image of gambling in old west saloons is not a figment of modern imagination.

¶ 131. The 1921 Louisiana Constitution drew an explicit distinction between lotteries and other forms of gambling. This distinction is underscored by the self-executing provision on lotteries (but not other gambling) and the reference to "lottery tickets." The reference to tickets was a nearly uniform pattern in the states, especially at the time the Wisconsin Constitution was adopted. The fact that the Wisconsin Constitution did not refer to "lottery tickets" in 1848 should not be interpreted as a departure from that pattern, at least without some evidence to support such an interpretation.

¶ 132. Finally, the experience outside Wisconsin is consistent with the experience in Wisconsin. Pre-statehood territorial legislation governing gaming tables and gambling devices did not address lotteries; post-statehood legislation distinguished between lotteries and other forms of gaming.[15] *Panzer,* 271 Wis. 2d 295, ¶ 7.[16]

---

[15] At the First Session of the Legislative Assembly of the Territory of Wisconsin, the territorial legislature approved an act to prevent and punish gambling. Ch. 65, Laws of the Wisconsin Territory, First Session (approved Jan. 18, 1838). The act provided criminal penalties for setting up, keeping, and permitting any gaming table or gambling device or betting money at any gaming table, but it made no reference to lotteries. The 1839 Statutes of Wisconsin contain "An Act to provide for the punishment of offences against public policy." Statutes of the Territory of Wisconsin 363–65 (1839). The first seven sections of this act deal with lotteries, while sections 8, 9, and 10 deal with other forms of gaming. This legislation was carried over after statehood. Chapter 138, "Of Offences Against Public Policy," Revised Statutes of the State of Wisconsin 705–07 (1849). In these early statutes, table games such as faro, "E O," and roulette were treated differently from lotteries. *Id.*

[16] For a discussion of the history of Wisconsin's lottery, see Dan Ritsche, Wisconsin Legislative Reference Bureau, *The*

¶ 133. In his law review article, Farnsley notés that Wis. Stat. ch. 138 § 1 (1849) "uses the term 'lottery' in its limited sense." Farnsley, *supra* at 855 n.225. He quotes Section 1 as follows:

> Every person who shall set up or promote any lottery for money ... and every person who shall aid either by *printing or writing,* or shall in any way be concerned in setting up, managing or *drawing* any such lottery, or who shall in any house, shop or building owned or occupied by him ... knowingly permit the setting up, managing or *drawing* any such lottery, or the sale of any *lottery ticket,* or share of a *ticket* ....

In other words, the first law passed by the legislature following the adoption of the constitution spoke of lotteries and "lottery tickets," and of a "drawing," all signifying a limited scope to the term. Moreover, the Index to the 1849 statutes clearly distinguishes lotteries from betting and gaming. The two subjects appeared under different headings in the index and on different pages in the statutes.

¶ 134. There is no reference to betting on horse races in the 1849 statutes. According to Farnsley, the legislature first acted in 1878 to halt gambling at racetracks (Wis. Stat. § 1779 (1878)), and in 1885 to halt gambling at local fairs (Wis. Stat. § 1463 (1889)).[17] Farnsley, *supra,* at 857. Thus, Richard Current was able to write: "By 1857 horse racing and betting on the horses were well established, at least in some parts of the state." Richard N. Current, *II The History of Wisconsin* 128 (1976). Betting on horses at racetracks and

*Evolution of Legalized Gambling in Wisconsin,* Research Bulletin 00–1 (May 2000) (hereinafter *Ritsche*).

[17] *See* Ritsche, *supra,* at 5–6 (discussing the history of on-track betting in Wisconsin).

local fairs would not have been possible if the public had understood Article IV, Section 24 as a ban on all gambling.

¶ 135. The distinction between lotteries and the broader terms "gaming" and "gambling" is also found in early court decisions. For instance, in *State v. Lewis,* 12 Wis. 483 [*434] (1860), the defendant was indicted "for permitting *gaming* with cards for gain upon his premises." *Id.* at 483 [*434] (emphasis added). The decision discusses cards as gaming devices and it mentions euchre, poker, faro bank, and roulette but never uses the word "lottery."

¶ 136. The first case to use the word "lottery" was *Lemon v. Grosskopf,* 22 Wis. 427, 99 Am. Dec. 58 (1868).[18] It involved a dispute between the owner of a "lottery scheme in the city of Chicago" and his agent in Milwaukee. The "defendant was employed by the plaintiff to sell [ ] *lottery tickets,* receive and retain the money for them until he became satisfied that the *drawing* of the *prizes* in the scheme was fairly conducted, and then account to the plaintiff." *Id.* at 431 (emphasis added). The court's decision makes no reference to "gaming" or "gambling."

¶ 137. Finally, in a third case, we see this court use the words "lottery" and "gaming" in the same opinion. *Sperry & Hutchinson Co. v. Weigle, State Dairy & Food Comm'r,* 166 Wis. 613, 166 N.W. 54 (1918) ("Trading Stamp cases"). The issue presented was the constitutionality of state legislation prohibiting the use of trading stamps except for stamps having cash value. The court upheld the legislation as a proper exercise of

[18] *See also Everingham v. Meighan,* 55 Wis. 354, 13 N.W. 269 (1882).

the police power. It did not cite Article IV, Section 24. Rather, it cited *Rast v. Van Deman & Lewis Co.,* 240 U.S. 342 (1916), and said:

> [T]he court held that the scheme and practice of issuing such trading stamps in connection with the conduct of a lawful business . . . and the redemption thereof in articles of merchandise or premiums in addition to the articles sold is attended with evil and pernicious consequences, which have a tendency to affect the general welfare *similar in effect to the evils attending a "lottery" and "gaming."*

*Sperry & Hutchinson,* 166 Wis. at 622–23 (emphasis added). The court also approvingly quoted *Rast:* "This may not be called in an exact sense a 'lottery,' *may not be called 'gaming*'; it may, however, be considered as having the seduction and evil of such . . . ." *Sperry & Hutchinson,* 166 Wis. at 623–24 (quoting *Rast,* 240 U.S. at 365) (emphasis added). The use of trading stamps involved the elements of prize, chance, and consideration, but trading stamps did not fall within the lottery statute. The prohibition of these stamps required specific legislation. Thus, in 1916 this court acknowledged that "lottery" was not an all-inclusive term for "gaming."

¶ 138. To sum up, after reviewing relevant 19th Century and early 20th Century material, I find no evidence that the framers of the 1848 Wisconsin Constitution and the people who adopted it intended to ban all forms of gambling by approving Article IV, Section 24. They intended to prevent the legislature from authorizing a particular mass participation form of gambling that had frequently been used as a source of public and private revenue. The historical context shows that the provision requires a limiting interpretation.

## III. INTERPRETING ARTICLE IV, SECTION 24 AS AMENDED IN 1987

¶ 139. Article IV, Section 24 was amended three times between 1848 and 1986. The first amendment (1965) permitted certain kinds of promotional contests by excluding such actions as watching a television program, filling out a coupon, or visiting a mercantile establishment from consideration "as an element of a lottery." The second amendment (1973) authorized charitable bingo. The third amendment (1977) authorized charitable raffles.

¶ 140. In 1987 the constitution was amended twice more to authorize pari-mutuel on-track betting and a state operated lottery. In interpreting the latter provision, we begin with the words. The 1987 lottery amendment provided:

> (6) The legislature may authorize the creation of a lottery to be operated by the state as provided by law. The expenditure of public funds or of revenues derived from lottery operations to engage in promotional advertising of the Wisconsin state lottery is prohibited. Any advertising of the state lottery shall indicate the odds of a specific lottery ticket to be selected as the winning ticket for each prize amount offered. The net proceeds of the state lottery shall be deposited in the treasury of the state, to be used for property tax relief as provided by law.

¶ 141. The wording of subsection (6) was consistent with my interpretation of subsection (1). Notwithstanding the general bar in subsection (1) on legislative authorization of "any lottery," subsection (6) gave the legislature authority to permit a single sponsor—the state—to create, operate, and advertise a lottery with multiple prizes. People could make themselves eligible

for these prizes by purchasing "tickets." To be fair, however, the state lottery was required to advise people of "the odds of a specific lottery ticket to be selected as the winning ticket for each prize amount offered." For the state, the overriding purpose of the lottery was the generation of revenue "for property tax relief as provided by law." The professionalism and public scrutiny given to state operation of the lottery would protect people from mismanagement or fraud.

¶ 142. In 1987 the word "lottery" in subsection (6) gave no hint of applying to every gambling enterprise involving prize, chance, and consideration.

¶ 143. In interpreting the amendment, we are expected to consider the history of the times. By 1987 three of Wisconsin's neighboring states—Michigan, Illinois, and Iowa—had approved and started up lotteries like Wisconsin's. Minnesota was soon to follow. At least 26 states had established state lotteries before Wisconsin acted.

¶ 144. A report on "Gambling in California" produced by the California Research Bureau in 1997, explains the background:

> Growing opposition to tax increases was a leading factor in establishing state-run lotteries in the 20th century. In 1964 New Hampshire was the first state to sponsor a lottery, followed by New York in 1967. New Jersey launched the first financially successful modern lottery in 1971.
>
> . . . .
>
> Lotteries are legal now in 37 states and the District of Columbia.

Roger Dunstan, *Gambling in California,* II-9, III-1, California Research Bureau, California State Library

95

(1997) *available at* http://www.library.ca.gov/CRB/97/ 03/crb97003.html (last visited Mar. 2, 2006). This information provides historical context.

¶ 145. In October 1989 the Wisconsin Lottery asked Attorney General Donald J. Hanaway to answer two questions: (1) What is the scope of gaming in which the Wisconsin Lottery is authorized or permitted to engage by Article IV, Section 24 of the Wisconsin Constitution and Chapter 565 of the Wisconsin Statutes; and (2) If the Wisconsin Lottery cannot legally offer a particular type of gaming or gambling operation as part of the lottery, may such type of game or gambling operation be lawfully included in state-tribal gaming compacts within the Indian Gaming Regulatory Act, 25 U.S.C. § 2701–2721?

¶ 146. Attorney General Hanaway answered these questions in a 1990 opinion. 79 Op. Att'y Gen. 14 (1990). He concluded that the term "lottery" in the constitution and statutes did not include all forms of gaming:

> Betting, playing gambling machines and operating gambling places are not to be considered as included within the meaning of the term lottery as used in the constitution, and chapters 945 and 565, Stats. (1987–88). Therefore, it is clear, that the meaning of the term lottery as contained in the constitution and both legislative enactments up to the present day does not include and is not meant to embrace all the forms of gambling.

*Id.* at 26.

¶ 147. Attorney General Hanaway observed that constitutional provisions on the same subject are normally construed together and considered to be in pari

materia. *Id.* He also asserted that constitutional provisions, like statutes, should be construed to make sense.

> It is apparent to me that during the entire legislative debate, over several years, on the advisability of adopting a resolution providing for a constitutional amendment authorizing a state operated lottery, during the public debate prior to the ratification of such constitutional amendment by statewide referendum in April of 1987, and during the legislative deliberations and debate on the enactment of legislation enabling the lottery constitutional amendment, chapter 565, there was neither legislative or public discussion or debate nor legislative or public intent to authorize the playing of roulette, blackjack, craps, slot machines, video gambling machines and other types and forms of casino gambling.

*Id.* at 26–27.

¶ 148. Attorney General Hanaway's reference to Chapter 565 of the statutes alluded to the fact that the first legislation following the enactment of the amendment dealt with the state operated lottery as a specific form of gambling.

¶ 149. The implications of Hanaway's opinion were controversial. In light of the opinion, Wisconsin's 11 Indian tribes and bands were not entitled to demand casino gambling based on the lottery amendment. However, the legislature was not barred by the constitution from authorizing casino gambling, slot machines, and video games. In fact, the legislature could authorize casino gambling "just in Indian country." *Id.* at 14, 32. A more subtle implication of Hanaway's opinion was that previous attorneys general, the Wisconsin Supreme Court, and the Legislative Reference Bureau had been reading too much into the original 1848 provision. For

diverse reasons, Hanaway's opinion was sharply criticized, and he was defeated in the November 1990 election.[19]

¶ 150. The new attorney general, James E. Doyle, issued a second opinion in May 1991. 80 Op. Att'y Gen. 53 (1991). The Assembly Organization Committee asked him: "[D]oes Wisconsin Constitution, article IV, section 24, prohibit all forms of gambling in Wisconsin, except for those matters specified in the Constitution, or does the constitutional term 'lottery' have a narrow scope that would allow legislation to be enacted legalizing the forms of gambling to which reference is made in OAG 3–90?" *Id.* at 53.

¶ 151. Attorney General Doyle concluded that the legislature could not authorize any scheme involving prize, chance, and consideration without amending the constitution *unless* the scheme fell within the bingo, raffle, pari-mutuel on-track, or state lottery exceptions to the constitution. *Id.*[20] He added, however, that "the Legislature may authorize *any type of state-operated lottery* subject only to the advertising, use-of-revenue and off-track wagering restrictions. The Legislature may not . . . authorize such lotteries if they are not operated by the state, or fall within the bingo, raffle or on-track, pari-mutuel exceptions." *Id.* at 58 (emphasis added). In short, the legislature could permit the state (but only the state) to operate casinos with every form of casino gambling.

----

[19] *See* Editorial, *Legislature Should Not Back Gambling,* Milwaukee Sentinel, Feb. 7, 1990, at 10 ("Hanaway is getting it from all sides."); Matt Pommer, *Doyle Says Hanaway Flipflopped on Gambling,* The Capital Times, June 29, 1990, at 3–A.

[20] *See* Ritsche, *supra,* at. 10–11 (discussing the divergent interpretations offered by Hanaway and Doyle).

¶ 152. Attorney General Doyle said he based his opinion on "prior decisions of the Wisconsin Supreme Court, the legislative history of the 1955 criminal code revision and the manner in which the Legislature has treated the term 'lottery' in proposing amendments to our constitution and enacting legislation." *Id.* at 54.

¶ 153. Attorney General Doyle quoted from the familiar three-part methodology for interpreting a constitutional provision, *id.*, but his opinion substantially disregarded this methodology to reach its conclusion.

¶ 154. The Doyle opinion operated from the reasonable premise that the term "lottery" in subsection (1) of Article IV, Section 24 and the term "lottery" in subsection (6) should be construed the same. *Id.* at 57 (citing *United States v. Nunez,* 573 F.2d 769, 771 (2nd Cir. 1978); 2A Singer, *Sutherland Statutory Construction* § 46.06 n.6 (Sands 4th ed. 1984)). It argued that because the term "lottery" in subsection (1) covered all gambling, the term "lottery" in subsection (6) also must cover all gambling.

¶ 155. There were significant problems with this conclusion. In focusing on subsection (1), the opinion did not take into account the meaning, purpose, history, and interpretation of the provision in 1848. It concentrated instead on broad interpretations of the term "lottery" many years after the provision was adopted. According to the opinion:

> (1) "The term 'lottery' has been continuously and uniformly construed by the courts to include the three elements of prize, chance and consideration." 80 Op. Att'y Gen. at 55 (citing cases).

> (2) "Numerous prior opinions of the attorney general have . . . found a violation of the lottery *statute* whenever the three elements of prize, chance and consideration were present in any scheme." *Id.*

(3) "As stated by the Wisconsin Supreme Court: 'The legislature, the courts, and the attorney general have traditionally taken a restrictive view of games, schemes, and plans involving a prize, chance, and consideration, *condemning them as lotteries prohibited by the constitution.*'" *Id.* at 55–56 (quoting *Kayden Indus.* 34 Wis. 2d at 724) (emphasis added).

¶ 156. In reviewing this analysis, there is no dispute "that a lottery involves three elements. There must be a prize, chance, and a consideration." *State ex rel. Cowie v. La Crosse Theaters Co.*, 232 Wis. 153, 158, 286 N.W. 707 (1939). It does not follow, however, that every undertaking that involves prize, chance, and a consideration *is* a lottery.

¶ 157. Gambling is a broad term covering many forms. A lottery is one form of gambling. Pari-mutuel on-track betting is another form of gambling. Roulette is a form of gambling. Each of these forms includes the elements of prize, chance, and consideration. But each of these forms has unique characteristics. It is no more logical to say that the term "lottery" includes "roulette" than to say that the term "roulette" includes "pari-mutuel on-track betting."

¶ 158. When we carefully examine the authorities cited in Attorney General Doyle's opinion, we can begin to understand how constitutional interpretation wandered off course.

¶ 159. In 1916 Attorney General Walter Owen was asked by officials of the Wisconsin State Fair whether they could sell lapel buttons together with a "ticket for admission, upon the back of which will be a number. The holder of the lucky number will win an Overland automobile." 5 Op. Att'y Gen. 380, 380 (1916). The Attorney General concluded that this scheme constituted a lottery in violation of Wis. Stat. §§ 4523 and

100

4524. *Id.* at 382. His opinion made no reference to Article IV, Section 24 of the Wisconsin Constitution. He quoted from Monte M. Lemann, *Lotteries* 25, Cyclopedia of Law and Procedure 1633 (William Mack & Howard P. Nash eds., 1912), that "a lottery is a *species of gaming* which may be defined as a scheme for the distribution of prizes by chance among persons who have paid, or agreed to pay, a valuable consideration for the chance to obtain a prize." *Id.* at 381 (emphasis added). Thus, the state fair plan constituted a lottery *under the lottery statute.* "State agencies charged with the duty of carrying forward state enterprises should not adopt methods in the prosecution of their work which amount to violation of *criminal statutes." Id.* at 382 (emphasis added).

¶ 160. In a 1920 opinion, Attorney General John Blaine commented on gift coupons containing four numbers. These numbers could be drawn separately and awarded prizes. *See* 9 Op. Att'y Gen. 9 (1920). Both the distribution of the coupons and the drawing of the numbers were orchestrated by a local newspaper. After quoting the same definition of lottery quoted in the 1916 opinion, the Attorney General said:

> If the coupon is obtained without money, without consideration or without the rendering of services, as some form of valuable consideration, the return merely constitutes a method for the distribution of a gratuitous gift.

> If there was a consideration here for the sale of the chance or for the receipt of the coupon, which constitutes evidence of chance, a lottery perhaps might be shown.

> If, in order to receive the coupon, it is necessary for one to purchase a newspaper, in such case it might be held a lottery scheme.

101

*Id.* at 11. Attorney General Blaine did not cite Article IV, Section 24.

¶ 161. In a 1922 opinion, Attorney General William Morgan stated: "It is unlawful to sell numbered tickets for general admission . . . and make a free gift of an automobile to the purchaser and owner of a ticket." 11 Op. Att'y Gen. 396 (1922). Then he added: "*Whenever* prizes are given, the prize winner being determined by chance, and there being a consideration paid for such chance, it is a violation of our antilottery laws." *Id.* (emphasis added). The Attorney General's use of the word "whenever" in this sentence without reference to the limitations of either the constitution or statutes, represented a substantial broadening of the term "lottery."

¶ 162. In subsequent opinions, 23 Op. Att'y Gen 396 (1934) ("a scheme to sell about 100,000 tickets out of which twenty-three will be drawn to receive $500 each and the twenty-fourth to receive $10,000"); 26 Op. Att'y Gen. 143 (1937) (bank night, involving cards bearing numbers entitling holders to prize money if they also purchase theater tickets); 28 Op. Att'y Gen. 457 (1939) (a modified form of bank night); and 28 Op. Att'y Gen. 556 (1939) (ticket dispenser at movie theater periodically gives ticket refunds depending on how many tickets are sold), attorneys general concluded that each of the respective schemes was a "lottery."

¶ 163. In most of the above-referenced opinions, the respective attorney general pointed to a specific lottery statute, such as Wis. Stat. § 348.01 (1939). This lottery statute was different from the statutes that covered gaming devices (Wis. Stat. § 348.07 (1939)), betting upon games (Wis. Stat. § 348.08 (1939)), gambling contests of skill, speed, or power of man or beast (Wis. Stat. § 348.085 (1939)), "policy" games (Wis. Stat.

102

§ 348.171 (1939)), and pool selling (bookmaking) (Wis. Stat. § 348.172 (1939)). One deficiency in Attorney General Doyle's opinion was that it failed to mention the *multitude* of attorney general opinions that discuss other forms of gambling besides lotteries but do not make reference to the term "lottery."

¶ 164. Attorney General Doyle also cited four cases to support the proposition that the term "lottery" has been "continuously and uniformly construed by the courts to include the three elements of prize, chance and consideration." 80 Op. Att'y Gen. at 55 (citing *Kayden Indus.*, 34 Wis. 2d 718; *State v. Laven,* 270 Wis. 524, 71 N.W.2d 287 (1955); *State ex rel. Regez v. Blumer,* 236 Wis. 129, 294 N.W. 491 (1940); and *La Crosse Theaters,* 232 Wis. 153). Curiously, the opinion omitted *State ex rel. Trampe v. Multerer,* 234 Wis. 50, 289 N.W. 600 (1940).

¶ 165. The *La Crosse Theaters* case involved bank nights at a theater. The State sought to enjoin the practice as a nuisance on the ground that a bank night was a lottery. The defendant argued that a bank night did not constitute a lottery. This court disagreed, stating "that a lottery involves three elements. There must be a prize, chance and a consideration." *La Crosse Theaters,* 232 Wis. at 158. It concluded that going to a theater either to purchase a ticket or to register to become eligible for a prize was "consideration" and part of a "scheme" to increase ticket sales at the theater. When the court addressed an additional argument that the state should not seek to enjoin the violation of a criminal statute, it noted that the state had "abated" a place where liquor was sold during Prohibition. Then it added: "'The maintenance of a lottery is as much the violation of the public policy of the state as declared *by its constitution* and its criminal statutes as is the sale of

intoxicating liquor in violation of its criminal laws, or . . . the Eighteenth Amendment." *Id.* at 160–61 (emphasis added). This oblique reference to the constitution added a new dimension to the analysis.

¶ 166. The *Regez* and *Laven* cases did not discuss the constitution. They did nothing more than reiterate the three elements of a lottery. But the uncited case, *Multerer,* added a twist.

¶ 167. In *Multerer* (1940), a private citizen sought to enjoin the defendants from maintaining or permitting a gambling house and from conducting bingo on the premises. *Multerer,* 234 Wis. at 51. The citizen accused the defendants of openly using their premises to carry on the game of bingo "or similar and other games of chance," and contended that the premises constituted "a common gambling resort; [and] that great numbers of persons resorted to said premises for the purpose of gaming or gambling." *Id.* The defendants acknowledged that their public halls "had been rented to various charitable, religious, and fraternal organizations who had played bingo and used the proceeds for charitable, religious, and fraternal purposes." *Id.* (citing Wis. Stat. § 348.07 (1939)). The circuit court concluded that bingo was "a gambling game" and that the citizen was entitled to an injunction.

¶ 168. On appeal, the defendants contended that "bingo was not gambling as it was played upon the defendants' premises." *Id.* at 55. But they conceded "that the term 'gamble' is sufficiently broad to embrace the game of bingo if played for money or prizes and for purposes other than those of raising money for charitable or patriotic purposes." *Id.* at 55–56. The court responded:

> We have no doubt that bingo, as played for about a year upon the defendants' premises, was *a gambling*

104

*game and was a lottery. . . .* [A] lottery involves three elements. There must be a prize, chance, and a consideration. . . . In the playing of bingo there obviously was a consideration . . . Clearly, bingo as played upon the premises was a lottery, and was played in violation of the statutes of this state. Sec. 348.01, Stats.

*Id.* at 56 (emphasis added).

¶ 169. None of the above-quoted language is suspect. But the court plowed on: "Sec. 24, art. IV, of our constitution provides: 'The legislature shall never authorize any lottery.' That is a strong declaration of the public policy of this state." *Id.* "If a state or its municipalities may not be authorized by its legislature *to conduct gambling and lotteries* for their benefit, it seems clear that religious or charitable organizations could not be so authorized, in the face of a constitutional provision like ours." *Id.* at 58.

¶ 170. What the court did in *Multerer—for the first time*—was to assert that the constitution prohibited "gambling," which is a much broader term than "lottery." The decision is notable for its total failure to apply *any* of the methodology we now consider proper in interpreting a constitutional provision to discern the intent of the framers and the people who adopted the provision.

¶ 171. After the *Multerer* decision, attorneys general broadened their interpretation of lotteries to include other gambling. *See, e.g.,* 32 Op. Att'y Gen. 181 (1943) (coin-in-the-slot gambling games and devices of pinball, slot machine or similar design type, as well as bingo, are lotteries prohibited by Article IV, Section 24, citing *Multerer*). Thus, it was not surprising when this court stated in *Kayden Industries* (1967) that: "'The legislature, the courts, and the attorney general of Wisconsin have traditionally taken a restrictive view of

105

*games,* schemes, and plans involving prize, chance, and consideration, *condemning them as lotteries prohibited by the constitution." Kayden Indus.,* 34 Wis. 2d at 724 (emphasis added).

¶ 172. Attorney General Doyle's opinion used this quotation as the central tenet in its analysis of the original Article IV, Section 24, even though none of the court decisions or attorney general opinions leading to this statement had ever provided a serious analysis of the meaning or intent of the constitutional text. This same mistaken mindset of "lottery equals all gambling" —based upon cases like *Kayden Industries*—prompted the Legislative Reference Bureau repeatedly to draft constitutional amendments on gambling as *exceptions* to the prohibition on lotteries in Article IV, Section 24.

¶ 173. Once again, while it is true that a lottery requires the elements of prize, chance, and consideration, it is not true that every game involving prize, chance, and consideration is a lottery. A lottery is gambling, but not all gambling is a lottery, because lotteries are but one species in the larger class of gambling.

¶ 174. Having concluded that the term "lottery" in subsection (1) of Article IV, Section 24 covered all gambling, Attorney General Doyle's opinion set out to render a consistent interpretation of the term "lottery" in subsection (6). In subsection (6), however, the term "lottery" was surrounded by other language such as "specific lottery ticket," "winning ticket," "promotional advertising," and "the odds of a specific lottery ticket [being] selected as the winning ticket."

¶ 175. The opinion tackled the "ticket" dilemma as follows:

> [I do not] view the use of the word "ticket" in the third sentence . . . as limiting the lottery to games

106

employing a ticket as a method of determining the winner. The plain, ordinary definition of ticket is "a written, typed, printed, stamped, or engraved notice, record, memorandum, or token." Webster's Third New International Dictionary 2389 (1986). Under this definition, a ticket is evidence of participation in a lottery game. The word ticket does not require that the ticket be in some way used in the play of the game or selection of the winner . . . . Under the plain meaning of the word "ticket" as set forth above, a note, document or token in writing which serves as a permit to participate in any specific game would serve as a ticket within the meaning of the constitutional provision.

The Lottery Board currently operates three such games involving tickets. The instant game television show does not use the ticket to determine the amount of the prizes awarded on the television show. A ticket is used to determine the participants in the show. Megabucks and SuperCash *tickets* are memoranda of the numbers selected by the player. The winners are ultimately determined by mechanical selection of numbered balls.

80 Op. Att'y Gen. at 58–59 (emphasis added).

¶ 176. This rationale covered particular games conducted by the Wisconsin Lottery. It even covered the evidence of a pari-mutuel bet on a particular horse or dog in a specific race. But it did not explain a person's play with a slot machine or at a roulette table. It did not try to equate tickets and cards.

¶ 177. The constitutional requirement that the State provide "the odds" that a person will win a specific lottery game, when applied to non-lottery games such as roulette or poker, was simply explained away with the comment that "implementation of some lottery

107

games [will be] more difficult [for the State Lottery] than others." *Id.* at 58.[21]

¶ 178. The 1991 Attorney General's opinion did not examine the 1987 amendment in its historical context, and it did not discuss its legislative intent. Attorney General Hanaway had asserted that there was no evidence that the framers of the amendment or the people who adopted it ever intended to authorize casino gambling. 79 Op. Att'y Gen. at 26–27. Attorney General Doyle never rebutted this assertion.[22] There was also

---

[21] This analysis is inconsistent with the commentary in *State ex rel. Martin v. Heil,* 242 Wis. 41, 55, 7 N.W.2d 375 (1941), where the court stated:

> It is extremely important in the interpretation of constitutional provisions that we avoid determinations based purely on technical or verbal argument and that we seek to discover the true spirit and intent of the provisions examined. We must not fail to give effect to plain and completely unambiguous language in the constitution, but where there is reasonable ground to differ concerning the sense in which language is used, the provision should be examined in its setting in order to find out, if possible, the real meaning and substantial purpose of those who adopted it.

[22] In 1992 the Legislative Reference Bureau prepared an extensive legal memorandum discussing Article IV, Section 24 and the Hanaway and Doyle opinions. *See* Memorandum from Barry J. Stern, Legis. Att'y, to Sen. Michael Ellis (Feb. 13, 1992) (on file with the Legislative Reference Bureau) (regarding "Constitutionality of 1991 Assembly Bill 469"). The memorandum argued that the meaning of the term "lottery" in Section 24(6) is different from the meaning of the term in Section 24(1). It defended Attorney General Doyle's interpretation of "lottery" in subsection (1), citing the same cases cited in the Doyle opinion, but disagreed with the interpretation of subsection (6). The memorandum stated:

> The Doyle opinion appears to have given substantial weight . . . to the presumption that "lottery" means the same thing in s. 24(6) as it does in s. 24(1). It analyzed ways that the "ticket"

no discussion in the opinion of the relationship between the lottery amendment and the pari-mutuel on-track betting amendment adopted the same day. The lottery amendment purportedly gave the legislature authority to permit the State Lottery to conduct "casino-type games" as well as other gaming activities besides traditional lotteries. 80 Op. Att'y Gen. at 58. But the pari-mutuel on-track betting amendment specifically

language could make sense if "lottery" in s. 24(6) refers to any form of gambling, including casino-type gambling, but did not consider any arguments to the contrary. It did not examine the legislative history of or contemporary news accounts relating to the approval of s. 24(6), the referendum question submitted to the voters in April 1987 or the legislative history relating to the enactment of ch. 565. Instead, it identified certain language in ch. 565 that, in isolation from the rest of ch. 565, arguably supports a construction of "lottery" in s. 24(6) to mean any form of gambling.

I am fairly certain that a Wisconsin state court would not accept the reasoning of the Doyle opinion in construing "lottery" in s. 24(6). The literal meaning approach taken in the Doyle opinion is an approach that, to my knowledge, has never been taken by a Wisconsin state court in construing a . . . constitutional provision. As previously discussed in this memorandum, the literal meaning approach . . . is rarely followed by a court in construing a constitutional provision.

. . . .

In examining the legislative history relating to the approval of s. 24(6) and the enactment of ch. 565, the court would be expected to examine the LRB drafting files and other documents prepared by legislative service agencies relating to those provisions. *I have examined those drafting files and there is no mention in either file of anything related to casino-type gambling or of any intent for the legislature to authorize the state to operate any form of gambling other than the specific form of gambling that was being conducted by various other states and that involves the sale of lottery tickets* and the selection of winning tickets through drawings or another method of chance.

*Id.* at 10–11, 12–13 (emphasis added).

109

provided that, "The state may not own or operate any facility or enterprise for pari-mutuel betting, or lease any state-owned land to any other owner or operator for such purposes." Article IV, Section 24(5) (1987). It is hard to reconcile these provisions. Why would the voters ratify *state* operation of casinos and slot machines but prohibit *state* operation of pari-mutuel on-track betting?

¶ 179. In my view, Attorney General Doyle's opinion was grounded on a mistaken premise about the effect of subsection (1), followed by a mistaken and tortured interpretation of subsection (6) so that it coincided with subsection (1). His interpretation of subsection (6) disregarded historical setting and the intent of the framers and the people who adopted it.

## IV. THE UNITED STATES DISTRICT COURT'S DECISION IN THE *LAC DU FLAMBEAU* CASE

¶ 180. Attorney General Doyle's 1991 opinion contained a footnote that "The State of Wisconsin is currently a defendant in a lawsuit involving the issue of gambling activities which must be the subject of negotiations between the state and Indian tribes under the Indian Gaming Regulatory Act." 80 Op. Att'y Gen. at 54 n.1. The lawsuit referred to was *Lac du Flambeau Band of Lake Superior Chippewa Indians v. State of Wisconsin,* 770 F. Supp. 480 (W.D. Wis. 1991). This landmark case resulted in an order requiring the state to negotiate Indian casino gaming in Wisconsin.[23]

¶ 181. The United States District Court *ordered* Wisconsin to negotiate over all forms of Class III

---

[23] *See* Ritsche, *supra,* at 20–21.

gaming under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701. The court stated:

> The parties dispute whether the state is required to include casino games, video games and slot machines in its negotiations with the tribes. I conclude that it is required to negotiate those activities because they are permitted under Wisconsin law within the meaning of 25 U.S.C. § 2710(d)(1)(B).

*Lac du Flambeau,* 770 F. Supp. at 482.

¶ 182. In my view, this conclusion represented a fundamental misreading of IGRA. The critical provision of IGRA reads as follows:

> (d) *Class III gaming activities; authorization; revocation; Tribal-State compact*
>
> (1) Class III gaming activities shall be lawful on Indian lands *only if such activities are—*
>
> (A) authorized by [a Tribal] ordinance or resolution . . .
>
> (B) *located in a State that permits such gaming for any purpose by any person, organization, or entity,* and
>
> (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

25 U.S.C. § 2710(d)(1)(A)-(C) (emphasis added).

¶ 183. In *Lac du Flambeau,* the State argued that, irrespective of the Wisconsin Constitution, casino games, video games, and slot machines were not permitted for any purpose by any person, organization, or entity, and thus Wisconsin was not required to bargain over these games. According to the court:

> Defendants' position is that Congress meant "permits" to be given its usual dictionary meaning of formally or

111

> expressly granting leave; therefore, unless a state
> grants leave expressly for the playing of a particular
> type of gaming activity within the state, that activity
> cannot be lawful on Indian lands.

*Lac du Flambeau,* 770 F. Supp. at 484–85. The court disagreed, pointing to alternative definitions of "permits," namely to "allow" or to "let" or to "acquiesce."

¶ 184. More significant, however, the court adopted the United States Supreme Court's analysis in *California v. Cabazon Band of Mission* Indians, 480 U.S. 202 (1987), "on which [it said] Congress relied in drafting the Indian Regulatory Gaming Act [sic]." *Lac du Flambeau,* 770 F. Supp. at 485. It noted that *Cabazon* said, "a court must analyze the state's policy toward gambling" to determine whether a state's criminal laws would apply to gambling on Indian lands. *Id.* By embracing this approach, the court substituted judicial balancing for the criteria set out in IGRA. The court said:

> The initial question in determining whether Wisconsin
> "permits" the gaming activities at issue is not whether
> the state has given express approval to the playing of a
> particular game, but whether Wisconsin's public policy
> toward Class III gaming is prohibitory or regulatory.

*Id.* at 486. The court concluded: "The amendments to the Wisconsin Constitution evidence a state policy toward gaming that is now regulatory rather than prohibitory in nature. *Id.* "I conclude that [Wisconsin] is required to negotiate [casino games] because they are *permitted* under Wisconsin law within the meaning of 25 U.S.C. § 2710(d)(1)(B)." *Id.* at 482 (emphasis added).

¶ 185. In reaching this conclusion, the court leaned heavily on Attorney General Doyle's opinion. Utilizing the opinion's truncated historical analysis, the court stated:

The original Wisconsin Constitution provided that "[e]xcept as provided in this section, the legislature shall never authorize any lottery, or grant any divorce." For more than a century, *this prohibition* against "any lottery" was interpreted as prohibiting the operation or playing of any game, scheme or plan involving the elements of prize, chance and consideration.

*Id.* at 486 (emphasis added).[24]

¶ 186. The court added:

When the voters authorized a state-operated "lottery," they removed any remaining constitutional prohibition against state-operated games, schemes or plans involving prize, chance and consideration, with minor exceptions. *See* Op. Att'y Gen. Wis. 10–91, slip op. at 5 ("Under the [state] constitution, the Legislature may authorize any type of state operated lottery subject only to the advertising, use-of-revenue and off-track wagering restrictions.").

The amendments to the Wisconsin Constitution evidence a state policy toward gaming that is now regulatory rather than prohibitory in nature. *See [California v. Cabazon Band of Mission Indians,* 480 U.S. 202 (1987)] . . . . The fact that Wisconsin continues to prohibit commercial gambling and unlicensed gaming activities does not make its policy prohibitory.

*Id.* at 486–87.

¶ 187. The court used Attorney General Doyle's opinion again to rebut the State's argument about distinctions among different gaming activities:

Defendants offer no authority for distinguishing between the State's current lottery games and the

---

[24] These passages do not accurately quote the 1848 constitution and they do not accurately report the history of judicial interpretation.

113

[casino game] activities proposed for negotiation by the tribes. Instead the state makes the bald statement that casino games "are of a wholly different character than a state lottery or on-track pari-mutuel wagering." Defendants' reply brief at 17. The state's current attorney general has rejected the imposition of artificial distinctions within the term lottery, so long as the activity involves the elements of prize, chance and consideration and is not addressed explicitly by the constitutional amendments. Op. Att'y Gen. Wis. 10–91, slip op. at 5–7. I find no reason to impose similarly artificial categories in applying the *Cabazon* test and in interpreting the Indian Gaming Regulatory Act.

*Id.* at 487.

¶ 188. In sum, the court used Attorney General Doyle's opinion to conclude that Wisconsin had given a green light to nearly comprehensive gambling activity operated by the state, thereby moving from a prohibitory to a regulatory policy. As a result, the court said, Wisconsin was required to negotiate all Class III gaming with its tribes.[25]

¶ 189. The State appealed the district court's decision, but the Seventh Circuit Court of Appeals refused to review the merits of the action because the State failed to file a timely notice of appeal. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. State of Wisconsin,* 957 F.2d 515 (7th Cir. 1992). The State filed its appeal before the district court disposed of a motion

---

[25] In *Lac du Flambeau Band of Lake Superior Chippewa Indians v. State of Wisconsin,* 957 F.2d 515, 516 (7th Cir. 1992), the Court of Appeals summarized the district court's holding as follows: "The district court held that amendments to the state's constitution and recent legislation establishing a state lottery also authorized other forms of gambling, in which the tribes may engage."

to vacate the judgment, and thus the State's appeal was dismissed. The Seventh Circuit said:

> Much as we regret visiting the effects of counsel's error on the State of Wisconsin in a case bearing on its governmental powers, the current version of Rule 4(a)(4) leaves no alternative. A timely notice of appeal is essential to this court's jurisdiction. The notice defendants filed is ineffective. The appeal is dismissed for want of jurisdiction.

*Id.* at 517.

¶ 190. Four months after the Seventh Circuit dismissed the State's appeal, eight members of the Wisconsin legislature filed a petition to commence an original action in this court. *Leann v. Wisconsin,* 1993 Wisc. LEXIS 16, No. 92–1861–OA (Jan. 20, 1993). This court denied the petition on grounds that it presented no justiciable controversy. *Id.* at *2. Three members of the court, Justices Bablitch, Day, and Wilcox, would have heard the matter to clear up the confusion surrounding the meaning of the word "lottery." *Id.* at *8–9 (Bablitch, J., dissenting). The others refused.

¶ 191. As a result of these decisions, the district court's holding and order were never reviewed. Not until *Panzer v. Doyle* did a Wisconsin court openly question the correctness of the *Lac du Flambeau* ruling. *Panzer,* 271 Wis. 2d 295, ¶ 92. Now that a majority of this court adopts *Lac du Flambeau,* it is necessary to revisit the decision and show why the court's ruling was wrong.[26]

---

[26] A United States District Court is not the final arbiter of the meaning of a state constitution. In a February 25, 1997, letter to State Representative Daniel P. Vrakas, Attorney General Doyle wrote that:

¶ 192. Under IGRA, the statutory test for determining whether a state is required to negotiate a particular Class III gaming activity with Indian tribes is whether the state "permits such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B). The district court rejected a narrow interpretation of "permits," that is, it rejected any requirement for formal authorization of an activity by the state. But the court went well beyond that interpretation by construing the phrase "such gaming" in § 2710(d)(1)(B) to refer to *all* "Class III gaming activities" in § 2710(d)(1). Thus, in the court's view, if a state permitted or allowed *any* Class III gaming activity (like a state lottery), it was required to negotiate *all* gaming activities within Class III. There are several reasons why this conclusion was erroneous.

¶ 193. First, the phrase "such gaming" refers back to "Class III gaming activities," 25 U.S.C. § 2710(d)(1), not "Class III gaming." The term "Class III gaming" is defined in 25 U.S.C. § 2703(8). "Class III gaming" is a very broad term that encompasses an entire class of gaming under the statute, made up of *everything* that is not in the two other classes. By contrast, the phrase "Class III gaming activities" is elastic enough to cover

Judge Crabb's decision only binds the parties to the particular action in which it was issued. The only effect of the decision was to direct the parties to that case to enter into negotiations for a compact at that time. However, it did make clear, under the law as it existed in 1991, how Judge Crabb would have ruled in similar cases.

As a district court opinion, it has no mandatory precedential effect over future cases in that or any other court. Any new cases regarding negotiation of compacts, even between the same parties, would arise under a new fact situation and in a changed legal environment, and thus not be directed specifically by that prior decision.

all or part of the specific gaming activities within Class III. Clearly, "*a*" Class III gaming *activity* describes *one* of the gaming activities within that class.

¶ 194. Class III gaming *activities* are lawful only when they meet certain conditions. For instance, "Class III gaming *activities* shall be lawful on Indian lands *only if such activities*" are (A) authorized by a Tribal ordinance or resolution *and* (C) "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3)." Significantly, paragraph (3) refers to "*a* Class III gaming activity," a subset of the larger class. In addition, the statute contemplates tribal ordinances and tribal-state compacts enumerating one or more specific Class III gaming activities that have been authorized by a tribe and/or negotiated with a state. It would make no sense for either a tribe or a state to negotiate Class III gaming as a whole because neither party would be able to predict everything that might someday fall within that exceptionally broad class. Likewise, subparagraph (B) makes sense only when the term "such gaming" refers to one or more specific gaming activities permitted by the state.

¶ 195. Second, logic and history dictate this construction. A number of states permitted certain Class III gaming activities (like a state-operated lottery, pari-mutuel betting, slot machines, or jai alai) long *before* IGRA was enacted in 1988. These states acted before the statutory classification—"Class III gaming"—even existed. Thus, *if* the district court's interpretation of the statute were correct, each of these states would have been required—involuntarily—to negotiate all casino games with any tribe within its borders, irrespective of whether the state permitted *any* of these games. (To illustrate the district court's theory, if a state permitted

117

or allowed jai alai (and only jai alai) before IGRA, it would have been required to negotiate pari-mutuel betting, slot machines, and casino gaming after IGRA became law.) It passes belief to suppose that members of Congress from a state that had previously approved a single gaming activity now classified as a Class III gaming activity, would have voted for federal legislation that blew the doors off Indian gaming and transferred so much of their state's police power to other sovereignties. It is one thing to argue that a state that opens the door a crack to a particular gaming activity must negotiate that activity with all its tribes. *See Mashantucket Pequot Tribe v. Connecticut,* 913 F.2d 1024, 1026, 1029 (2nd Cir. 1990). It is quite another thing to argue that opening up the door to one gaming activity opens the doors to all gaming activities.

¶ 196. Third, legislative intent is also revealed in IGRA's legislative history. On June 25, 1987, Senator John McCain of Arizona appeared before the House Committee on Interior and Insular Affairs for a hearing on IGRA. Senator McCain said:

> [W]hen we talk about gaming spreading all over this country, let's not forget that no tribe will be allowed to have gaming operations which exceed that which is already allowed in the State.
>
> So, let's not paint the picture, let's not say casinos are going to spring up all over this Nation; they are not. No gaming will be allowed which exceeds the gaming which is allowed for non-Indians in that State.

*Indian Gaming Regulatory Act: Hearing on H.R. 964 and H.R. 2507 Before the Comm. on Interior and Insular Affairs,* 100th Cong. 177 (1987).

¶ 197. Committee Chairman Morris K. Udall agreed:

118

> Mr. McCain pointed out that one of the basic things in our bill, as long as we have been involved in this, is that Indians are not going to get any better treatment than anybody else, but they are going to get as good a treatment as anybody else, and if you have j'ai alai and poker parlors and whatnot in California, you can have j'ai alai and poker parlors in [an Indian] reservation or wherever else.

*Id.* at 178.

¶ 198. These basic assumptions about IGRA were echoed by other witnesses, including representatives of the Reagan Administration. *See id.* at 178 (statement of Rep. James H. Bilbray (D-Nev.)); *id.* at 208 (statement of Victoria Toensing, Deputy Assistant Att'y Gen., Criminal Div., United States Dep't of Justice); *id.* at 222 (statement of Ross O. Swimmer, Assistant Secretary Indian Affairs, Bureau of Indian Affairs, United States Dep't of Interior). *See also Senate Hearings on S. 555 and S. 1303 Before the Select Comm. on Indian Affairs,* 100th Cong. 86 (1987) (statement of Sen. Peter V. Dominici).

¶ 199. The Senate Committee Report on Senate Bill 555, which ultimately became the Indian Gaming Regulatory Act, explained that Congress recognized:

> the need to fashion a means by which different public policies of these respective governmental entities [tribes and states] can be accommodated and reconciled. This legislation is intended to provide a means by which tribal and State governments can realize their unique and individual governmental objectives, while at the same time, work together to develop *a regulatory and jurisdictional pattern that will foster a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied.*

S. Rep. No. 100–446, at 6 (emphasis added).

119

¶ 200. This language is not as direct in its guidance as it might be, but it recognizes the desirability of "consistency and uniformity" in gaming regulation as well as the right of a state to protect its governmental objectives. Thus, although IGRA permits a state to negotiate a compact that grants tribes exclusive authority to engage in certain Class III gaming activities, the state is not *required* to give its tribes the right to engage in these Class III gaming activities when it *prohibits* these activities to *everyone* else. Congress established a clear rule that a Class III gaming activity is lawful on Indian lands *only* if the activity is located in a state that permits the activity "for any purpose by any person, organization, or entity" and *only* if the activity is conducted in conformance with a Tribal-State compact.

¶ 201. Significantly, IGRA strips federal courts of their authority to make subjective evaluations that characterize a state's gaming policy as regulatory or prohibitory. The Committee report states:

> S. 555 is intended to expressly preempt the field in the governance of gaming activities on Indian lands. Consequently, *Federal courts should not balance competing Federal, State, and tribal interests to determine the extent to which various gaming activities are allowed.*

S. Rep. No. 100–446, at 6 (emphasis added).

¶ 202. The report went on:

> [T]he Committee anticipates that Federal courts will rely on the distinction between State criminal laws which prohibit certain activities and the civil laws of a State which impose a regulatory scheme upon those activities to determine whether class II games are allowed in certain States. . . . The Committee wishes to make clear that, under S. 555, *application of the prohibitory/regulatory distinction is markedly different from the application of the distinction in the context of*

*Public Law 83–280* [as applied in *Cabazon*]. Here, the courts will consider the distinction between a State's civil and criminal laws to determine whether a body of law is applicable, as a matter of Federal law, to either allow or prohibit certain activities.

*Id.* (emphasis added).[27]

¶ 203. This statement modifies the ruling in *Cabazon*. Admittedly, the statement references "class II games," but this does not undermine the analysis. On the contrary, Class II gaming does not depend upon a compact. A tribe's right to a Class II gaming activity is determined by whether the state permits that gaming activity "for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(b)(1)(A). Consequently, when a dispute arises over whether a certain Class II gaming activity is lawful on Indian land, the answer does not depend on whether the state has agreed to that activity in a formal way. The answer depends on whether the state has enacted criminal laws that *prohibit* that activity to *everyone*. This new rule is even more applicable to Class III gaming activities.

¶ 204. The original understanding of IGRA from 1987–88 is affirmed today by the National Indian Gaming Commission. In its "Indian Gaming Regulatory Act Overview," the Commission states:

---

[27] The district court cited this very language. *Lac du Flambeau,* 770 F. Supp. at 485. Nevertheless, the district court inexplicably applied the prohibitory/regulatory distinction from *California v. Cabazon Band of Mission Indians,* 480 U.S. 202 (1987), rather than simply determining whether the gaming activity was prohibited by state criminal law, as contemplated by the Senate Report. *See Lac du Flambeau,* 770 F. Supp. at 485 (criticizing the State for ignoring the analysis in *Cabazon* for purposes of determining whether a state permits Class III gaming).

The Indian Gaming Regulatory Act, enacted in 1988 as Public Law 100–497 and now codified at 25 U.S.C. § 2701, establishes the jurisdictional framework that presently governs Indian gaming.

. . . .

The definition of class III gaming is extremely broad. It includes all forms of gaming that are neither class I nor II. Games commonly played at casinos, such as slot machines, black jack, craps, and roulette, would clearly fall in the class III category, as well as wagering games and electronic facsimiles of any game of chance. Generally, class III is often referred to a[s] casino-style gaming. *As a compromise, the Act restricts Tribal authority to conduct class III gaming.*

Before a Tribe may lawfully conduct class III gaming, the following conditions must be met: (1) *The particular form of class III gaming that the Tribe wants to conduct must be permitted in the state in which the tribe is located;* (2) The Tribe and the state must have negotiated a compact that has been approved by the Secretary of the Interior, or the Secretary must have approved regulatory procedures; and (3) The Tribe must have adopted a Tribal gaming ordinance that has been approved by the Chairman of the Commission.

*See* National Indian Gaming Commission, *Indian Gaming Regulatory Act Overview,* http://www.nigc.gov/laws/igra/overview.jsp (last visited March 1, 2006) (emphasis added). The phrase "particular form of class III gaming" decimates the *Lac du Flambeau* ruling.

¶ 205. Looking back, the district court was incorrect in almost every respect. It misread Wisconsin constitutional history and it misinterpreted IGRA, first, by engaging in a balancing interpretation that wrongly characterized Wisconsin's climate toward Class III gaming as regulatory rather than prohibitory, even though

Wisconsin *prohibited* all casino games by criminal statute; and, second, by concluding that if Wisconsin permitted any Class III gaming, it was required to negotiate all Class III gaming.

¶ 206. The district court's interpretation has been rejected by other federal courts.[28] In *Yavapai-Prescott Indian Tribe v. Arizona,* 796 F. Supp 1292, 1296 (D. Ariz. 1992), the court said the *Lac du Flambeau* "ruling missed the mark and went too far." It quoted a district court in Washington as saying, "frankly, the *Lac du Flambeau* analysis seems overbroad." *Id.* at 1296 n.13 (quoting *Spokane Tribe of Indians v. United States,* 782 F. Supp. 520, 522 n.2 (E.D. Wash. 1991)).

¶ 207. In addition, it should be noted that the United States Supreme Court handed down an important sovereign immunity decision in *Seminole Tribe v. Florida,* 517 U.S. 44, 47 (1996). In that case, the Court

---

[28] *See Rumsey Indian Rancheria of Wintun Indians v. Wilson,* 41 F.3d 421, 427 (9th Cir. 1994), *amended,* 64 F.3d 1250 (9th Cir. 1995) and 99 F.3d 321 (9th Cir. 1996) ("IGRA does not require a state to negotiate over one form of Class III gaming activity simply because it has legalized another, albeit similar form of gaming."); *Cheyenne River Sioux Tribe v. South Dakota,* 3 F.3d 273, 279 (8th Cir. 1993) ("The 'such gaming' language of 25 U.S.C. § 2710(d)(1)(B) does not require the state to negotiate with respect to forms of gaming it does not presently permit. Because video keno and traditional keno are not the same and video keno is the only form of keno allowed under state law, it would be illegal, in addition to being unfair to the other tribes, for the tribe to offer traditional keno to its patrons."); *Am. Greyhound, Inc. v. Hull,* 146 F. Supp. 2d 1012, 1067 (D. Ariz. 2001), *vacated on other grounds,* 305 F.3d 1015, 1018 (9th Cir. 2002) (holding that a compact cannot authorize forms of gaming not otherwise legal in state); *Coeur d'Alene Tribe v. Idaho,* 842 F. Supp. 1268, *aff'd,* 51 F.3d 876, 876 (9th Cir. 1995) (holding that state was required to negotiate only with respect to specific Class III games that were permitted in the state).

held that the Indian Commerce Clause—the authority under which Congress enacted IGRA—does not empower Congress to abrogate a state's Eleventh Amendment immunity. As a result, unless a state consents to suit, an Indian tribe may not enforce IGRA against a state in federal court. *Panzer,* 271 Wis. 2d at 355 n.37. In other words, without Wisconsin's consent, the district court could not issue a decision like *Lac du Flambeau* today.

## V. THE LEGISLATIVE RESPONSE TO THE *LAC DU FLAMBEAU* DECISION

¶ 208.　The *Lac du Flambeau* decision was issued on June 18, 1991. The Court's order "REQUIRED" the State "to conclude a tribal-state Class III gaming compact" with the two plaintiff tribes "within sixty (60) days from the date of this order." *Lac du Flambeau,* 770 F. Supp. at 488. By June of 1992 Governor Tommy G. Thompson had negotiated compacts with all 11 of the State's federally recognized tribes.[29] These compacts authorized (1) electronic games of chance with video facsimile displays; (2) electronic games of chance with mechanical displays; (3) blackjack; and (4) pull-tabs or break-open tickets when not played at the same location where bingo is played. *See Panzer,* 271 Wis. 2d 295, ¶ 25. These 11 compacts were scheduled to expire seven years after each took effect, but they could be extended and amended.

¶ 209.　One of the concluding paragraphs of the district court's opinion stated:

> I conclude that the state is required to negotiate with plaintiffs over the inclusion in a tribal-state compact of *any* activity that includes an element of prize,

---

[29] For a history and description of the compacts, *see* Ritsche, *supra,* at 22–28.

chance and consideration and *that is not prohibited expressly by the Wisconsin Constitution or state law.*

*Lac du Flambeau,* 770 F. Supp. at 488 (emphasis added). The court's language was noted in the legislature and may have influenced the legislative response to the decision. *See* Memorandum from Jane R. Henkel, Deputy Dir. of the Legislative Council, to Sen. Lynn Adelman (Feb. 26, 1992) (hereinafter Henkel/Adelman Memorandum); and Memorandum from Jane R. Henkel to Rep. David Travis 3 (June 19, 1992) (hereinafter Henkel/Travis Memorandum) (both on file with the Wisconsin Legislative Council, Madison, Wisconsin).

¶ 210. On April 2, 1992, Governor Thompson announced that he would call the legislature into special session on April 14 to vote on "a bill that would limit all forms of casino gambling." Press Release, *Governor Thompson Calls Gambling Special Session* (Apr. 2, 1992) (on file with Legislative Reference Bureau, Madison, Wisconsin). The news release stated that, as of that date, only three tribes did not have compacts. On April 13 Governor Thompson issued another news release that stated:

> Governor Tommy G. Thompson and Attorney General James Doyle have reached agreement on a bill limiting gambling. The legislature will consider the bill in special session tomorrow.
>
> "The bill before the legislature tomorrow is one that both the Attorney General and I support," Governor Thompson said. "This bill will limit gambling to exactly what Wisconsin voters intended when they approved a state lottery. . . . "
>
> The bill, as agreed upon, will narrowly define lottery to a form of gambling including only the types of games currently offered by the State Lottery and prohibit casino gambling.

It will prohibit the legislature from authorizing expanded gambling that has not been approved by voters in a statewide referendum and will not affect Indian gambling compacts agreed to within 30 days after the bill takes effect.

News Release, *Governor, Attorney General Agree on Gambling Bill* (Apr. 13, 1992) (on file with the Legislative Reference Bureau, Madison, Wisconsin).

¶ 211. Governor Thompson's companion bills, April 1992 Special Session Senate Bill 1 and April 1992 Special Session Assembly Bill 1, did not pass, but April 1992 Special Session Assembly Bill 6, introduced in May, was approved.[30] Analysis written by the Legislative Reference Bureau explained that:

---

[30] During consideration of April 1992 Special Session Assembly Bill 6, the legislature approved an amendment offered by Senator Tim Weeden entitled "Advisory Referendum on Additional Forms of Gambling." The amendment provided:

> After the effective date of this section . . . neither house of the legislature may pass any bill that authorizes the conduct of any game specified in s. 565.01(6m)(b), 1991 stats., unless, prior to the passage of that bill and during the same legislative session, all of the following occur:
>
> (1) A bill requiring a statewide advisory referendum on the question of whether the legislature should authorize the conduct of such a game has been enacted.
>
> (2) The advisory referendum required under sub. (1) has been held.

*See* drafting file for Wis. A.B. 6, April 1992 Special Session, on file with the Legislative Reference Bureau, Madison, Wisconsin. This amendment is now codified as Wis. Stat. § 565.015. This statute was adopted before the 1993 constitutional amendment when the legislature theoretically had the authority to grant either the State Lottery or the tribes the right to conduct "additional forms of gambling."

The bill [ ] provides that the provisions of the bill which prohibit the state from conducting casino-type games shall not impair the provisions of any Indian gaming compact entered into by an Indian tribe and the governor before the date that is 30 days after the date on which the bill becomes law. Under the federal Indian gaming regulatory act, a casino-type game may be lawfully conducted by an Indian tribe on tribal lands in Wisconsin only if that activity is permitted to be conducted in Wisconsin by any other person, organization or entity and if the casino-type game is conducted by the tribe in conformance with a tribal-state compact that is entered into by the tribe and the state (governor) and approved by the secretary of the federal department of the interior.

¶ 212. The exception ultimately written into Wis. Stat. § 565.01(6m)(c) reads: "This subsection shall not affect the provisions of any Indian gaming compact entered into before January 1, 1993, under s. 14.035." The brevity of this exception is notable because, several weeks earlier, April 1992 Special Session Assembly Bill 3, introduced by the Committee on Assembly Organization, had contained an exception that read: "This subsection shall not affect the provisions of any Indian gaming compact entered into before the effective date of this paragraph ... under s. 14.035, *including any provisions in the compact relating to the extension, renewal or renegotiation of the compact.*" (Emphasis added.) On May 5, 1992, the Assembly adopted Assembly Amendment 4 to the bill striking out "renegotiation." The amendment was approved on a voice vote after efforts to table and reject the amendment had failed. The Assembly then adopted Assembly Amendment 2, 56 to 43, striking everything after "s. 14.035." Hence, the language in Wis. Stat. § 565.01(6m)(c) has a

meaningful history.[31] *See* drafting file for Wis. A.B. 3, April 1992 Special Session, on file with the Legislative Reference Bureau, Madison, Wisconsin.

¶ 213. On June 17, 1992, Governor Thompson issued an executive order calling a second special session to consider a constitutional amendment relating to distinguishing the State lottery from prohibited gambling, limiting "lottery," prohibiting lottery expansion to other games, and removing from the gambling section of the constitution the language prohibiting the legislature from granting individual divorces.[32]

¶ 214. The Governor's proposed amendment, June 1992 Special Session Assembly Joint Resolution 1 (1991 Enrolled Joint Resolution 27)[33] made no reference to Indian gaming in its text or in its Legislative Reference Bureau analysis.

¶ 215. After his amendment was approved, Governor Thompson issued a news release complimenting the legislature. Governor Thompson stated:

> This amendment begins the process of making a permanent, constitutional change to limit gambling in

[31] Assembly Amendment 2 was introduced by Republican Representatives Welch and Loucks. An identical amendment, Assembly Amendment 5, was introduced by Democratic Representatives Rohan, Holperin, Young, Reynolds, and Black. *See* drafting file for Wis. A.B. 3, April 1992 Special Session, on file with the Legislative Reference Bureau, Madison, Wisconsin.

[32] A coalition of the majority of the state's Indian tribes opposed the amendment, offering to give Wisconsin "a significant share of future casino revenues" if the amendment proposal was dropped. Ritsche, *supra,* at 11–12.

[33] Senator Lynn Adelman authored two similar joint resolutions earlier in the session. 1991 S.J.R. 73 and 1991 S.J.R. 93. The Adelman joint resolutions made no reference to Indian gaming.

Wisconsin to the level Wisconsin citizens thought they approved in 1987. At that time, people voted for a lottery and parimutuel betting and not casino gambling. It is our responsibility to ensure that their wishes are upheld[.]

News Release, Governor Tommy G. Thompson, *Governor Compliments Legislature On Limiting Gambling* (June 30, 1992) (on file with the Legislative Reference Bureau, Madison, Wisconsin).

¶ 216. Early in 1993 the legislature took up a second consideration of the proposed constitutional amendment restricting gambling. *See* 1993 S.J.R. 2 (1993 Enrolled Joint Resolution 3). Again, the text of the amendment and the analysis of the amendment made no reference to Indian gaming.

¶ 217. In its original draft, 1993 Senate Joint Resolution 2 proposed a ballot question entitled: *"No expansion of state lottery."* This was amended in the Senate to a question innocuously entitled: *"Clarify prohibition against gambling."*

¶ 218. In the Assembly, a bipartisan group of legislators (Representatives Freese, Stower, Schneider, Ward, Welch, and Brancel) offered a pointed alternative question that was adopted and presented to the people. The new question read:

> Question 1: *Gambling expansion prohibited.* Shall article IV of the constitution be revised to clarify that all forms of gambling are prohibited except bingo, raffles, pari-mutuel on-track betting and the current state-run lottery and to assure that the state will not conduct prohibited forms of gambling as part of the state-run lottery?

¶ 219. Before this amendment was adopted, Representatives Schneider, Freese, and Krug offered an

amendment to insert the words "Indian gaming" into the list of exceptions in the question. This amendment was tabled without a vote. Then Representative Schneider offered a second amendment to modify the question by inserting the phrase "forms of gambling allowed under current state-tribal gaming compacts" into the list of exceptions. This amendment was *rejected* by the Assembly by a vote of 63 to 35.

¶ 220. On April 6, 1993, the proposed constitutional amendment restricting gaming in Wisconsin was approved by the people, 623,987 to 435,180. On the same day, the people voted on five advisory referenda related to gambling. One of these referenda asked: "Do you favor a constitutional amendment that would restrict gambling casinos in this state?" This advisory referendum was approved 646,827 to 416,722.

## VI. INTERPRETING ARTICLE IV, SECTION 24 AS AMENDED IN 1993

¶ 221. The principal issue in this case is whether the 1993 constitutional amendment on gambling affected the compacts negotiated with Wisconsin's Indian tribes in 1991–92.[34] The issue presented requires that we interpret the amendment.

¶ 222. Article IV, Section 24, after the 1993 amendment, reads in part as follows:

> (1) Except as provided in this section, the legislature may not authorize gambling in any form.
>
> . . . .
>
> (6)(a) The legislature may authorize the creation of a lottery to be operated by the state as provided by law.

[34] *See* Ritsche, *supra,* at 11–12 (discussing the history of the 1993 amendment).

The expenditure of public funds or of revenues derived from lottery operations to engage in promotional advertising of the Wisconsin state lottery is prohibited. Any advertising of the state lottery shall indicate the odds of a specific lottery ticket to be selected as the winning ticket for each prize amount offered. The net proceeds of the state lottery shall be deposited in the treasury of the state, to be used for property tax relief for residents of this state as provided by law. The distribution of the net proceeds of the state lottery may not vary based on the income or age of the person provided the property tax relief. The distribution of the net proceeds of the state lottery shall not be subject to the uniformity requirement of section 1 of article VIII. In this paragraph, the distribution of the net proceeds of the state lottery shall include any earnings on the net proceeds of the state lottery.

(b) The lottery authorized under par. (a) shall be an enterprise that entitles the player, by purchasing a ticket, to participate in a game of chance if: 1) the winning tickets are randomly predetermined and the player reveals preprinted numbers or symbols from which it can be immediately determined whether the ticket is a winning ticket entitling the player to win a prize as prescribed in the features and procedures for the game, including an opportunity to win a prize in a secondary or subsequent chance drawing or game; or 2) the ticket is evidence of the numbers or symbols selected by the player or, at the player's option, selected by a computer, and the player becomes entitled to a prize as prescribed in the features and procedures for the game, including an opportunity to win a prize in a secondary or subsequent chance drawing or game if some or all of the player's symbols or numbers are selected in a chance drawing or game, if the player's ticket is randomly selected by the computer at the time of purchase or if the ticket is selected in a chance drawing.

131

(c) Notwithstanding the authorization of a state lottery under par. (a), the following games, or games simulating any of the following games, may not be conducted by the state as a lottery: 1) any game in which winners are selected based on the results of a race or sporting event; 2) any banking card game, including blackjack, baccarat or chemin de fer; 3) poker; 4) roulette; 5) craps or any other game that involves rolling dice; 6) keno; 7) bingo 21, bingo jack, bingolet or bingo craps; 8) any game of chance that is placed on a slot machine or any mechanical, electromechanical or electronic device that is generally available to be played at a gambling casino; 9) any game or device that is commonly known as a video game of chance or a video gaming machine or that is commonly considered to be a video gambling machine, unless such machine is a video device operated by the state in a game authorized under par. (a) to permit the sale of tickets through retail outlets under contract with the state and the device does not determine some or all of the player's symbols or numbers on the player's ticket have been selected in a chance drawing, or by verifying that the player's ticket has been randomly selected by a central system computer at the time of purchase; 10) any game that is similar to a game listed in this paragraph; or 11) any other game that is commonly considered to be a form of gambling and is not, or is not substantially similar to, a game conducted by the state under par. (a). No game conducted by the state under par. (a) may permit a player of the game to purchase a ticket, or to otherwise participate in the game, from a residence by using a computer, telephone or other form of electronic telecommunication, video or technological aid.

Wis. Const. art. IV, § 24.

¶ 223. Focusing on the language of the amended section, there can be no doubt that the amendment established a sweeping limitation on the legislature's power to authorize "gambling in any form." The text

132

lists several exceptions to this barrier, but it specifically denies the state-operated lottery any authority to conduct poker, roulette, craps, keno, and many other forms of gambling. Because these enumerated gaming activities are specifically excluded, they constitute forms of gambling that the legislature may not authorize.

¶ 224. The 1993 amendment does not explicitly include Indian gaming but it does not exclude Indian gaming either. Clearly, the section's present language is broad enough on its face to include Indian gaming. In these circumstances, the court must examine extrinsic materials to interpret the provision and give it proper effect.

¶ 225. It should be noted at once that the majority's wide-ranging examination of extrinsic materials—to discern the intent of the framers of the amendment and the people who adopted it—stands in stark contrast to the tunnel-vision that federal and state courts have applied to earlier versions of Article IV, Section 24. If courts had followed the proper methodology in interpreting the 1848 constitution and the 1987 amendment, the Wisconsin experience with Indian gaming would be very different.

¶ 226. The plain truth is that the amended constitution is different from the contemporaneously enacted statute, Wis. Stat. § 565.01(6m)(c), in that it contains no exception for Indian gaming. Moreover, if we look beyond the words of the amendment to its legislative history, we note that the legislature rejected an opportunity to clarify the amendment's impact on Indian gaming by amending the ballot question.

¶ 227. Nonetheless, a powerful case can be made that the amendment was not intended to close down Indian casinos.

¶ 228. First, in Wisconsin a constitutional amendment is to be given prospective effect unless the amendment specifically provides otherwise. *Kayden Indus.*, 34 Wis. 2d at 731.[35] The prospective effect of the 1993 amendment suggested to most lawmakers that *if* the amendment had any impact on Indian gaming, it would not come until 1998 and 1999, when the time came for the state to renew the compacts.

¶ 229. Second, there is persuasive evidence that legislators intended to preserve gaming as it existed in 1992, including Indian gaming. In response to an inquiry, Attorney General Doyle advised Representative John Medinger that "a constitutional amendment as proposed by the Governor would not affect compacts which already exist under the current state of the substantive law." Letter from Att'y Gen. James E. Doyle to Rep. John Medinger (June 24, 1992).

¶ 230. The Attorney General also advised Representative Marlin Schneider on February 3, 1993, that, in his opinion, "the proposed constitutional amendment would not affect Indian gaming *currently being conducted* in this state under the terms of the compacts between the various tribes and the Governor . . . . [A] constitutional amendment as currently proposed would not affect compacts which already exist *under the current state of the substantive law.*" Letter from Att'y Gen. James E. Doyle to Rep. Marlin Schneider (Feb. 3, 1993) (emphasis added). These assurances were widely repeated during the ratification campaign by propo-

---

[35] This principle is nearly universal. *See State v. Bates,* 305 N.W.2d 426 (Iowa 1981); *People v. Gornbein,* 285 N.W.2d 41 (Mich. 1979); *Kadan v. Bd. of Supervisors of Elections of Baltimore County,* 329 A.2d 702 (Md. 1974); *Kneip v. Herseth,* 214 N.W.2d 93 (S.D. 1974); *Goff v. Hunt,* 80 A.2d 104 (N.J. 1951); *Luikart v. Higgins,* 264 N.W. 903 (Neb. 1936).

nents of the amendment, and they are reflected in newspaper editorials cited in the majority opinion.

¶ 231. Third, the legislature enacted Wis. Stat. § 565.01(6m)(c), excepting Indian gaming from statutory prohibitions before it first considered the constitutional amendment; and it signaled its approval of the 1991–92 compacts in subsequent legislation such as 1993 Act 406, creating Wis. Stat. § 992.20(1) (validating "[a]ll contracts for the . . . joint exercise of any power or duty required or authorized by law entered into by a municipality, as defined in s. 66.0301(1)(a), and a federally recognized Indian tribe or band in this state before May 6, 1994").

¶ 232. Finally, there was discussion in the legislature that the contracts clauses of the United States Constitution, Article I, Section 10, and the Wisconsin Constitution, Article I, Section 12, would prevent the proposed amendment from closing down Indian casinos. This discussion was fueled by memoranda from Jane R. Henkel, Deputy Director of the Legislative Council, to Senator Lynn Adelman, dated February 26, 1992, and to Representative David Travis, dated June 19, 1992. *See* Henkel/Adelman Memorandum and Henkel/Travis Memorandum.

¶ 233. Based on the evidence at hand, it would be hard to argue that either the proponents or opponents of the amendment expected or intended the immediate closure of Indian casinos.

¶ 234. The intended impact of the amendment on the *extension* of the Indian gaming compacts is not so clear. The consensus of news reports during the amendment's ratification process was that the amendment might affect renewal of the compacts. For instance, a Milwaukee Journal reporter concluded that though any "threat to closing Wisconsin Indian casinos

if the amendment passes won't hit for six more years," there was the potential "when the compacts come up for renewal in 1998 and 1999 that the amendment could be used to shut down the tribal casinos." Steve Schultze, *Answers help shed light on amendment questions,* Milw. J., Apr. 4, 1993, at B-3. The Wisconsin State Journal noted that passage of the amendment would not affect the compacts for at least six years but that tribal members feared the state would not renew the compacts. Ron Seely, *You can bet on it; Gaming referendum is sure to confuse,* Wis. St.J., Apr. 4, 1993, at 1–A. This explains why some tribes opposed the amendment.

¶ 235. Each of the 11 compacts contained a provision for automatic renewal, worded as follows:

Duration.

A. This Compact shall be in effect for a term of seven years after it becomes binding on the parties.

B. *The duration of this Compact shall thereafter be automatically extended for terms of five years,* unless either party serves written notice of nonrenewal on the other party not less than one hundred eighty days prior to the expiration of the original term of this Compact or any extension thereof.

*See* St. Croix compact, section XXV (emphasis added).

¶ 236. In 1998 and 1999 the governor who signed the original compacts, Tommy Thompson, was still in office, and he *extended* the compacts by deciding not to serve a notice of nonrenewal on the tribes. Governor Thompson's decision to extend was not challenged at that time in court.

¶ 237. Extensions of the compacts were designed to occur automatically, without the necessity of negotiation. These extensions would not expand gambling in

any substantive sense. They would preserve the status quo. This was consistent with the title of the ballot question: "Gambling expansion prohibited"—and it was consistent with explanations of the amendment by Senator Lynn Adelman and Representative Peter Bock, that approval of the amendment would "freeze the current level of gambling in Wisconsin and put a constitutional brake on new, expanded forms of gambling." Lynn Adelman & Peter Bock, Editorial, *"Vote 'yes' on Question 7 to limit expansion,"* Milw. J., Mar. 29, 1993, at A-8. It was also consistent with Attorney General Doyle's assurance that "the proposed constitutional amendment would not affect Indian gaming *currently being conducted." See* Letter from Att'y Gen. James E. Doyle to Rep. Marlin Schneider (Feb. 3, 1993).

¶ 238. Either party had the right to nonrenew existing compacts at five-year intervals. This is undisputed. However, there is little evidence that proponents intended the amendment to require a Wisconsin governor to nonrenew the compacts. In fact, some of the opposition to the amendment was based on the view that because of the automatic extension provisions in the compacts, the tribes were being given a *permanent* monopoly. In addition, legislators understood that if the amendment forced nonrenewal of the compacts, it would trigger lawsuits about the impairment of contracts because forced nonrenewal would eliminate the great bulk of the revenue-raising activity at Indian casinos. Finally, nonrenewal of compacts, one by one, would create problems of consistent treatment among the tribes. To illustrate, the compact of the Lac Courte Oreilles Band of Lake Superior Chippewa would have ended in mid-August 1998, if nonrenewed, but the Ho-Chunk Nation's compact would not have ended until June 1999. All tribes whose compacts would have

137

been nonrenewed before the Ho-Chunk compact ended could have argued that Wisconsin was violating IGRA, or compact provisions, by permitting allegedly prohibited casino games in some Indian casinos, but not allowing the same games in the casinos of the tribes whose compacts had ended.

¶ 239. The 1998–99 compacts did have some amendments. However, the 1998–99 amendments did not render any of the compacts substantially different from the original compacts. For instance, the Forest County Potawatomi compact was amended to increase the number of slot machines from 200 to 1000 and to permit the playing of blackjack at the tribe's Menomonee Valley Casino in Milwaukee. *Panzer*, 271 Wis. 2d 295, ¶ 32. The 1998–99 amendments did not give the Forest County Potawatomi (or any tribe) a new gaming activity.[36] *See generally* Amendments to the Forest County Potawatomi Community of Wisconsin and the State of Wisconsin Gaming Compact of 1992, 1–4 (1998). The Forest County Potawatomi's original compact authorized slot machines at the Menomonee Valley site, so that only the number of slot machines changed; and it authorized blackjack at other Potawatomi tribal facilities. Forest County Potawatomi Compact §§ IV, XV(H). Thus, the 1998–99 amendments did not violate

---

[36] In the negotiations on initial compact renewal with the State, Wisconsin tribes sought an expansion of games, including roulette and craps, and promised the State larger shares of their gambling revenues in return. Amy Rinard, *Casinos to seek roulette, craps,* Milw. J.S., Dec. 24, 1996, at A-1. These initiatives were not accepted by Governor Thompson. The Journal Sentinel editorialized against the expansion, suggesting that the offer of more money for expanded gaming "smacks a little bit of bribery." Editorial, *A risky bet for tribes, Wisconsin,* Milw. J.Sentinel, Dec. 30, 1996, at 10–A; Editorial, *Just say 'no' to more gaming,* Milw. J.Sentinel, Nov. 23, 1997, at 4–J.

the Wisconsin Constitution unless the extension by itself violated the constitution. They were also supported by 25 U.S.C. § 2710(d)(1)(B).

¶ 240. This brings us to the issue that was decided in *Panzer*, namely, whether the Governor had authority to approve amendments to the original Indian gaming compacts to add new games of poker, roulette, craps, and keno, which are explicitly prohibited by the Wisconsin Constitution.

¶ 241. In *Panzer*, the Governor contended that Wis. Stat. § 14.035 gives Wisconsin governors expansive authority to enter into and negotiate amendments to gaming compacts. Section 14.035 states: "The governor may, on behalf of this state, enter into any compact that has been negotiated under 25 U.S.C. § 2710(d)." This court recognized § 14.035 as an important delegation of power to the Governor, but it concluded that this power is "subject to certain implicit limits." *Panzer*, 271 Wis. 2d 295, ¶ 60.

¶ 242. The court held that the constitution acts as a limitation on both the legislature and the governor, and that the criminal code acts as a limitation on the governor.

¶ 243. The power delegated to a governor also is limited by IGRA, 25 U.S.C. § 2710(d)(1)(B), which provides that "[c]lass III gaming activities *shall be lawful on Indian lands only if* such activities are . . . (B) *located in a State that permits such gaming* for any purpose by any person, organization, or entity." (Emphasis added.) Accordingly, if state law prohibits a Class III gaming activity, the governor's power to negotiate that activity is circumscribed. *Panzer*, 271 Wis. 2d 295, ¶ 89.[37]

[37] Counsel for Governor Doyle addressed this issue in *Panzer v. Doyle*, 2004 WI 52, ¶ 87, 271 Wis. 2d 295, 680 N.W.2d

¶ 244. IGRA does not invest a state governor with authority to negotiate games that are prohibited to everyone by state law. Instead, IGRA acknowledges the primacy of state law over a Class III gaming activity *so long as the state does not permit that gaming activity to anyone for any purpose.* Thus, a governor would contravene *federal* law if the governor contravened state law.

¶ 245. In *Panzer,* the court concluded the 1993 amendment to Article IV, Section 24 of the Wisconsin Constitution *and* Wis. Stat. ch. 945, which criminalizes gambling, foreclosed the Governor from amending the compacts to include additional types of games prohibited by law. *Panzer,* 271 Wis. 2d 295, ¶ 96. The *Panzer* court held:

> [T]he Governor's agreement to the additional games of keno, roulette, craps, and poker in 2003 was contrary to criminal/prohibitory sections of state law in addition to the constitution. It is beyond the power of any state actor or any single branch of government to unilaterally authorize gaming activity in violation of the policy in Wisconsin's criminal code. The governor may not carve out exceptions to the state's criminal statutes unilaterally. We are unable to conclude that the legislature delegated such power or could delegate such power in light of the 1993 constitutional amendment.

*Panzer,* 271 Wis. 2d 295, ¶ 96.

¶ 246. The legislature has *not* changed the criminal statutes governing poker, roulette, craps, and keno. More important, the legislature cannot change the

---

666. The court responded, beginning at ¶ 88, quoting with approval the analysis in *American Greyhound,* 146 F. Supp. 2d at 1067: "According to the structure of § 2710(d)(1) and its plain terms, a compact cannot make legal class III gaming not otherwise permitted by state law. The State must first legalize a game, even if only for tribes, before it can become a compact term."

statutes on poker, roulette, craps, and keno in any way that would permit these games to be conducted in Wisconsin. The legislature may not authorize these four games until the people, by constitutional amendment, remove the constitutional impediment to legislative action. Neither the present governor nor any other governor may rely on Wis. Stat. § 14.035 as authority to negotiate what the constitution prohibits. *Panzer* held that the Governor acted ultra vires by negotiating beyond the scope of the power that the Wisconsin Legislature gave or could give *any* governor under the present constitution.

¶ 247. This is not only the holding in *Panzer*, it is also the argument made to the Seventh Circuit Court of Appeals in the State's failed appeal of the *Lac du Flambeau* decision. In a brief submitted by Attorney General James Doyle, the State said:

> [T]he Governor cannot exceed the statutory authority which has been delegated to him. Section 14.035, Wis. Stat., provides merely that "[t]he governor may, on behalf of this state, enter into any compact that has been negotiated under 25 USC 2710(d)." This statute assumes that such a compact will be negotiated based on the requirements of that section. Section 14.035 does not purport to in any way amend or change the public policy of Wisconsin for gaming. It is merely authorization for the Governor to sign legally negotiated compacts. The Legislature has delegated to the Governor only such authority as the state statutes and the federal law provide. The Governor cannot exceed that delegation by signing a compact which does not comport with either 25 U.S.C. s 2710(d) or Wisconsin's gaming policy.

The State's argument was made before the 1993 constitutional amendment. Passage of the 1993 amendment strengthened an already unanswerable argument.

¶ 248. The majority appears to understand the peril in relying on Wis. Stat. § 14.035 as the Governor's source of authority for agreeing to new games that are prohibited by the constitution. It attempts to fashion an alternative analysis that muddles the distinction between extensions and amendments, and wraps them both in the protective mantle of "impairment of contracts." Majority op., ¶ 67. The gist of the majority's analysis is as follows:

(1) The original compacts are lawful.[38] Majority op., ¶¶ 6, 77.

(2) The compacts may be extended automatically and will extend automatically unless formal notice of nonrenewal is filed. Majority op., ¶ 65.

(3) The compacts may be amended to add new games. Majority op., ¶¶ 2, 82–86.

(4) The provision for amendment is a fundamental feature of each original compact. *See* Majority op., ¶¶ 91, 95.

(5) The parties have a reliance interest in the continuation of the original compacts. Majority op., ¶ 58.

(6) Nonrenewal of the compacts because of the constitutional amendment would unconstitutionally impair the compacts. Majority op., ¶ 70.

(7) Because the original compacts contemplated amendments that add new games, amendments to the original compacts that add new games are constitutionally protected by the contracts clauses

---

[38] The original compacts are lawful because (1) the legislature authorized the governor of Wisconsin to negotiate Indian gaming compacts, consistent with IGRA, by its passage of Wis. Stat. § 14.035; (2) the United States District Court ordered the State to "conclude" compact negotiations; (3) the governor of Wisconsin, pursuant to delegated authority and court order, agreed to compacts; and (4) the compacts thus negotiated were not timely challenged.

of the Wisconsin and United States Constitutions. Majority op., ¶ 95.

The majority's analysis is both unavailing and dangerous, and it does not withstand careful scrutiny.

¶ 249. All the compacts contain provisions authorizing amendments. For example, the original Forest County Potawatomi compact, in Section XXX, states: "This Compact shall not be modified, *amended* or otherwise altered without the prior written agreement of both the State and the Tribe." (Emphasis added.)

¶ 250. Plainly, this bare-bones provision is a *procedural* rule that permits the parties to agree to changes in the compact. The provision does not authorize the parties to disregard their own laws. It does not give the negotiator for a party extra authority beyond the authority the negotiator already has.

¶ 251. For a compact amendment to be valid, it must be agreed to in writing. After the 1993 amendment to Article IV, Section 24, however, state officials are denied the authority to bind the state to gaming activities that violate the Wisconsin Constitution. The governor has no more authority to violate the Wisconsin Constitution than the legislature. The governor of Wisconsin has no more authority to sign a compact approving prohibited games than the Badger mascot.

¶ 252. A second provision in the compacts mentions amendments. The original Forest County Potawatomi Community Compact (1992) provided, in part, in Section IV:

Authorized Class III Gaming

A. The Tribe shall have the right to operate the following Class III games during the term of this Compact but only as provided in this Compact:

143

1. Electronic games of chance with video facsimile displays;

2. Electronic games of chance with mechanical displays;

3. Blackjack; and

4. Pull-tabs or break-open tickets when not played at the same location where bingo is being played.

B. *The Tribe may not operate any Class III gaming not expressly enumerated in this section of this Compact unless this Compact is amended pursuant to section XXX.*

Forest County Potawatomi Community of Wisconsin and State of Wisconsin Gaming Compact of 1992, Section IV.A. and B. (emphasis added).[39] Subsection B. refers back to the amendment section discussed in ¶ 249.

¶ 253. Other subsections of the compact provide that if the State commences to operate or license or permit additional games, the compact may be reopened for amendment. *See id.* at Section IV.C., D., and E.

¶ 254. These reasonable provisions permit the addition of new gaming activities, such as lotteries and pari-mutuel on-track betting, so long as they are lawful; but they do not constitute an independent grant of

---

[39] The 10 other original compacts contained the same provisions. *See* Bad River Band Compact § IV(B); Winnebago [Ho-Chunk] Compact § IV(C); Lac Courte Oreilles Compact § IV(B); Lac du Flambeau Compact § IV(B); Menominee Compact § IV(B); Oneida Compact § IV(B); Red Cliff Compact § IV(B); Sokaogon Chippewa Compact § IV(B); St. Croix Chippewa Compact § IV(B); Stockbridge-Munsee Compact § IV(B).

authority to approve Class III gaming activities not otherwise permitted in Wisconsin. The governor of Wisconsin does not have some "contract" right to disregard the state constitution.

¶ 255. The majority appears to believe otherwise. The majority opinion states that when the parties agreed upon provisions allowing for future amendments to the types of games that may be conducted in Indian country, "the parties negotiated for the amendment provision under the auspices of the law as interpreted by the court in *Lac du Flambeau, under which all Class III games are negotiable.*" Majority op., ¶ 85 (emphasis added). Thus, the governor has the authority to negotiate for any games that would have been lawful under *Lac du Flambeau* in 1991 and 1992. The Original Compacts are insulated from the 1993 Amendment and further changes in Wisconsin's gaming laws unless and until the compacts are terminated. Majority op., ¶¶ 65–66.

¶ 256. To summarize, the majority concludes that the governor of Wisconsin has the authority and duty to negotiate all Class III games, i.e., *all* Class III gaming activities, and to act as though the 1993 constitutional amendment did not exist. But there is a problem with this position. "Class III gaming" is a very broad term that encompasses all forms of gaming that are not Class I gaming or Class II gaming. The classification "all Class III games" includes pari-mutuel betting, both *on*-track and *off*-track. Off-track pari-mutuel betting was explicitly prohibited by the Wisconsin Constitution in 1987, and is prohibited by the Wisconsin Constitution today. Wis. Const. art. IV, § 24(1) and (5). It was not affected by the 1993 amendment. Thus, a governor cannot negotiate *all* Class III games without disregarding the constitution as of 1987.

145

¶ 257. A governor has clear authority under the Wisconsin Constitution to agree in a compact to permit a Wisconsin tribe to operate a dog track or other racing track and to offer pari-mutuel betting at that track. Pari-mutuel on-track betting is permitted by both the Wisconsin Constitution and state statutes. On the other hand, a governor of Wisconsin has no authority to permit a second tribe to take off-track bets on the dog races conducted by the first tribe. Why? Because off-track pari-mutuel betting is prohibited by the Wisconsin Constitution. If a compact amendment were negotiated to permit tribes to take bets on dog races without operating a track, it would legitimize off-track betting in Indian country throughout Wisconsin. If the constitution does not bar gubernatorial approval of such an amendment, it would also not bar an amendment approving betting on all races and all sporting events, so long as that betting activity was not barred by federal law.

¶ 258. When this court authorizes a governor to disregard the state constitution, there is no stopping point . . . except federal law. Jai alai is negotiable. Any casino game is negotiable. Any gambling activity is negotiable so long as it does not violate federal law. If the governor is authorized to disregard the constitution in one compact amendment, it is hard to see why the governor may not disregard the constitution in other compact amendments. This could permit the Governor to negotiate a perpetual compact and waive the state's sovereign immunity. Three of the four members of the majority supported these amendments in their *Panzer* dissent.

¶ 259. The impairment of contracts clauses do not save the 2003 amendments, which add poker, roulette, craps, and keno to the Indian gaming compacts, because the tribes understood the importance to the state of limiting casino games.

146

¶ 260. Seven of the original compacts articulated the parties' intent and material considerations. For instance, the St. Croix Chippewa Indians of Wisconsin Gaming Compact of December 1991 stated in Section XXXI:

A. In consideration of:

1. The Tribe's desires to be able to offer Class III games that are economically viable and provide substantial revenues to support tribal self-sufficiency and economic development, and to have the confidence that such games may be offered for such period of time that the Tribe can develop its gaming enterprise, recover its capital investments, and receive a reasonable return; and

2. *The State's desire to limit the types of "casino-type" games that may be offered within this state to a select number in order not to have pervasive broad-scale "casino-type" gambling within this state;*

The parties acknowledge the mutual compromises with respect to the types of games the Tribe is authorized to operate during the term of this Compact and with respect to the duration of this Compact were significant material considerations in reaching agreement and are the essence of this Compact.

St. Croix Chippewa Indians of Wisconsin Gaming Compact, Section XXXI (1991) (emphasis added).[40]

---

[40] *See also* Bad River Band Compact § XXXI; Lac Courte Oreilles Compact § XXXI; Menominee Compact § XXXII; Red Cliff Compact § XXXI; Sokaogon Chippewa Compact § XXXI; St. Croix Chippewa Compact § XXXI; Stockbridge-Munsee Compact § XXXI.

¶ 261. A threshold question in any contracts clause analysis is whether a contract to which a state is a party surrenders an essential attribute of state sovereignty. *See United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 23–24 (1977). Contracts that limit the exercise of a state's police power or eminent domain power are "invalid ab initio under the reserved-powers doctrine[.]" *Id.* at 23; *see also Wis. Prof'l Police Ass'n v. Lightbourn,* 2001 WI 59, ¶ 149, 243 Wis. 2d 512, 627 N.W.2d 807. If a contract does not implicate a state's police power or eminent domain power, to establish an unconstitutional impairment of contract, it is necessary to show: (1) there was a valid, pre-existing contract; (2) the legislation substantially impairs the contractual relationship; and (3) either (a) there is no significant and legitimate public purpose behind the legislation or (b) if there is a significant and legitimate public purpose, the legislation is unreasonable and unnecessary to serve the public purpose. *See Lightbourn,* 243 Wis. 2d 512, ¶¶ 147–49.

¶ 262. Without addressing the threshold question or the validity of the majority's conclusions as to the first and third parts of the three-part test—which are ably addressed in Justice Roggensack's concurring/dissenting opinion—I disagree with the majority's conclusion that the 1993 amendment to Article IV, Section 24 substantially impairs the relationships created by the original compacts when it applies prospectively to the scope of gaming. *See* majority op., ¶ 79.

¶ 263. Legislation impairs a contractual relationship when it "alters the contractual expectations of the parties." *State ex rel. Canon v. Moran,* 111 Wis. 2d 544, 555, 331 N.W.2d 369 (1983). In determining whether the impairment is substantial, "a court should look to

the reasonableness of the parties' reliance upon the contract affected." *Chappy v. LIRC, DILHR,* 136 Wis. 2d 172, 187, 401 N.W.2d 568 (1987). Based on the text of the original compacts and the historical events that occurred before the compacts were renewed in 1998–99, I conclude the parties could not reasonably have expected the compacts would be amended to include additional types of games that were explicitly prohibited by the Wisconsin Constitution.

¶ 264.　From the State's perspective, the desire to limit the types of casino games offered within the state was deemed "the essence" of the compact. The *extension* of such compacts would preserve the status quo. The nonrenewal of such compacts would alter the status quo, and deprive tribes of substantial revenues to support tribal self-sufficiency and economic development. Nonetheless, the State had an undisputed right to nonrenew the compacts.

¶ 265.　If the contractual right to nonrenew gaming compacts would not have impaired the compacts, how could a refusal by the State to agree to four *new* games that the tribes never had—in violation of the Wisconsin Constitution, state criminal statutes, and what the State viewed as the "essence" of the compact —impair the compacts?

¶ 266.　The provision allowing amendments to the compacts to add new games represented a contingency that might or might not occur. The tribes could not rely on that contingency. *See Ochiltree v. R.R. Co.,* 88 U.S. 249, 252 (1874) ("the obligation of contract within the meaning of the Constitution is a valid subsisting obligation, not a contingent or speculative one"). They could not rely on the possibility that the State would offer *new* games that are prohibited for all purposes to all persons, organizations, and entities, because to do so

149

would violate both state *and* federal law. Against this background, it is hard to imagine how *any* court could hold that denying tribes the *new* right to play poker, roulette, craps, and keno at their casinos—when no one else has that right—would *substantially* and *unconstitutionally* impair their compacts.

¶ 267. In terms of reliance, the tribes were fully aware of Attorney General James Doyle's stated position on new games. After the *Lac du Flambeau* decision was issued, the State appealed,[41] and that appeal was not dismissed until March 23, 1992. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. State of Wisconsin,* 957 F.2d 515 (7th Cir. 1992). By that date, 7 of the 11 compacts had already been signed.

¶ 268. The following month, after Governor Thompson had called the April 1992 special session, two state representatives asked Attorney General Doyle his opinion on the effect the change in statutory law would have on Indian gaming in general and on the compacting process in particular. *See* Letter from James E. Doyle, Att'y Gen., to Walter Kunicki, Speaker of the Wis. Assembly, and John Medinger, Chairperson of the Assembly Comm. on State Affairs (Apr. 29, 1992) (on file with the Wisconsin Historical Society Archives, John D. Medinger Papers, Box 6, Folder 1).

¶ 269. Representatives Kunicki and Medinger posed a number of questions. For instance, they asked whether "the legislation prevent[s] the Governor from entering into compacts that authorize blackjack and

---

[41] The Associated Press reported the following statement from Attorney General Doyle: "The governor, as the client, has asked for an appeal. And I concur in his decision. There is considerable interest throughout the country regarding this ruling." Michael C. Buelow, *State gears up for fight to stop casino gambling,* The Post-Crescent (Appleton), July 18, 1991, at B-6.

electronic games with the three tribes that currently do not have compacts, if such compacts are not entered into [before the change in definition becomes effective]." Attorney General Doyle responded in part:

> The legislation will change, on its effective date, those games which are permitted in Wisconsin. After the effective date of the legislation the enumerated games, roulette, craps, banking card games, etc., will no longer be permitted in Wisconsin except as provided in the grandfather provision [pursuant to proposed § 565.01(6m)(c) regarding state-tribal gaming compacts]. *At that point it will be unlawful for tribes to whom the statute applies to conduct those games and since their conduct is unlawful, the Governor is not required to negotiate over them.*

*Id.* at 2 (emphasis added).

¶ 270. The legislators also asked about existing compacts that "grant to the tribes the right to request that compacts be revised to permit additional games." They asked the prescient question: "Does the legislation prevent the Governor, through the negotiation process, from authorizing Indian tribes to conduct additional games?" Attorney General Doyle responded:

> The current legislation would not prevent the Governor from negotiating with the tribes over the adding of additional games to the compact so long as those games are permitted after the effective date of the legislation, or the additional games were added prior to the effective date of the legislation. *If the games are not permitted after the effective date, the Governor would not be able to add them.*

*Id.* at 4 (emphasis added).[42]

---

[42] *See* ¶ 211, n.30 *infra.*

¶ 271. On July 25, 1994, Attorney General Doyle appeared before the Senate Committee on Indian Affairs. The Committee was considering Senate Bill 2230, involving proposed (but never approved) amendments to IGRA. Speaking for the National Association of Attorneys General, Attorney General Doyle said:

> We are also concerned [with the scope of gaming provision in the bill] with the provision which makes games not prohibited as a matter of state and criminal law subject to negotiation. This provision neglects to recognize that some states have prohibited specific games through the use of self-executing constitutional provisions. These types of prohibitions are stronger than statements of state public policy and stronger than the state's criminal law.

*Hearing on S. 2230 Before the S. Comm. on Indian Affairs,* 103rd Cong. 117 (July 25, 1994). Later, Senator McCain asked the following:

> Senator McCain. You've suggested that the bill needs to make explicit provisions with regard to changes in State law. Do you think that such provisions may give rise to claims under the 5th amendment of takings of property without compensation?
>
> Mr. Doyle. Well, they certainly may give rise to the claims. And I would certainly hesitate to give my legal opinion on whether that would be successful. I think it would be very difficult given that we're talking about broad social policy of the State to declare that that's a taking, as I understand takings laws.
>
> I mean, the same argument could be made, if you put aside the Indian question, that if you permitted gaming in a State, you could simply change the law to say there's no longer gaming in the State. I don't think the operators of gaming concerns would have a takings

claim under the 5th amendment. But again, I'm giving you a quick, legal, 5th amendment takings analysis without any research.

*Hearing on S. 2230 Before the S. Comm. on Indian Affairs,* 103rd Cong. 120 (July 25, 1994).

¶ 272. On August 1, 1994, Attorney General Doyle sent a letter to Senator Daniel K. Inouye and Senator McCain amplifying his answer. He wrote:

Change of State Law

We were also asked our views on whether a change-of-law provision in the Act, which became operative to make tribal gaming under an existing compact impermissible, could constitute a Taking under the Fifth Amendment. We do not believe there is any merit in the suggestion that terminating once-legal gaming could constitute a taking in the constitutional sense. This is not the kind of property-based expectation the constitution protects; state criminal prohibitions have never been held to be hostage to plans for profits from activities which the state can make legal.

The history and cases decided under the Takings Clause of the U.S. Constitution simply provide no support for the proposition that a ban on Indian gaming activities could trigger a compensable taking of private property. . . .

. . . .

As the [Supreme] Court noted in . . . recent takings decisions, the nature of both the governmental action and the regulated industry are crucial factors in assessing any Takings Clause claim. The gaming industry is one of the most heavily regulated in the United States. That regulatory system is based on important and well-founded concerns of public safety and welfare. Similarly, property owners who willingly participate in

153

heavily regulated fields are not immunized by the Takings Clause from regulatory changes, even those which subsequently change the regulatory system in a manner which is financially detrimental to the property owner. In the words of the Court, such property owners simply lack any reasonable, investment-backed expectations that the regulatory environment will be free from change.

¶ 273. Although Attorney General Doyle's letter addressed "takings" rather than impairment of contracts, the principles he espoused are not dissimilar. In *Stone v. Mississippi,* 101 U.S. 814 (1879), the Supreme Court examined the effect of a state constitutional amendment banning lotteries on an existing lottery previously chartered by the state. The Court acknowledged the presence of a valid contract, but it declared, "All agree that the legislature cannot bargain away the police power of a state." *Id.* at 817.

¶ 274. The Court declared that a legislature, by chartering a lottery company, cannot defeat the will of the people, in relation to the further continuance of that business. *Id.* at 819. "No legislature can bargain away the public health or the public morals." *Id.* Lotteries, it said, "are a species of gambling." *Id.* at 821. "Certainly the right to suppress them is governmental, to be exercised at all times by those in power, at their discretion." *Id.*

> Any one, therefore, who accepts a lottery charter does so with the implied understanding that the people in their sovereign capacity, and through their properly constituted agencies may resume it at any time when the public good shall require, whether it be paid for or not. All that one can get by such a charter is a suspension of certain governmental rights in his favor, subject to withdrawal at will.

*Id.*

154

¶ 275. The principles of *Stone* remain good law. In 1914 the Supreme Court stated in *Atlantic Coast Line Railroad Co. v. City of Goldsboro,* 232 U.S. 548, that:

> [I]t is settled that neither the "contract" clause nor the "due process" clause has the effect of overriding the power of the state to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property are held subject to its fair exercise.

*Id.* at 558. *See also United States v. Winstar Corp.,* 518 U.S. 839 (1996) (providing an important contemporary discussion of governmental power to affect a contract).

¶ 276. In the present case, none of the members of this court is seeking to close down Indian casinos. The primary purpose of this dissent is to disavow any power in state officials to *amend* Indian gaming compacts to add games that are explicitly prohibited by the constitution and state criminal law and thereby expand gambling in Wisconsin. Giving the Governor this unprecedented power is an abdication of state sovereignty and rewards those who refused to recognize this court's decision in *Panzer.*

## VII. THE EFFECT OF ARTICLE IV, SECTION 24 ON INDIAN GAMING

¶ 277. The majority concludes that the 1993 Amendment to Article IV, Section 24 had no impact on Indian gaming, the Original Compacts, or any continuation of those pre-existing contractual relationships. I disagree.

¶ 278. In my view, the amendment has the following effects.

155

¶ 279. First, the 1993 amendment prevents the legislature and governor from agreeing to any compact amendment that adds new forms of gaming activity that are prohibited by state law for all purposes to all persons, organizations, and entities. As a result of the amendment, Wisconsin governors have no authority to approve new forms of gaming activity that are prohibited by Article IV, Section 24.

¶ 280. Second, neither the State nor the Tribes can ever nonrenew a compact without seriously jeopardizing the future of Indian gaming in Wisconsin. The majority acknowledges as much. This absurd result is the inevitable consequence of a United States District Court ordering the State to agree to gaming that the State had never permitted to anyone in Wisconsin, and that is now explicitly prohibited by the constitution.

¶ 281. Third, *new* Indian gaming compacts to approve casino games will be virtually impossible until the people approve a change in the constitution.

¶ 282. No matter which view of the law prevails, this state is facing a constitutional crisis. The cleanest, most honest way to correct the situation is to amend the constitution. If the results announced in the majority's decision are what the people of Wisconsin want, the people will give their approval. They will respect and respond to being asked, instead of having a massive expansion of gambling shoved down their throats.

¶ 283. At present, the United States District Court and this court have succeeded in turning IGRA on its head. In Wisconsin, only Indian tribes have the right to conduct most forms of Class III gaming. Apart from the state operated lottery, most gaming competition has been driven out of business. This is not the way IGRA was supposed to work. This is not the way our federal system is supposed to work. The time is long overdue for impartial review of this constitutional debacle.

¶ 284. I am authorized to state that Justices JON P. WILCOX and PATIENCE DRAKE ROGGENSACK join this opinion.

¶ 285. PATIENCE DRAKE ROGGENSACK, J. (*concurring in part and dissenting in part*). Dairyland Greyhound Park, Inc. (Dairyland) appeals summary judgment dismissing its complaint, which judgment the circuit court rendered in 2001. Dairyland's complaint involved the 1991–92 and the 1998–99 Indian gaming compacts. The majority opinion concludes that the games added to the compacts in 2003 do not violate Wisconsin law. Majority op., ¶ 91. However, the 2003 gaming compacts were never presented to the circuit court and therefore, they are not properly brought before this court as we review the circuit court decision. All that we are to decide is the effect of Article IV, Section 24 of the Wisconsin Constitution, amended in 1993, as it relates to games that were included in the 1991–92 and the 1998–99 Indian gaming compacts.

¶ 286. In 2004, we decided the meaning and effect of the 1993 constitutional amendments and criminal statutes on the new types of games that were added to the Indian gaming compacts in 2003; the new games violate Wisconsin's criminal statutes. *Panzer v. Doyle*, 2004 WI 52, ¶ 96, 271 Wis. 2d 295, 680 N.W.2d 666. The decisions of this court are final if not set aside on a motion for reconsideration in the case in which the ruling was issued, Wis. Stat. § 809.64 (2003–04),[1] or overturned by a federal court on a federal question, *see State v. Webster*, 114 Wis. 2d 418, 426 n.4, 338 N.W.2d 474 (1983). Notwithstanding this rule of law, at the request of the Governor, the majority opinion takes up

[1] All subsequent references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

an issue we decided in 2004 and puts it into the appeal of a 2001 circuit court decision. In his request, the Governor asserts that Article IV, Section 24 of the Wisconsin Constitution, enacted by the people of Wisconsin, cannot be applied to the Tribal Nations that have gambling operations in Wisconsin.

¶ 287. The majority opinion adopts the view of the Governor, wherein he argues on behalf of the Tribal Nations that Article IV, Section 24 of the Wisconsin Constitution cannot be applied to Indian gambling operations in Wisconsin. Majority op., ¶¶ 2, 91. In so doing, the majority opinion surrenders the judicial independence of the Supreme Court of Wisconsin to the Governor, thereby stripping the court of its claim to be an impartial decision maker and of its ability to act as a check on the political branches in Wisconsin's tripartite system of government. The majority opinion does so under the guise of an impairment of contracts discussion based largely on Article I, Section 10 of the U.S. Constitution. Majority op., ¶¶ 51–95. In its efforts to achieve the result the Governor has requested, the majority opinion chooses to ignore controlling precedent of the United States Supreme Court, which if applied, would uphold the State of Wisconsin's ability to enforce Wisconsin's criminal statutes that prohibit any type of Class III gambling that was not permitted before the 1993 constitutional amendment to Article IV, Section 24 of the Wisconsin Constitution.

¶ 288. The majority opinion and Justice Prosser's concurrence/dissent agree that Article IV, Section 24 of the Wisconsin Constitution is a substantive constitutional amendment that is prospective in effect. Majority op., ¶ 22; Justice Prosser's concurrence/dissent, ¶¶ 228–33. However, the majority interprets the 1993 amendment as having no effect on the compacts as a

158

whole, majority op., ¶ 91, and Justice Prosser concludes the 1993 amendment has no effect on the types of games that were lawfully compacted prior to the 1993 constitutional amendment because of the amendment's prospective effect, Justice Prosser's concurrence/ dissent, ¶¶ 228–33. I agree with Justice Prosser that the 1993 amendment did not prohibit those types of games that were lawfully compacted for in 1991–92.[2] Therefore, any type of game included in an Indian gaming compact prior to 1993 remained lawfully compactable subsequent to the 1993 amendment. *Id.* Because the 1998–99 compact amendments added no new types of games, the 1998–99 compacts are lawful as well.[3] No party has terminated the 1998–99 compacts according to their provisions; therefore, they remain in effect, with an opportunity to amend or to non-renew next occurring in 2008.[4] Accordingly, I concur in the affirmance of the dismissal of Dairyland's complaint.

[2] The majority opinion asserts that I do not discuss the prohibition of Article IV, Section 24 of the Wisconsin Constitution with regard to the casino games that were agreed upon in the 1991–92 compacts, and that failing to do so undermines the argument that new types of games added in 2003 are unconstitutional. Majority op., ¶ 20 n.23. I do not discuss the casino games of the 1991–92 compacts because I agree with the concurrence/dissent of Justice Prosser: Article IV, Section 24 is prospective in its prohibition of the types of casino games that can be lawfully operated.

[3] Although the number of slot machines and blackjack tables increased in 1998, no new types of games were added to the compacts.

[4] The 1998–99 compacts contain an opportunity to give notice of non-renewal every five years. As no notice was given in 2003, the compacts are in effect until at least 2008.

¶ 289. However, I dissent from the majority opinion's consideration of and decision about the new types of games that were added in the 2003 compacts for the following reasons: (1) in acceding to the Governor's request on behalf of the Tribal Nations, the majority opinion surrenders this court's judicial independence so necessary to protect the people of Wisconsin in a tripartite system of government; (2) the gaming compacts are not the type of contract that is protected by either Article I, Section 12 of the Wisconsin Constitution or Article I, Section 10 of the U.S. Constitution; (3) there is no obligation to contract for new types of games that were not permitted under the 1991–92 compacts; therefore, there can be no impairment of a contractual obligation in that regard; and (4) the State has a significant and legitimate public purpose in controlling the type of gambling that occurs within Wisconsin's borders, which Article I, Section 10 does not affect.

## I. BACKGROUND

¶ 290. This appeal is taken from a 2001 circuit court decision granting the Governor's[5] motion for summary judgment dismissing Dairyland's complaint. It is before us on certification from the court of appeals. Dairyland asserts that the Class III casino games included in the 1991–92 gaming compacts are prohibited by the 1993 constitutional amendment in combination with state criminal statutes. Dairyland argues that this prohibition forms the legal basis for an order requiring the Governor to give notice of non-renewal of the compacts. *Complaint,* ¶¶ 13, 16 and 41–42 (Dane

[5] For purposes of ease of expression, I refer to the Governor and the Secretary of the Department of Administration as "the Governor."

County Cir. Ct. Oct. 22, 2001). Accordingly, we are required to establish the meaning and effect of Article IV, Section 24 of the Wisconsin Constitution in regard to whether the types of casino games that were compacted for in 1991–92 may continue after the 1993 constitutional amendment.

¶ 291. In the analysis of the provisions of Article IV, Section 24 of the Wisconsin Constitution that relate to the issues presented by this appeal, it is important to recognize what we decided, and what we did not decide, about the 1993 constitutional amendment in *Panzer*. *Panzer* concluded that the 1991–92 compacts were lawful when entered into, *Panzer*, 271 Wis. 2d 295, ¶ 99, but that any new type of game not included in those compacts was prohibited by the laws of Wisconsin subsequent to 1993, *id.*, ¶ 96. We did not decide whether the types of games that were lawfully compacted in 1991–92 retained their lawful status after the 1993 constitutional amendment was ratified by the citizens of Wisconsin because that question was not before us. *Id.*, ¶ 102. We also concluded that the 1993 constitutional amendment, in combination with Wisconsin criminal statutes, set out a state policy that prohibited all types of Class III games that were not of a type included in the 1991–92 compacts. *Id.*, ¶¶ 96–97.

¶ 292. The Governor asks us to hold that those same types of games that our 2004 decision in *Panzer* held were unlawful additions to the 2003 compacts are not prohibited by the very same constitutional provision. However, judicial independence, the doctrine of stare decisis[6] and the application of controlling United States

---

[6] It is a longstanding rule that this court "is bound by its own precedent." *State v. Hansen,* 2001 WI 53, ¶ 52, 243 Wis. 2d 328, 627 N.W.2d 195 (citation omitted). Failing to abide by stare

Supreme Court precedent require that we reject this request. Because I join the concurrence/dissent of Justice David Prosser, which thoroughly explains the meaning and effect of the 1993 constitutional amendment in regard to the types of Class III[7] games set out in the 1991–92 and 1998–99 compacts, I focus my concurrence/dissent on judicial independence and the majority opinion's contract impairment discussion.

## II. DISCUSSION

### A. Judicial Independence

¶ 293. Judicial independence is universally recognized as central to a democratic form of government.

decisis raises serious concerns as to whether the court is implementing "principles . . . founded in the law rather than in the proclivities of individuals." *Payne v. Tennessee,* 501 U.S. 808, 853 (1991) (quoting *Vasquez v. Hillery,* 474 U.S. 254, 265 (1986)).

[7] The Indian Gaming Regulatory Act (IGRA) created three classes of gaming, which classes are based on types of games. 25 U.S.C. §§ 2703(6)-(8). The types of games that Indian tribes may offer under Class I are traditional Indian social gaming, § 2703(6), and whether to offer those games is determined solely by the tribes, with the states having no control over those decisions, 25 U.S.C. § 2710(a)(1). Class II gaming includes bingo, whether or not it is electronically or computer assisted and if played in the same location, pull-tabs, lotto, punch boards, tip jars, instant bingo, and other similar games, as well as card games that are explicitly authorized by the state; however, it does not include any banking card games, such as baccarat, chemin de fer, blackjack, electronic or electromechanical facsimiles of the same or slot machines. § 2703(7). Class II gaming may be operated in a state that permits such gaming for any purpose. § 2710(b)(1). Class III gaming includes all types of games that do not fall within Classes I or II, § 2703(8), and Class III games are the types of games that the states generally regulate most heavily and may be operated only pursuant to a tribal-state compact, § 2710(d).

But what does that phrase, judicial independence, really mean? We can determine its meaning, in part, by what it was designed to accomplish. For example, judicial independence is essential in a tripartite system of government where the judicial branch is to act as a check on the two political branches—executive and legislative. All would agree that judicial independence is a pillar of American jurisprudence that implies that courts should be trusted to issue decisions based on a rule of law, rather than permitting pressures from extra judicial sources to drive their decisions. Judicial independence requires a high level of judicial integrity and courage to make the "tough decisions," without being affected by political favors or reprisals. The integrity of the court as an institution is critical when the surrounding political context in which a case arises is highly charged or when the other branches of government are under particularly strong political pressure in regard to the issues a case presents.

¶ 294. Judicial independence is often described as being of two general types: decisional independence and institutional independence. Eli M. Salzberger, *A Positive Analysis of the Doctrine of Separation of Powers, or: Why Do We Have an Independent Judiciary?*, 13 Int'l Rev. L. & Econ. 349, 351–52 (1993) [hereinafter *A Positive Analysis of the Doctrine of Separation of Powers*].

¶ 295. Decisional independence is adherence to the rule of law in individual cases, such that decisions of a court or an individual judge are not affected by the demands of another branch of government or by political agendas. *Id.* "[A]n independent judiciary requires also that [its] decisions, once given, would not be altered or ignored by the government (responsible to enforce them)." *Id.* at 352.

163

¶ 296. Institutional independence focuses on independence of the entire judicial branch of government from the legislative and executive branches. It is most often associated with the separation of powers doctrine, though in reality both decisional and institutional independence have separation of powers qualities. For example, the legislature may enact a statute that affects the functioning of courts as an institution. *See State v. Holmes,* 106 Wis. 2d 31, 41–47, 315 N.W.2d 703 (1982) (concluding that Wis. Stat. § 971.20(5) (1979–80), which provides for the preemptory right of substitution of judges, is constitutional because the statute was enacted in an area of shared power). Or, the legislature may enact a statute that effectively overrules an individual supreme court decision. *See Verdoljak v. Mosinee Paper Corp.,* 200 Wis. 2d 624, 633–34, 547 N.W.2d 602 (1996).

¶ 297. In my view, the majority opinion surrenders the decisional independence of this court to the Governor, who heads the executive branch, and is arguing against applying Article IV, Section 24 of the Wisconsin Constitution to the Tribal Nations. The majority opinion does so by overruling this court's decision in *Panzer,* where we decided that the new types of games that were added to the tribal compacts in 2003 violated the 1993 constitutional amendment and were, therefore, prohibited by the criminal laws of the State of Wisconsin. *Panzer,* 271 Wis. 2d 295, ¶¶ 96–97.

¶ 298. *Panzer* was issued on May 13, 2004. That decision was subject to a motion for reconsideration for 20 days from May 13, 2004. Wis. Stat. § (Rule) 809.64. A motion for reconsideration made more than 20 days after a decision of the supreme court is not timely and will not be heard. *Lobermeier v. Gen. Tel. Co. of Wis.,* 120 Wis. 2d 419, 421–22, 355 N.W.2d 531 (1984). No

motion for reconsideration was made in *Panzer*.[8] My research shows that no appeal was filed in any federal court. Therefore, the issue of whether the new types of games that were added to the compacts in 2003 could be lawfully operated in Wisconsin is not subject to further review, unless it were an issue in a case that was subsequently before us.

¶ 299. The summary judgment dismissing Dairyland's complaint was granted by the circuit court in 2001. That decision did not involve the issue of whether the new types of games that were added to the compacts in 2003 were prohibited by Article IV, Section 24 of the Wisconsin Constitution and the criminal code of Wisconsin. The circuit court decision could not have reviewed the new types of games that were added in 2003 because those facts were not then in existence for the circuit court to address.

¶ 300. The majority opinion's decision to overrule our holding in *Panzer* is the culmination of an ongoing effort by the executive branch to undermine the judicial independence of this court in regard to Indian gaming compacts. To explain: shortly after our decision in *Panzer* was released, the executive branch of Wisconsin government sent out a clear message that it would not enforce our decision.[9] All of the Tribal Nations that have gaming compacts, except one, the Ho-Chunk Nation,[10] have picked up on this message and, subsequent to our decision in *Panzer*, they have continued to

---

[8] The records at the clerk of the supreme court show that the court file in *Panzer* was closed on July 13, 2004, without the filing of a motion for reconsideration.

[9] *See Oneida Nation Pays State $20 Million,* Capital Times, June 30, 2004, at 5A.

[10] I sincerely appreciate the respect shown to *Panzer v. Doyle,* 2004 WI 52, 271 Wis. 2d 295, 680 N.W.2d 666 by the

operate games that, according to *Panzer,* violate the criminal laws of Wisconsin.

¶ 301. The Governor, as the head of the executive branch of Wisconsin government, is charged by Article V, Section 4 of the Wisconsin Constitution,[11] with enforcing the laws. Notwithstanding this constitutional obligation and the oath the Governor took upon entering office, the Governor has done nothing to enforce our 2004 decision in *Panzer.* To the contrary, the types of games we concluded were unlawful in Wisconsin in our 2004 decision are operated with the full knowledge and consent of the Governor. In my view, the failure of the Governor to enforce the law is exactly the type of undercutting of judicial independence that Eli Salzberger cautioned against at the 1993 International Conference when he said, "an independent judiciary requires also that [its] decisions, once given, would not be altered or ignored by the government." *A Positive Analysis of the Doctrine of Separation of Powers,* at 352.

¶ 302. The executive branch's public lack of respect for the decisions of this court also undermines our tripartite system of government, which was created with checks and balances among the three branches of government. Judicial independence is required to sustain those checks and balances. We magnify the executive branch's lack of respect for the courts as an independent branch of government necessary to a tripartite system of government when we disregard our

Ho-Chunk Nation. It is the type of mutual respect between the courts of the Tribal Nations and the courts of Wisconsin we sought to facilitate through the State Court/Tribal Court Forum, first begun in 1997.

[11] Article V, Section 4 provides in relevant part:

The governor . . . shall take care that the laws be faithfully executed.

own rules and contort the law in order to achieve a particular result, as the majority does here.

¶ 303. There are methods by which to affect a decision of this court that do not impair the court's independence. For example, if the Governor really thought that this court's decision in *Panzer* was not in accord with Article IV, Section 24 of the Wisconsin Constitution, he could have asked the legislature to introduce a further constitutional amendment to specify that Indian gaming compacts are not within the scope of the constitutional prohibition contained in Article IV, Section 24. However, when the majority opinion takes up an issue that we previously decided and places it in a case where the issue never existed, we assist the Governor in tearing apart the institutional integrity of this court. A court that lacks institutional integrity does not establish a rule of law; rather, it establishes only the personal preferences of the men and women who hold office on the court at any given time.

B. Impairment of Contract

¶ 304. The majority opinion relies mainly on its interpretation of Article I, Section 10 of the U.S. Constitution. *See* majority op., ¶¶ 2, 51–59, 69–79. However, with no discussion except to assert that "our prior decisions [regarding Contract Clause issues] have relied upon the decisions of the United States Supreme Court," the majority refers to Article I, Section 12 of the Wisconsin Constitution. Majority op., ¶ 51. Neither constitution protects the new types of games that were added in 2003.

1. Wisconsin Constitution, Article I, Section 12

¶ 305. The Governor enters into compacts with the Tribal Nations on behalf of the State. The Wiscon-

167

sin Constitution does not protect the State from impairing its own contractual obligations *to itself*, although it could potentially protect another party who had a contract with the State. Article I, Section 12 of the Wisconsin Constitution protects the contractual obligations of *other* contracting parties to be free from interference *by the State*. Article I, Section 12 provides:

> No bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed . . . .

It makes no sense to say that the State of Wisconsin can claim that its own obligation of contract that is protected by one provision in the Wisconsin Constitution is unconstitutionally impaired by another provision of the Wisconsin Constitution. Essentially, the State would have to claim that it is interfering with itself.[12] Yet this is the conclusion the majority opinion reaches. Majority op., ¶ 2. No citations to legal authority are given to support this conclusion.

### 2. United States Constitution, Article I, Section 10

¶ 306. I begin by setting out a basic principle of Article I, Section 10 discussions:

> Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State "to safeguard the vital interests of its people."

*Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983) (quoting *Home Bldg. &*

---

[12] While the Tribal Nations might have been able to make this argument, the Tribal Nations have chosen not to be parties to this lawsuit.

*Loan Ass'n v. Blaisdell,* 290 U.S. 398, 434 (1934)). My discussion employs this principle to come to three conclusions: (1) a contract that permits gambling is not the type of contract that Article I, Section 10 protects; (2) there is no contractual obligation to agree to new types of games that were not permitted under the 1991–92 compacts; therefore, there can be no impairment of a contractual obligation in that regard; and (3) even if I were to assume that gambling contracts are of a type that potentially could be protected under Article I, Section 10 and also assume that there is an obligation to contract for additional types of games, Article IV, Section 24 of the Wisconsin Constitution does not run afoul of the U.S. Constitution because the State of Wisconsin has a significant and legitimate public purpose in controlling the scope of gambling within its boundaries.

¶ 307. The majority opinion concludes that Article IV, Section 24 of the Wisconsin Constitution, as interpreted in *Panzer* to prohibit expansion of the types of gambling beyond that contracted for in 1991–92, violates Article I, Section 10 of the U.S. Constitution. Majority op., ¶ 2.

a. *There is no protection for gambling contracts under Article I, Section 10 of the U.S. Constitution.*

¶ 308. The first question that must be answered in any case where constitutional protection is sought for a contract under Article I, Section 10 of the U.S. Constitution is whether the contract is of a type for which constitutional protection potentially could be afforded. *See Gen. Motors Corp. v. Romein,* 503 U.S. 181, 187 (1992). The answer to this question is determined by the application of federal law. *See id.* As the United States Supreme Court explained, whether a contract comes within the scope of those contracts to

169

which Article I, Section 10 applies is an issue that underlies the oft-repeated question of whether a change in state law resulted in a substantial impairment of a contractual obligation. *See id.* at 186. This question must be answered in the negative in the case before us, and that answer should be decisive of the impairment of contract question as it relates to the United States Constitution.

¶ 309. I begin with the federal constitutional provision, Article I, Section 10. It states in relevant part:

> No state shall . . . pass any . . . law impairing the obligation of contracts . . . .

The above statement seems broad and absolute. However, it has *never* been interpreted by the United States Supreme Court to preclude a state from legislating to protect the public health or morals, regardless of what terms a contract with a state contains.[13] *Stone v. Mississippi,* 101 U.S. 814, 818 (1879).

¶ 310. In *Stone,* the legislature of Mississippi granted a charter to a company to run a lottery for 25 years in consideration for a stated sum of cash and annual payments of additional sums. *Id.* at 817. One year later, the citizens of the State of Mississippi adopted a constitutional provision that declared that the legislature could not authorize any lottery and therefore, the lottery had to be discontinued. *Id.* at 819. In its analysis, the Supreme Court explained that when an impairment of contract argument is made, the first

---

[13] While a state's police power may be exercised in many substantive areas, no case cited in the majority opinion, or that I could find, holds that Article I, Section 10 of the U.S. Constitution provides protection when the contract at issue is affected by a state law that regulates in the area of public morals.

inquiry is always "whether a contract has in fact been entered into, and if so, what its obligations are." *Id.* at 817. The Supreme Court set the inquiry as "whether the State of Mississippi, in its sovereign capacity, did by the charter now under consideration bind itself irrevocably by a contract to permit [the lottery] for twenty-five years." *Id.* The Court concluded that the language of the charter was clear so that the question of whether the state had bound itself turned on whether the legislature had the "authority" to bind the state and its people to the charter. *Id.* In concluding that the legislature had no such authority, the Court explained that "the legislature cannot bargain away the police power of a State. . . . [N]o legislature can curtail the power of its successors to make such laws as they may deem proper in matters of police." *Id.* at 817–18. In defining what comes within the "police power" of a state, the Court explained that while the police power has been defined in many ways, it always "extends to all matters affecting the public health or the public morals. Neither can it be denied that lotteries are proper subjects for the exercise of this power." *Id.* at 818 (citation omitted). In concluding that the State of Mississippi could not bargain away its right to prohibit lotteries in the future, the court explained:

> [that whether] the legislature of a State can, by the charter of a lottery company, defeat the will of the people, authoritatively expressed, in relation to the further continuance of such business in their midst[,] [w]e think it cannot. No legislature can bargain away the public health or the public morals.

*Id.* at 819.

¶ 311. This same limitation on the authority of a state to contract away its police power in the regulation of public morals was addressed in *Douglas v. Kentucky,*

168 U.S. 488 (1897). In *Douglas,* the State of Kentucky, by constitutional provision, forbade the operation of lotteries. *Id.* at 489. Douglas claimed he had a contractually "vested right" to operate a lottery by virtue of a written agreement with the City of Frankfort, *id.* at 492, "which the State was forbidden by the Constitution of the United States" from impairing, *id.* at 495. One of the initial issues the Court addressed in analyzing Douglas's impairment of contract claim was, "whether that which the defendant asserts to be a contract was a contract of the class to which the Constitution of the United States refers." *Id.* at 500. Because the regulation of gambling is a regulation affecting public morals, which regulation a state always has the power to effect, the Supreme Court concluded that a contract to operate a lottery was not the type of contract that falls within the scope of Article I, Section 10.

> [W]e hold that *a lottery grant is not, in any sense, a contract within the meaning of the Constitution of the United States,* but is simply a gratuity and license, which the State, under its police powers, and for the protection of the public morals, may at any time revoke, and forbid the further conduct of the lottery; and that no right acquired during the life of the grant, on the faith of or by agreement with the grantee, can be exercised after the revocation of such grant and the forbidding of the lottery, if its exercise involves a continuance of the lottery as originally authorized. *All rights acquired on the faith of a lottery grant must be deemed to have been acquired subject to the power of the State . . . .*

*Id.* at 502–03 (emphasis added).

¶ 312. The retention by the sovereign of its authority to exercise its police power in matters of public morals and safety, notwithstanding an assertion of

contract rights to curtail the sovereign, was strongly reaffirmed in *Atlantic Coast Line Railroad Co. v. City of Goldsboro*, 232 U.S. 548 (1914):

> [I]t is settled that neither the "contract" clause nor the "due process" clause has the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and *is inalienable even by express grant;* and that all contract and property rights are held subject to its fair exercise.

*Id.* at 558 (emphasis added).

¶ 313. The principles of constitutional interpretation that were laid down in *Stone, Douglas* and *Atlantic Coast Line* were reaffirmed by the United States Supreme Court in *United States v. Winstar Corp.*, 518 U.S. 839 (1996). *Winstar* involved a claim that the United States was contractually obligated to permit financial institutions to use special accounting methods that were authorized in exchange for the institutions' assumption of liabilities of other failed financial institutions, despite changes made in the law under FIRREA.[14] *Id.* at 843, 858–61. Winstar argued, among other things, that the passage of FIRREA violated its rights under Article I, Section 10 of the U.S. Constitution. *Id.* at 860.

¶ 314. In reviewing the common law history of the ability of one session of Congress to undo what an earlier session had provided, the Supreme Court explained the "unmistakability doctrine," which has been

---

[14] "FIRREA" is the Financial Institutions Reform, Recovery, and Enforcement Act of 1989. *United States v. Winstar Corp.*, 518 U.S. 839, 856 (1996).

used where the regulations at issue affected economic interests. *Id.* at 871–80. This doctrine permitted the court to side-step the effect of Article I, Section 10 on the claimed contract right by concluding that absent an unmistakable provision to the contrary, "contractual arrangements, including those to which a sovereign itself is a party, 'remain subject to subsequent legislation' by the sovereign." *Id.* at 877 (quoting *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52 (1986)).

¶ 315. *Winstar* explained that the unmistakability doctrine was not universally applied because of "the different kinds of obligations the Government may assume and the consequences of enforcing them." *Winstar,* 518 U.S. at 880. *Winstar* noted that at times a variant of the unmistakability doctrine was referred to as the "reserved powers doctrine," wherein "a state government may not contract away 'an essential attribute of its sovereignty.' " *Id.* at 888 (citing *U.S. Trust Co. of New York v. New Jersey,* 431 U.S. 1, 23 (1977)). *Winstar* went on to explain that "a classic example" of the limitations on a state's ability to contract for certain provisions was shown by *Stone* where the Supreme Court held that the legislature had no power to contract away the sovereign's police power in areas affecting public morals. *Winstar,* 518 U.S. at 888. Furthermore, as the Court held in *U.S. Trust:*

> [The doctrine of reserved powers] requires a determination of the State's power to create irrevocable contract rights in the first place, rather than an inquiry into the purpose or reasonableness of the subsequent impairment. In short, the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty.

*U.S. Trust,* 431 U.S. at 23.

174

¶ 316. The Indian gaming compacts are contracts to permit gambling, pure and simple. Article IV, Section 24 of the Wisconsin Constitution and the criminal laws contained within ch. 945 of the Wisconsin Statutes prohibit gambling. Laws that affect gambling of any type operate in regard to public morals and are enacted pursuant to the police powers of the State of Wisconsin. *City of Milwaukee v. Milwaukee Amusement, Inc.,* 22 Wis. 2d 240, 250–51, 125 N.W.2d 625 (1964).

¶ 317. In *Milwaukee Amusement,* we examined a city's action to collect a forfeiture from Milwaukee Amusement because its pinball machines violated the city's anti-gambling ordinance. *Id.* at 246. After concluding that the pinball machines were a gambling device, we addressed Milwaukee Amusement's contention that the ordinance was unlawful. *Id.* at 251. In concluding that the ordinance was valid, we clearly explained that the regulation of gambling by a governmental body was done in the exercise of the police power.

> Ordinances, such as the instant one, proscribing gambling devices are enacted pursuant to the city's police power. Estoppel will not lie against a municipality so as to bar it from enforcing an ordinance enacted pursuant to the police power.

*Milwaukee Amusement,* 22 Wis. 2d at 253 (citation omitted). Also in *Wisconsin Bingo Supply & Equipment Co. v. Wisconsin Bingo Control Board,* 88 Wis. 2d 293, 276 N.W.2d 716 (1979), while addressing a challenge to a statute that permanently barred gambling promoters from obtaining a bingo supplier license, we explained that the statute was enacted in the legislature's exercise of its police power:

175

> [A] state may make any reasonable classification which it deems necessary to the police purpose intended to be attained by the legislation . . . .

*Id.* at 307 (citation omitted).

¶ 318. By adopting the Governor's argument on impairment of contract, the majority abrogates the State of Wisconsin's sovereign police power to regulate gambling within its jurisdiction. Even though this is a federal question that is to be decided based on precedent of the United States Supreme Court, the majority opinion ignores this precedent.[15] As the Supreme Court explained in *Marvin v. Trout,* 199 U.S. 212 (1905):

> The plain object of this legislation is to discourage, and, if possible, prevent gambling. . . . We are aware of no provision in the Federal Constitution which prevents this kind of legislation in a State for such a purpose.

*Id.* at 225.

¶ 319. We are required to follow the precedent set by the United States Supreme Court on questions of federal law, such as the meaning of a provision of the United States Constitution. *Webster,* 114 Wis. 2d at 426 n.4. And as I noted earlier, it is a question of federal law whether a contract has been created that is of a type that potentially could be protected by the United States Constitution. *Gen. Motors,* 503 U.S. at 187. The Court has consistently held that a state cannot create a binding contract to which Article I, Section 10 protections attach when the subject matter of the contract

---

[15] Instead of analyzing the cases cited above or other cases it deems controlling on this question, the majority opinion simply cites one paragraph from a commentator, James M. McGoldrick, Jr. Majority op., ¶ 53. However, McGoldrick does not dispute that when a state exercises its police power to regulate public morals, Article I, Section 10 does not apply.

comes within the scope of the state's legislation in areas affecting public morals, as does gambling. *Winstar,* 518 U.S. at 888; *U.S. Trust,* 431 U.S. at 23; *Atlantic Coast Line,* 232 U.S. at 558; *Marvin,* 199 U.S. at 225; *Douglas,* 168 U.S. at 502–03; *Stone,* 101 U.S. at 819.

¶ 320. The contract provisions the Governor seeks to protect pertain to the operation of certain types of gambling and the potential for amendment of the compact to add additional types of gambling. State action in regard to gambling is within the state's sovereign police power; this right cannot be abrogated by contract, now or in the future. *Stone,* 101 U.S. at 819. Therefore, it does not matter whether the court examines the contracts as a whole, as the majority does, or whether the court examines the contracts in regard to the new provisions that affect the types of games permitted. They are contracts that affect public morals and therefore, the U.S. Constitution does not afford protection to them.

¶ 321. The majority opinion puts the cart before the horse, when it relies on *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234 (1978), *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400 (1983), *U.S. Trust Co.* and *Wisconsin Professional Police Ass'n v. Lightbourn,* 2001 WI 59, 243 Wis. 2d 512, 627 N.W.2d 807 for its impairment of contract analysis. Majority op., ¶¶ 55–58. As explained above, those cases, with the exception of a portion of *U.S. Trust Co.* that the majority opinion chooses to ignore,[16] have no

---

[16] *United States Trust Co. of New York v. New Jersey,* 431 U.S. 1 (1977), explains, "The initial inquiry concerns the ability of the State to enter into an agreement that limits its power to act in the future. . . . In short, the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty." *Id.,* 431 U.S. at 23. The

application to the initial contract question presented here. Accordingly, the majority opinion errs when it concludes that Wisconsin has bargained away its sovereign right to establish the types of gambling that are prohibited within its borders.[17]

¶ 322. In countering the conclusion that the State maintains its sovereign authority under its police power to legislate in areas affecting public morals, the majority opinion asserts that the State has no jurisdiction to enforce its criminal laws on tribal land unless such jurisdiction has been granted by the federal government. Majority op., ¶ 73. I have no quarrel with this assertion; however, it has absolutely no relevance to whether the State of Wisconsin can enforce its criminal laws that prohibit gambling on tribal land. The compacts themselves recognize the authority of the State to enforce the State's criminal laws in regard to gambling on tribal land.

XVIII. ALLOCATION OF JURISDICTION

. . .

B. Criminal jurisdiction.

1. The State, except as provided in par. B.2. and sec. XXIII, shall have jurisdiction to prosecute such crimi-

---

court also explained that the inability of a state to limit its own sovereign powers depended on the subject matter of that limitation. For example, in areas of public morals, the state could not create a binding contract that gave up its power to act in the future, but a state could enter into effective financial contracts that will restrict future state action. *Id.* at 23–27.

[17] Only if the contract is of a type that may be protected by the United States Constitution, does the analysis shift to whether there has been a substantial impairment of a contractual obligation. *Gen. Motors Corp. v. Romein,* 503 U.S. 181, 186 (1992).

nal violations of its gambling laws, including amendments thereto, as may occur on tribal lands. This jurisdiction may be exercised in a similar manner as the State exercises general criminal jurisdiction pursuant to Public Law 280, 18 U.S.C. section 1162. Consent of the Attorney General of Wisconsin shall be a condition precedent to commencement of any prosecution. This provision shall not survive the term and termination of this Compact.

Forest County Potawatomi Community of Wisconsin and State of Wisconsin Gaming Compact of 1992 (1992 Gaming Compact), Section XVIII, B. 1.

b. *The 1991–92 compacts created no contractual obligation to add new types of gambling.*

¶ 323. The majority opinion also *assumes* that the compacts contain an obligation to amend the compacts to permit the addition of new types of gambling that were not permitted under the 1991–92 compacts. Majority op., ¶ 82. The majority then assumes that the application of Article IV, Section 24 of the Wisconsin Constitution to the compacts impairs this obligation of contract contrary to Article I, Section 10 of the U.S. Constitution. Majority op., ¶ 91.

¶ 324. The majority opinion's assumptions are incorrect. It misses the first step in basic contract analysis, which is: did the 1991–92 compacts create a contractual obligation to add new types of games? The creation of a property right in a contract is determined under state law. *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 519 (1987) (Rehnquist, C.J., dissenting). Under Wisconsin law, an agreement to reach an agreement in the future imposes no contractual obligation on either party. *Dunlop v. Laitsch,* 16 Wis. 2d 36, 42, 113 N.W.2d 551 (1962). In order to have a contractual right, the parties' agreement must be

179

"definite" and "certain." *Petersen v. Pilgrim Village,* 256 Wis. 621, 624–25, 42 N.W.2d 273 (1950). However, the 1991–92 compacts create no contractual obligation to amend the compacts to add new types of gambling because no provision creates a "definite and certain" obligation in that regard. The majority opinion ignores this basic principle of contract law, i.e., it never concludes that the State had a contractual obligation to add any new types of games to those that are listed in the 1991–92 compacts.

¶ 325. To explain why there is no obligation to add new types of games, I review the compact provisions that conceivably could be interpreted to relate to amending the types of Class III gambling that were permitted in the 1991–92 gaming compacts:

IV. AUTHORIZED CLASS III GAMING.

. . .

B. The Tribe may not operate any Class III gaming not expressly enumerated in this section of this Compact unless this Compact is amended pursuant to section XXX.

1992 Gaming Compact, Section IV, B.

XXX. AMENDMENT.

This Compact shall not be modified, amended or otherwise altered without the prior written agreement of both the State and the Tribe.

*Id.,* Section XXX. These provisions are too indefinite to create a contractual obligation to add additional types of games. For example, Section IV. B. of the compacts is a prohibitory provision that *expressly restricts the types of gambling* that the Tribe may offer. It says that the

180

Tribe cannot operate any type of Class III gambling that is not "expressly enumerated" in Section IV of the compact. It creates no state obligation to permit any new type of game, and it creates no tribal obligation to operate any type of game that is not listed in Section IV.

¶ 326. Section XXX provides that only written alterations of the compact that are signed by both the State and the Tribe are binding. It is a standard clause in most written contracts. Neither Section IV nor Section XXX is a definite provision that creates an obligation to add new types of games in the future; therefore, neither provision could give rise to a breach of contract action in that regard. At most, those sections imply, but do not even promise, the possibility of mutually agreeing upon other unspecified games in the future. Those provisions do not create a contractual obligation to add additional types of games. As we have explained:

> To be enforceable a contract must be definite and certain as to its basic terms and requirements. It must spell out the essential commitments and the obligations of each party with reasonable certainty.

*Witt v. Realist, Inc.,* 18 Wis. 2d 282, 297, 118 N.W.2d 85 (1962); *see also Shetney v. Shetney,* 49 Wis. 2d 26, 39–40, 181 N.W.2d 516 (1970) (concluding that discussions between the parties that they would mutually assist one another in continuing their educations were insufficient to spell out a contractual obligation to do so).

¶ 327. That the amendment provisions of the compacts are too vague to create an enforceable obligation is important because in order to have an impairment of contract claim, there must be a *contract obligation under state law and federal law that is being impaired. See Horwitz-Matthews, Inc. v. City of Chi-*

*cago,* 78 F.3d 1248, 1250 (7th Cir. 1996). Article I, Section 10 of the U.S. Constitution speaks to interference with contract *obligations.* As the United States Supreme Court has explained, when a court is faced with a claim of impairment of a constitutional guarantee, "we begin by identifying the precise contractual right that has been impaired." *Keystone Bituminous Coal,* 480 U.S. at 504. There is no "precise contractual right" to add any new types of games to those included in the 1991–92 compacts.

¶ 328. The "obligation of contracts," to which Article I, Section 10 of the U.S. Constitution refers, has been described as having two parts: (1) the obligation to perform the terms of the contract; and (2) the obligation to pay damages due to nonperformance. *Horwitz-Matthews,* 78 F.3d at 1251 (citing Oliver Wendell Holmes, "The Path of the Law," 10 Harv. L. Rev. 457, 462 (1897)). Therefore, in order to have a claim under the constitution for "impairment" of an "obligation of contracts," the state law that prevents performance must also prevent a remedy for the breach of nonperformance. *Horwitz-Matthews,* 78 F.3d at 1251 (citing *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1016 (1984) (concluding that in order to have a takings claim under the United States Constitution, there must be no ability to maintain a suit for compensation against the government)). As the United States Court of Appeals for the Seventh Circuit so clearly explained:

> [W]hen a state repudiates a contract to which it is a party it is doing nothing different from what a private party does when the party repudiates a contract; it is committing a breach of contract. It would be absurd to turn every breach of contract by a state or municipality into a violation of the federal Constitution.

*Horwitz-Matthews,* 78 F.3d at 1250.

¶ 329. What is apparent from the discussion above is that even if one were to assume, arguendo, that refusing to add a new type of game after the term of the 1991–92 compacts expired was a breach of the tribal compacts, that fact cannot form the basis for a constitutional claim of interference with a contractual obligation unless the State has prevented the Tribal Nations from recovering damages for the breach. However, the circuit court, whose summary judgment we are reviewing, made no determination about whether the State breached its contract with the Tribal Nations by enacting Article IV, Section 24 of the Wisconsin Constitution; the circuit court made no determination about the damages for a breach. However, before an impairment of contract claim will lie, there must be a breach of contract and a preclusion of damages for that breach. *Horwitz-Matthews*, 78 F.3d at 1251.

¶ 330. Nevertheless, in order to permit the expansion of Indian gambling, the majority opinion completely ignores basic precepts of constitutional law. It never explains how the State became obligated to the Tribal Nations to permit additional games or what those games are. In addition, because we are reviewing a 2001 decision of the circuit court, the majority opinion could not identify whether the State has breached its contract with the Tribal Nations and yet it concludes that Article IV, Section 24 of the Wisconsin Constitution interferes with a contractual obligation under the U.S. Constitution. As we have explained above, before there can be an interference with a contract within the meaning of Article I, Section 10 of the U.S. Constitution, there must be an "obligation"; there must be a breach of that obligation; and the State must have precluded a remedy for the breach. None of those conditions has occurred here.

183

c. *Controlling the scope of gambling in Wisconsin is a significant and legitimate public purpose.*

¶ 331. And finally, even if I were willing to ignore all the foundational requirements for the commencement of an impairment of contract analysis set out above and move into the majority opinion's three-part analysis, Article IV, Section 24 of the Wisconsin Constitution does not run afoul of the United States Constitution for at least two reasons: (1) Article IV, Section 24 does not operate as "a substantial impairment"; and (2) the State has a "significant and legitimate public purpose" behind its prohibition of all types of gambling. *Energy Reserves,* 459 U.S. at 411.

¶ 332. When we evaluate whether a state law constitutes a substantial impairment of a contract right, we are "to consider whether the [] (enterprise) the complaining party has entered has been regulated in the past." *Id.* (citing *Allied Structural,* 438 U.S. at 242 n.13.)

> When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic.

*Energy Reserves,* 459 U.S. at 411 (quoting *Veix v. Sixth Ward Bldg. & Loan Ass'n,* 310 U.S. 32, 38 (1940)).

¶ 333. Here, gambling has long been subject to prohibition under the criminal laws of Wisconsin. The Tribal Nations acknowledge in the compacts that the State may enforce its criminal gambling statutes on tribal lands. Therefore, there has always been an expectation that the "enterprise" of gambling could be subject to further legislation. In addition, as we explained above, the Tribal Nations could not mount a breach of

184

contract action against the State if the Governor chose not to agree to additional types of games. Therefore, the prohibition of new types of games is not a substantial impairment of an enforceable right.

¶ 334. In addition, the State has a "significant and legitimate public purpose" behind Article IV, Section 24 of the Wisconsin Constitution, which prohibits compacting for types of games that were not permitted in the 1991–92 compacts. The State's prohibition is done in the exercise of its police power in the area of public morals, which is always a legitimate subject for state laws. *Douglas,* 168 U.S. at 502–03. Therefore, even if I were to employ the contracts clause analysis the majority opinion sets out, Article IV, Section 24 is not in conflict with Article I, Section 10 of the U.S. Constitution.

¶ 335. The majority opinion justifies its reversal of our decision in *Panzer* by asserting that the contract impairment argument was not discussed in *Panzer.* Majority op., ¶ 94. It laments, "We find it disingenuous that some members of the *Panzer* majority refused to reach the Contract Clause analysis that was properly before it, and now criticize the *Dairyland* majority opinion for deciding the issue." *Id.* The majority opinion is recreating history as it would like it to be, rather than as it was. *The contract impairment issue was never before the court in Panzer. Panzer,* 271 Wis. 2d 295, ¶ 102. No party briefed or argued contract impairment in *Panzer;* therefore, we did not decide it. As various members of this court have said, we should not "reach out and decide issues" that were not presented to the court by the parties. *Town of Beloit v. County of Rock,* 2003 WI 8, ¶ 72, 259 Wis. 2d 37, 657 N.W.2d 344 (Abrahamson, C.J., dissenting). However, in *Panzer,* the dissent did not follow that rule. Instead, it created and then decided the contract impairment issue, without

185

the benefit of briefing or argument. *Panzer,* 271 Wis. 2d 295, ¶¶ 210–218 (Abrahamson, C.J., dissenting).

¶ 336. *Panzer* turned on whether the Governor had the power to enter into compacts for types of games that were not included in the 1991–92 compacts. We concluded that the constitutional amendment, Article IV, Section 24 of the Wisconsin Constitution, withdrew that power from both the legislature and the Governor. *Panzer,* 271 Wis. 2d 295, ¶¶ 83–86, 96–97. Based on this lack of power to validly compact for the new types of games that were added in the 2003 compacts, we concluded those games were unlawful. *Id.,* ¶ 96. The majority opinion never overrules this holding of *Panzer.* Majority op., ¶ 80 n.61.

¶ 337. In the case before us, no party has argued that the people of Wisconsin, by enacting the 1993 constitutional amendment, did not withdraw from the legislature and the Governor the power to authorize new types of gambling. All that has been argued is that invalidating the new types of games added in 2003 would violate Article I, Section 10 of the U.S. Constitution and Article I, Section 12 of the Wisconsin Constitution. The majority opinion ignores the *Panzer* limitation on the power of the Governor as though it were the same issue as whether the State has a contractual obligation to add new types of games. Analytically, the two issues are very different. *Compare Panzer,* 271 Wis. 2d 295, ¶¶ 83–102 with ¶¶ 304–34 of this concurrence/dissent. Accordingly, because I do not agree with the analysis set out in the majority opinion or its decision to overrule *Panzer,* I respectfully dissent.

### III. CONCLUSION

¶ 338. In 2004, we decided the effect of the 1993 constitutional amendments on the new types of games

that were added to the Indian gaming compacts in 2003; the new games violate Wisconsin's criminal statutes. *Panzer*, 271 Wis. 2d 295, ¶ 96. The decisions of this court are final, if not set aside on a motion for reconsideration made within 20 days in the case in which the ruling was issued, Wis. Stat. § 809.64, or overturned by a federal court on a federal question, *see Lobermeier*, 120 Wis. 2d at 421–22; *Webster*, 114 Wis. 2d at 426 n.4. The Governor exercised neither option, but instead he asserts that Article IV, Section 24 of the Wisconsin Constitution, enacted by the people of Wisconsin, cannot be applied to the Tribal Nations that have gambling operations in Wisconsin.

¶ 339. The majority opinion adopts the view of the Governor, wherein he argues on behalf of the Tribal Nations that Article IV, Section 24 of the Wisconsin Constitution cannot be applied to Indian gambling operations in Wisconsin. I conclude that the majority opinion is in error because: (1) in acceding to the Governor's request on behalf of the Tribal Nations, the majority opinion surrenders this court's judicial independence so necessary to protect the people of Wisconsin in a tripartite system of government; (2) the gaming compacts are not the type of contract that is protected by either Article I, Section 12 of the Wisconsin Constitution or Article I, Section 10 of the U.S. Constitution; (3) there is no obligation to contract for new types of games that were not permitted under the 1991–92 compacts; therefore, there can be no impairment of a contractual obligation in that regard; and (4) the State has a significant and legitimate public purpose in controlling the type of gambling that occurs within Wisconsin's borders, which Article I, Section 10 does not affect.

¶ 340. I am authorized to state that Justices JON P. WILCOX and DAVID T. PROSSER join this concurrence/dissent.